UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: NO. 05-11389RBC

| | |
|---|---|
| MARK BOMBARD, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| | ) |
| VS. | ) |
| | ) |
| SHUSTER CORPORATION, SOUTHEAST | ) |
| DEVELOPMENT, CO. AND | ) |
| RDA CONSTRUCTION CO., INC., | ) |
| | ) |
| DEFENDANTS. | ) |
| | ) |
| | ) |

## DEFENDANTS SHUSTER CORPORATION AND SOUTHEAST DEVELOPMENT CO.'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### Introduction

In this case, the plaintiff seeks to recover damages for injuries that he allegedly suffered on August 2, 2002 on a wharf in New Bedford, Massachusetts. He alleges that he is a commercial diver employed by defendant RDA Construction Co., Inc. ("RDA"), and that he was employed "as a crewmember of a barge to perform work on navigable waters of the United States." (EX. 1 Amended Complaint, ¶ 4). He alleges that RDA "had chartered a barge for the purpose of using it as a work platform to construct a tower for NOAA.[1]" (EX. 1 Amended Complaint, ¶ 6). As the plaintiff was walking back from the barge to the wharf, he was injured when he jumped from a fishing vessel to the wharf, and landed on his right leg. He allegedly

---

[1] The National Oceanic Atmospheric Administration

sustained a tibia plateau fracture with a ruptured ACL as a result of the jump. (*See* EX. 4, Plaintiff's Answers to Defendant, Shuster Corporation's First Set of Interrogatories, nn. 2, 16.)

The plaintiff asserts a Jones Act claim against RDA, and common law negligence claims against Shuster Corporation ("Shuster") and Southeast Development Corporation Co., LLC ("Southeast"). He alleges that Shuster and Southeast "owned and was in control of Shuster's Wharf" (EX. 1 Amended Complaint, ¶¶ 12, 17) and owed a duty to provide the plaintiff "with reasonably safe ingress and egress " from the barge. (EX. 1 Amended Complaint, ¶¶ 13, 18).

Shuster and Southeast are moving for summary judgment, asserting that:

1) Shuster is entitled to summary judgment because it did not own the property near the wharf and owed no duty to the plaintiff;

2) both Shuster and Southeast are entitled to summary judgment because they did not have a duty to protect the plaintiff from the obvious danger of jumping from the fishing vessel to the dock; and

3) both Shuster and Southeast are entitled to summary judgment because the plaintiff cannot prove proximate cause.

They submit this brief in support of that motion.

### The Circumstances Surrounding the Accident

RDA was building a tower for the NOAA behind Martha's Vineyard. (EX. 2, Deposition of Eugene Kelley, pp. 22-23). As part of this project, RDA needed to move very large piles and metal fabrication work onto a barge. (EX. 2, Deposition of Eugene Kelley, p. 26). To facilitate

2

this work, RDA docked a barge in New Bedford pursuant to an agreement between RDA and Southeast. (EX. 2, Deposition of Eugene Kelley, p. 31) .

On the day of the accident, two fishing vessels were moored to the wharf. (EX. 3, Deposition of Mark Bombard, p. 73).  RDA's barge, in turn, was moored to the two fishing vessels.  (EX. 3, Deposition of Mark Bombard, p. 73). According to the plaintiff,  RDA employees would climb onto a fishing vessel by walking up a  plank that was two inches by ten inches wide, and eight to ten feet long.  (EX. 3, Deposition of Mark Bombard, p. 77, 82-83) .They would then walk to the far end of the fishing vessel and climb over a rail onto the barge. (EX. 3, Deposition of Mark Bombard, p. 82).  According to James Souza, the RDA superintendent/foreman on the job (EX. 6, Deposition of James Souza pp.10-11), RDA employees would enter and exit the fishing vessel by climbing on scuppers, notches on the sidewall of the vessel that were like a ladder. (EX. 6, Deposition of James Souza, p. 52, 68-69).

At the time of the accident, the plaintiff was crossing from the barge back to the wharf. He walked from the barge onto the fishing vessel.  Then, instead of using the plank or the scuppers to go from the fishing vessel to the wharf, he went over a railing and jumped from the fishing vessel onto the wharf, injuring his knee in the process. (*See* EX. 4,  Plaintiff's Answers to Defendant, Shuster Corporation's First Set of Interrogatories, nn. 2, 16.)

### The Alleged Agreement Between Southeast and RDA

RDA contends that Southeast or Schuster agreed to provide RDA with exclusive access to the bulkhead located near 4 Wright Avenue in New Bedford.  RDA claims that Southeast or Shuster breached this agreement because there were two fishing vessels moored to the bulkhead.

As a result, RDA could not moor its barge directly to the bulkhead; instead, it moored the barge to the fishing vessels.

Southeast and Shuster assert that the agreement was between RDA and Southeast. Furthermore, Southeast contends that it merely permitted RDA to cross its property to access a vessel; it did not provide the physical means, such as a ramp, needed to go from the property to the vessel.    (EX. 5,  Deposition of Steven Lewis Shuster, pp. 69-70).

Southeast and Shuster are moving for summary judgment because the plaintiff cannot prove his case against them, even if RDA is correct regarding the terms of the agreement between RDA and Southeast.

**Undisputed Facts Entitling Southeast and Shuster to Summary Judgment**

1. Southeast owns the building and property located at 4 Wright Street, New Bedford, Massachusetts. (EX. 5, Deposition of Steven Lewis Shuster, pp. 11-12).

2. Shuster is a manufacturer of bearings that rents space from Southeast. (EX. 5, Deposition of Steven Lewis Shuster, pp. 16-17). As a tenant, it is not involved in dockage. (EX. 5, Deposition of Steven Lewis Shuster, p. 86).

3. Southeast's property is near the New Bedford waterfront.  At the harbor, there was a bulkhead,  a wall that holds the earth from falling into the harbor. (EX. 5,  Deposition of Steven Lewis Shuster, p. 21).   Between the bulkhead and the property owned by Southeast, there is a five foot strip of land owned by the City of New Bedford. (EX. 5,  Deposition of Steven Lewis Shuster, pp. 21-22).

4

4. In order to access a vessel moored to the bulkhead, someone would have to cross the property that Southeast owned. (EX. 5, Deposition of Steven Lewis Shuster, p. 41). Southeast charges companies for crossing its property to access vessels. (EX. 5, Deposition of Steven Lewis Shuster, p. 41). Southeast does not provide the physical means to move from the land to the vessel. (EX. 5, Deposition of Steven Lewis Shuster, pp. 44, 47).

5. RDA was "responsible for getting [its] employees on and off the boats or to and from the barge by means of a gangway or another means of safe access." (EX 2, Deposition of Eugene Kelley, p. 43). In other words, it was RDA's responsibility to provide its employees with a safe means of egress and access to and from vessels. (EX 2, Deposition of Eugene Kelley, p. 68). There were many ways to get on and off safely. (EX. 2, Deposition of Eugene Kelley, p. 43).

6. According to James Souza, the RDA superintendent/foreman on the job (Deposition of James Souza pp.10-11), RDA employees would enter and exit the fishing vessel by climbing on scuppers, notches on the sidewall of the vessel that were like a ladder. (EX. 6, Deposition of James Souza, p. 52, 68-69).

7. Using the scupper holes and walking across the fishing vessel was a safe way to access the barge. (EX. 6, Deposition of James Souza, pp. 78-79).

8. The plaintiff testified that he accessed the fishing vessel by walking up a plank; when he used the plank, he was careful and did not have any trouble getting on the vessel. (EX. 3, Deposition of Mark Bombard p. 83).

9. At the time of the accident, the plaintiff was walking from the fishing boat to the wharf. Instead of walking down the plank or using the scuppers, he decided to jump over the

5

side railing onto the wharf. (EX. 3, Deposition of Mark Bombard, pp. 93-94). He put his hands on the railing and swung his legs over the railing to try to minimize the drop time. (EX. 3, Deposition of Mark Bombard, p. 99). As he was in the air, his body spun a little and he planted his right foot first. (EX. 3, Deposition of Mark Bombard, p. 99).

10. By the time of the accident, the tide had risen so that the distance between the railing of the fishing boat and the wharf had increased to six to eight feet. (EX. 3, Deposition of Mark Bombard, pp. 87, 90).

11. The plaintiff knew that jumping from a higher boat height to a lower wharf would not be a safe way to exit the vessel. (EX. 3, Deposition of Mark Bombard, pp. 36, 46-47). He knew that there were "always better means" to exit the vessel. (EX. 3, Deposition of Mark Bombard, pp. 46-47).

12. The plaintiff could have used the scupper holes to access the fishing vessel. (EX. 6, Deposition of James Souza, p.79).

13. No one ever told the plaintiff that going over the railing was an acceptable safe way to access and exit a vessel that was docked at a wharf. (EX. 3, Deposition of Mark Bombard, p. 33).

13. Once the tide rose, the plaintiff did not see anyone else go over the railing and jump from the fishing boat onto the wharf. (EX. 3, Deposition of Mark Bombard, pp. 89-90).

14. The plaintiff made a personal decision to go over the railing and that decision did not depend on the height or angle of the plank. (EX. 3, Deposition of Mark Bombard, p. 93).

6

15.  The plaintiff's co-workers were able to go  down the plank between 12 and 24 times without incident, but the plaintiff decided to go over the rail instead of following the route that his co-workers had safely taken.  (EX. 3, Deposition of Mark Bombard, pp. 96, 100).

16.  The plaintiff admitted that going over the railing "was a stupid thing to do."  (EX. 3, Deposition of Mark Bombard, p. 106).

## Argument

### Southeast and Shuster's  Motion for Summary Judgment Should Be Granted

A motion for summary judgment should be granted if there are no genuine issues of material fact and the defendant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56. Summary judgment is proper if the plaintiff cannot prove an essential element of his case. *See Smith v. Stratus Computer, Inc.,* 40 F.3d 11,12 (1st Cir. 1994) (citation omitted) ("When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law.")

In a negligence case, summary judgment is proper if the defendant did not owe a duty to prevent the plaintiff's injuries. *See Jupin v. Kask,* 447 Mass. 141, 146 (2006) (" the existence of a duty is a question of law, and is thus an appropriate subject of summary judgment") Summary judgment  is also proper if the plaintiff cannot prove proximate cause.  *See Stalelens v. Dobert,* 318 F.3d 77 (1st Cir. 2003).  In this case, Shuster is entitled to summary judgment because it did not own the property near the wharf and owed no duty to the plaintiff.  Furthermore, both

Shuster and Southeast are entitled to summary judgment because they did not have a duty to protect the plaintiff from obvious dangers and the plaintiff cannot prove proximate cause.

## A. Shuster Is Entitled To Summary Judgment Because It Did Not Own The Property In Question And Had No Agreement With RDA.

Under Massachusetts law, "[l]iability for damages caused by the condition of the premises depends upon control of the offending instrumentality, either through ownership or otherwise." *Silvia v. Woodhouse,* 356 Mass. 119, 123 (1969). The plaintiff's claim against Shuster depends on his allegation that Shuster failed to provide proper access to RDA's barge. In fact, the undisputed evidence establishes that Southeast, not Shuster, owned the property near the wharf. *See* EX. 5 Deposition of Steven Lewis Shuster, pp. 11-12, 86. Since Shuster did not own that property, it could not provide access to RDA's barge and it is entitled to summary judgment.

## B. Shuster And Southeast Are Entitled To Summary Judgment Because They Had No Duty To Protect The Plaintiff From The Obvious Danger Of Jumping From The Vessel Onto The Wharf.

Whether a defendant owes a duty of care to the plaintiff is a question of law for the court. *O'Sullivan v. Shaw,* 431 Mass. 201, 203 (2000). Under Massachusetts law, it is settled that "a landowner's duty to protect lawful visitors against dangerous conditions on his property ordinarily does not extend to dangers that would be obvious to persons of average intelligence." *Id.* at 204. *Accord Barnett v. City of Lynn,* 433 Mass. 662, 666 (2001)

That established principle bars the plaintiff's claim. The danger of jumping over a railing onto a wharf six to eight feet below is obvious to persons of average intelligence. *Compare O'Sullivan v. Shaw,* 431 Mass. at 210-211 (defendant entitled to summary judgment because danger of diving into a shallow pool was obvious) ; *Barnett v. City of Lynn,* 433 Mass. at 666

8

(defendant entitled to summary judgment because danger of sledding down snow covered stairs was open and obvious).

## C. Shuster And Southeast Are Entitled To Summary Judgment Because The Plaintiff Cannot Prove Proximate Cause.

Under Massachusetts law, the plaintiff has the burden of proving proximate cause. *See Staelens v. Dobert,* 318 F.3d 77, 79 (1st Cir. 2003). A defendant is entitled to judgment as a matter of law if the plaintiff's proof of proximate cause is speculative. *See Eurich v. Windmere Corporation,* 416 Mass. 83 (1993); *Goffredo v. Mercedes-Benz Truck Co., Inc.,* 402 Mass. 97 (1988). It is also settled that a plaintiff is bound by his own testimony regarding his subjective knowledge. *See Maldonado v. Thomson National Press Company,* 16 Mass. App. Ct. 911, 912, *review denied,* 389 Mass. 1105 (1983).

Applying these principles in this case, Shuster and Southeast are entitled to summary judgment. The plaintiff admitted in his deposition that jumping over the rail was dangerous, and that he had other alternatives available. There is no causal connection between the plaintiff's accident and Shuster and Southeast's alleged failure to provide RDA with exclusive use of the bulkhead. In fact, the plaintiff had other alternatives for reaching the wharf even though the fishing vessels were present. He could have simply used the scuppers or used the plank that he said his fellow employees had used safely several times on the day of the accident. No acts or omissions of Shuster or Southeast forced him to take the unreasonable risk of jumping over the rail. Since the plaintiff cannot prove that Shuster or Southeast's acts or omissions were a proximate cause of his injuries, Shuster and Southeast's motion for summary judgment should be granted.

**Conclusion**

For all of the foregoing reasons, defendants Shuster and Southeast respectfully submit

that their motion for summary judgment should be granted.

Defendants,
Southeast Development, Co., LLC
Shuster Corporation
By their attorneys,

/s/  Jennifer B. Hardy
Richard J. Shea, BBO #456310
Andre Sansoucy, BBO # 441410
Jennifer B. Hardy, BBO #634494
Melick, Porter & Shea, LLP
28 State Street, 22nd Floor
Boston, Massachusetts 02109
Telephone:  (617) 523-6200
Facsimile:  (617) 523-8130

Dated:  April 16, 2007

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: NO. 05-11389RBC

|  |  |
|---|---|
| MARK BOMBARD,<br><br>PLAINTIFF,<br><br>VS.<br><br>SHUSTER CORPORATION, SOUTHEAST<br>DEVELOPMENT, CO. AND<br>RDA CONSTRUCTION CO., INC.,<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS SHUSTER CORPORATION AND SOUTHEAST DEVELOPMENT CO.'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### Introduction

In this case, the plaintiff seeks to recover damages for injuries that he allegedly suffered on August 2, 2002 on a wharf in New Bedford, Massachusetts. He alleges that he is a commercial diver employed by defendant RDA Construction Co., Inc. ("RDA"), and that he was employed "as a crewmember of a barge to perform work on navigable waters of the United States." (EX. 1 Amended Complaint, ¶ 4). He alleges that RDA "had chartered a barge for the purpose of using it as a work platform to construct a tower for NOAA.[1]" (EX. 1 Amended Complaint, ¶ 6). As the plaintiff was walking back from the barge to the wharf, he was injured when he jumped from a fishing vessel to the wharf, and landed on his right leg. He allegedly

---

[1] The National Oceanic Atmospheric Administration

sustained a tibia plateau fracture with a ruptured ACL as a result of the jump. (*See* EX. 4,

Plaintiff's Answers to Defendant, Shuster Corporation's First Set of Interrogatories, nn. 2, 16.)

The plaintiff asserts a Jones Act claim against RDA, and common law negligence claims

against Shuster Corporation ("Shuster") and Southeast Development Corporation Co., LLC

("Southeast"). He alleges that Shuster and Southeast "owned and was in control of Shuster's

Wharf" (EX. 1 Amended Complaint, ¶¶ 12, 17) and owed a duty to provide the plaintiff "with

reasonably safe ingress and egress " from the barge. (EX. 1 Amended Complaint, ¶¶ 13, 18).

Shuster and Southeast are moving for summary judgment, asserting that:

1) Shuster is entitled to summary judgment because it did not own the property near the

wharf and owed no duty to the plaintiff;

2) both Shuster and Southeast are entitled to summary judgment because they did not

have a duty to protect the plaintiff from the obvious danger of jumping from the fishing vessel to

the dock; and

3) both Shuster and Southeast are entitled to summary judgment because the plaintiff

cannot prove proximate cause.

They submit this brief in support of that motion.

### The Circumstances Surrounding the Accident

RDA was building a tower for the NOAA behind Martha's Vineyard. (EX. 2, Deposition

of Eugene Kelley, pp. 22-23). As part of this project, RDA needed to move very large piles and

metal fabrication work onto a barge. (EX. 2, Deposition of Eugene Kelley, p. 26). To facilitate

this work, RDA docked a barge in New Bedford pursuant to an agreement between RDA and Southeast. (EX. 2, Deposition of Eugene Kelley, p. 31) .

On the day of the accident, two fishing vessels were moored to the wharf. (EX. 3, Deposition of Mark Bombard, p. 73).  RDA's barge, in turn, was moored to the two fishing vessels.  (EX. 3, Deposition of Mark Bombard, p. 73). According to the plaintiff,  RDA employees would climb onto a fishing vessel by walking up a  plank that was two inches by ten inches wide, and eight to ten feet long.  (EX. 3, Deposition of Mark Bombard, p. 77, 82-83) .They would then walk to the far end of the fishing vessel and climb over a rail onto the barge. (EX. 3, Deposition of Mark Bombard, p. 82).  According to James Souza, the RDA superintendent/foreman on the job (EX. 6, Deposition of James Souza pp.10-11), RDA employees would enter and exit the fishing vessel by climbing on scuppers, notches on the sidewall of the vessel that were like a ladder. (EX. 6, Deposition of James Souza, p. 52, 68-69).

At the time of the accident, the plaintiff was crossing from the barge back to the wharf. He walked from the barge onto the fishing vessel.  Then, instead of using the plank or the scuppers to go from the fishing vessel to the wharf, he went over a railing and jumped from the fishing vessel onto the wharf, injuring his knee in the process. (*See* EX. 4,  Plaintiff's Answers to Defendant, Shuster Corporation's First Set of Interrogatories, nn. 2, 16.)

### The Alleged Agreement Between Southeast and RDA

RDA contends that Southeast or Schuster agreed to provide RDA with exclusive access to the bulkhead located near 4 Wright Avenue in New Bedford.  RDA claims that Southeast or Shuster breached this agreement because there were two fishing vessels moored to the bulkhead.

3

As a result, RDA could not moor its barge directly to the bulkhead; instead, it moored the barge to the fishing vessels.

Southeast and Shuster assert that the agreement was between RDA and Southeast. Furthermore, Southeast contends that it merely permitted RDA to cross its property to access a vessel; it did not provide the physical means, such as a ramp, needed to go from the property to the vessel.   (EX. 5,  Deposition of Steven Lewis Shuster, pp. 69-70).

Southeast and Shuster are moving for summary judgment because the plaintiff cannot prove his case against them, even if RDA is correct regarding the terms of the agreement between RDA and Southeast.

### Undisputed Facts Entitling Southeast and Shuster to Summary Judgment

1. Southeast owns the building and property located at 4 Wright Street, New Bedford, Massachusetts. (EX. 5, Deposition of Steven Lewis Shuster, pp. 11-12).

2. Shuster is a manufacturer of bearings that rents space from Southeast. (EX. 5, Deposition of Steven Lewis Shuster, pp. 16-17). As a tenant, it is not involved in dockage. (EX. 5, Deposition of Steven Lewis Shuster, p. 86).

3. Southeast's property is near the New Bedford waterfront.  At the harbor, there was a bulkhead,  a wall that holds the earth from falling into the harbor. (EX. 5,  Deposition of Steven Lewis Shuster, p. 21).   Between the bulkhead and the property owned by Southeast, there is a five foot strip of land owned by the City of New Bedford. (EX. 5,  Deposition of Steven Lewis Shuster, pp. 21-22).

4

4. In order to access a vessel moored to the bulkhead, someone would have to cross the property that Southeast owned. (EX. 5, Deposition of Steven Lewis Shuster, p. 41). Southeast charges companies for crossing its property to access vessels. (EX. 5, Deposition of Steven Lewis Shuster, p. 41). Southeast does not provide the physical means to move from the land to the vessel. (EX. 5, Deposition of Steven Lewis Shuster, pp. 44, 47).

5. RDA was "responsible for getting [its] employees on and off the boats or to and from the barge by means of a gangway or another means of safe access." (EX 2, Deposition of Eugene Kelley, p. 43). In other words, it was RDA's responsibility to provide its employees with a safe means of egress and access to and from vessels. (EX 2, Deposition of Eugene Kelley, p. 68). There were many ways to get on and off safely. (EX. 2, Deposition of Eugene Kelley, p. 43).

6. According to James Souza, the RDA superintendent/foreman on the job (Deposition of James Souza pp.10-11), RDA employees would enter and exit the fishing vessel by climbing on scuppers, notches on the sidewall of the vessel that were like a ladder. (EX. 6, Deposition of James Souza, p. 52, 68-69).

7. Using the scupper holes and walking across the fishing vessel was a safe way to access the barge. (EX. 6, Deposition of James Souza, pp. 78-79).

8. The plaintiff testified that he accessed the fishing vessel by walking up a plank; when he used the plank, he was careful and did not have any trouble getting on the vessel. (EX. 3, Deposition of Mark Bombard p. 83).

9. At the time of the accident, the plaintiff was walking from the fishing boat to the wharf. Instead of walking down the plank or using the scuppers, he decided to jump over the

side railing onto the wharf. (EX. 3, Deposition of Mark Bombard, pp. 93-94). He put his hands on the railing and swung his legs over the railing to try to minimize the drop time. (EX. 3, Deposition of Mark Bombard, p. 99). As he was in the air, his body spun a little and he planted his right foot first. (EX. 3, Deposition of Mark Bombard, p. 99).

10. By the time of the accident, the tide had risen so that the distance between the railing of the fishing boat and the wharf had increased to six to eight feet. (EX. 3, Deposition of Mark Bombard, pp. 87, 90).

11. The plaintiff knew that jumping from a higher boat height to a lower wharf would not be a safe way to exit the vessel. (EX. 3, Deposition of Mark Bombard, pp. 36, 46-47). He knew that there were "always better means" to exit the vessel. (EX. 3, Deposition of Mark Bombard, pp. 46-47).

12. The plaintiff could have used the scupper holes to access the fishing vessel. (EX. 6, Deposition of James Souza, p.79).

13. No one ever told the plaintiff that going over the railing was an acceptable safe way to access and exit a vessel that was docked at a wharf. (EX. 3, Deposition of Mark Bombard, p. 33).

13. Once the tide rose, the plaintiff did not see anyone else go over the railing and jump from the fishing boat onto the wharf. (EX. 3, Deposition of Mark Bombard, pp. 89-90).

14. The plaintiff made a personal decision to go over the railing and that decision did not depend on the height or angle of the plank. (EX. 3, Deposition of Mark Bombard, p. 93).

6

15. The plaintiff's co-workers were able to go down the plank between 12 and 24 times without incident, but the plaintiff decided to go over the rail instead of following the route that his co-workers had safely taken. (EX. 3, Deposition of Mark Bombard, pp. 96, 100).

16. The plaintiff admitted that going over the railing "was a stupid thing to do." (EX. 3, Deposition of Mark Bombard, p. 106).

## Argument

### Southeast and Shuster's Motion for Summary Judgment Should Be Granted

A motion for summary judgment should be granted if there are no genuine issues of material fact and the defendant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56. Summary judgment is proper if the plaintiff cannot prove an essential element of his case. *See Smith v. Stratus Computer, Inc.,* 40 F.3d 11,12 (1st Cir. 1994) (citation omitted) ("When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law.")

In a negligence case, summary judgment is proper if the defendant did not owe a duty to prevent the plaintiff's injuries. *See Jupin v. Kask,* 447 Mass. 141, 146 (2006) (" the existence of a duty is a question of law, and is thus an appropriate subject of summary judgment") Summary judgment is also proper if the plaintiff cannot prove proximate cause. *See Stalelens v. Dobert,* 318 F.3d 77 (1st Cir. 2003). In this case, Shuster is entitled to summary judgment because it did not own the property near the wharf and owed no duty to the plaintiff. Furthermore, both

Shuster and Southeast are entitled to summary judgment because they did not have a duty to protect the plaintiff from obvious dangers and  the plaintiff cannot prove proximate cause.

## A.  Shuster Is Entitled To Summary Judgment Because It Did Not Own The Property In Question And Had No Agreement With RDA.

Under Massachusetts law, "[l]iability for damages caused by the condition of the premises depends upon control of the offending instrumentality, either through ownership or otherwise." *Silvia v. Woodhouse,* 356 Mass. 119, 123 (1969).  The plaintiff's claim against Shuster depends on his allegation that Shuster failed to provide proper access to RDA's barge. In fact, the undisputed evidence establishes that Southeast, not Shuster, owned the property near the wharf. *See* EX. 5 Deposition of Steven Lewis Shuster, pp. 11-12, 86.  Since Shuster did not own that property, it could not provide access to RDA's barge and it is entitled to summary judgment.

## B. Shuster And Southeast Are Entitled To Summary Judgment Because They Had No Duty To Protect The Plaintiff From The Obvious Danger Of Jumping From The Vessel Onto The Wharf.

Whether a defendant owes a duty of care to the plaintiff is a question of  law  for the court.  *O'Sullivan v. Shaw,* 431 Mass. 201, 203 (2000).  Under Massachusetts law, it is settled that "a landowner's duty to protect lawful visitors against dangerous conditions on his property ordinarily does not extend to dangers that would be obvious to persons of average intelligence." *Id.* at 204.  *Accord Barnett v. City of Lynn,* 433 Mass. 662, 666 (2001)

That established principle bars the plaintiff's claim.  The danger of jumping over a railing onto a wharf six to eight feet below is obvious to persons of average intelligence.  *Compare O'Sullivan v. Shaw,* 431 Mass. at 210-211 (defendant entitled to summary judgment because danger of diving into a shallow pool was obvious) ;  *Barnett v. City of Lynn,* 433 Mass. at 666

8

(defendant entitled to summary judgment because danger of sledding down snow covered stairs was open and obvious).

## C. Shuster And Southeast Are Entitled To Summary Judgment Because The Plaintiff Cannot Prove Proximate Cause.

Under Massachusetts law, the plaintiff has the burden of proving proximate cause. *See Staelens v. Dobert,* 318 F.3d 77, 79 (1st Cir. 2003). A defendant is entitled to judgment as a matter of law if the plaintiff's proof of proximate cause is speculative. *See Eurich v. Windmere Corporation,* 416 Mass. 83 (1993); *Goffredo v. Mercedes-Benz Truck Co., Inc.,* 402 Mass. 97 (1988). It is also settled that a plaintiff is bound by his own testimony regarding his subjective knowledge. *See Maldonado v. Thomson National Press Company,* 16 Mass. App. Ct. 911, 912, *review denied,* 389 Mass. 1105 (1983).

Applying these principles in this case, Shuster and Southeast are entitled to summary judgment. The plaintiff admitted in his deposition that jumping over the rail was dangerous, and that he had other alternatives available. There is no causal connection between the plaintiff's accident and Shuster and Southeast's alleged failure to provide RDA with exclusive use of the bulkhead. In fact, the plaintiff had other alternatives for reaching the wharf even though the fishing vessels were present. He could have simply used the scuppers or used the plank that he said his fellow employees had used safely several times on the day of the accident. No acts or omissions of Shuster or Southeast forced him to take the unreasonable risk of jumping over the rail. Since the plaintiff cannot prove that Shuster or Southeast's acts or omissions were a proximate cause of his injuries, Shuster and Southeast's motion for summary judgment should be granted.

**Conclusion**

For all of the foregoing reasons, defendants Shuster and Southeast respectfully submit

that their motion for summary judgment should be granted.

Defendants,
Southeast Development, Co., LLC
Shuster Corporation
By their attorneys,

/s/  Jennifer B. Hardy
Richard J. Shea, BBO #456310
Andre Sansoucy, BBO # 441410
Jennifer B. Hardy, BBO #634494
Melick, Porter & Shea, LLP
28 State Street, 22nd Floor
Boston, Massachusetts 02109
Telephone:  (617) 523-6200
Facsimile:  (617) 523-8130

Dated:  April 16, 2007

10

EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11389 REK

*************************************************

MARK BOMBARD

v.

SHUSTER CORPORATION,
RDA CONSTRUCTION CO., INC., and
SOUTHEAST DEVELOPMENT CO., LLC
*************************************************

## PLAINTIFF'S AMENDED COMPLAINT

### The Parties and Jurisdiction

1.     The plaintiff, Mark Bombard, at all times material hereto, is/was a resident of Exeter, Rhode Island.

2.     The defendant, Shuster Corporation, is a Massachusetts corporation with a usual place of business in New Bedford, Massachusetts.

3.     The defendant, Southeast Development Co., LLC, is a Massachusetts corporation with a usual place of business in New Bedford, Massachusetts.

4.     At all times material hereto defendant, RDA Construction Co., Inc., was the employer of the plaintiff within the meaning of the Jones Act (46 U.S.C. § 688) and employed the plaintiff as a crewmember of a barge to perform work on navigable waters of the United States.

5.     Jurisdiction of the claim against RDA is based upon a federal statute, the Jones Act. (46 U.S.C. Sec. 688) and the general maritime law; Jurisdiction of the claim against Shuster is based on diversity of citizenship.

## COUNT II
### Mark Bombard v. RDA Construction Co., Inc.

6.     At all times materials the defendant, RDA, had chartered a barge for the purpose of using it as a work platform to construct a tower for NOAA.

7.     Plaintiff is a commercial diver who was employed by RDA to perform work in connection with the mission of said barge and to perform underwater welding once the piles to support the NOAA tower were driven.

8.     That as a Jones Act employer the defendant, RDA, owed the plaintiff a duty to provide him with reasonably safe ingress to and egress from the said vessel.

9.     That on or about August 2, 2002 the defendant breached said duty by failing to provide the Plaintiff with reasonably safe ingress to and egress from the said vessel.

10.     That as a proximate result of said defendant's negligence the Plaintiff was caused severe pain of body and anguish of mind, incurred substantial expenses for medical care and attention, was disabled from performing his usual duties as a diver/welder with a corresponding substantial diminution of earning capacity and was otherwise injured, as will be shown at the trial of this action.

    **WHEREFORE** the plaintiff, Mark Bombard, demands judgment against the defendant, RDA Construction, in the amount of $500,000.00 plus interest, costs and attorney's fees.

## COUNT II
### Mark Bombard v. Shuster Corporation

11.     On or about August 2, 2002 the Plaintiff was employed to work aboard a barge that was moored off Shuster's Wharf in New Bedford, MA.

12.     At all times material hereto Defendant owned and was in control of Shuster's Wharf.

13.     That Defendant owed the plaintiff a duty to provide him with reasonably safe ingress to and egress from the said vessel.

14.     That the defendant breached said duty by failing to provide the Plaintiff with reasonably safe ingress to and egress from the said vessel.

15.     That as a proximate result of said defendant's negligence the Plaintiff was caused severe pain of body and anguish of mind, incurred substantial expenses for medical care and attention, was disabled from performing his usual duties as a diver/welder with a corresponding substantial diminution of earning capacity and was otherwise injured, as will be shown at the trial of this action.

WHEREFORE the plaintiff, Mark Bombard, demands judgment against the defendant, Shuster Corporation in the amount of $500,000.00 plus interest, costs and attorney's fees.

## COUNT III
### Mark Bombard v. Southeast Development Corporation, Co., LLC

16.     On or about August 2, 2002 the Plaintiff was employed to work aboard a barge that was moored off Shuster's Wharf in New Bedford, MA.

17.     At all times material hereto Defendant owned and was in control of Shuster's Wharf.

18.     That Defendant owed the plaintiff a duty to provide him with reasonably safe ingress to and egress from the said vessel.

19.     That the defendant breached said duty by failing to provide the Plaintiff with reasonably safe ingress to and egress from the said vessel.

20.     That as a proximate result of said defendant's negligence the Plaintiff was caused severe pain of body and anguish of mind, incurred substantial expenses for medical care and attention, was disabled from performing his usual duties as a diver/welder with a corresponding substantial diminution of earning capacity and was otherwise injured, as will be shown at the trial of this action.

**WHEREFORE** the plaintiff, Mark Bombard, demands judgment against the defendant, Southeast Development Co., LLC, in the amount of $500,000.00 plus interest, costs and attorney's fees.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON EACH AND EVERY ISSUE RAISED HEREIN.

Dated: January 19, 2005

The Plaintiff, Mark Bombard,
By his attorney,
JOSEPH G. ABROMOVITZ, P.C.

Joseph G. Abromovitz
BBO NO. 011420
858 Washington Street, 3rd Floor
Dedham, MA 02026
Phone: (781) 329-1080

## CERTIFICATE OF SERVICE

I, Joseph G. Abromovitz, hereby certify that on the 19th day of January, 2006, I

served a copy of this document by first class mail, postage prepaid to the following

counsel of record:

Megan E. Kures
Melick, Porter & Shea, LLP
28 State Street
Boston, MA 02108-1775

Patrick O. McAleer, Esquire
Looney & Grossman, LLP
101 Arch Street
Boston, MA 02110-1112

_____
Joseph G. Abromovitz

EXHIBIT 2

Page 1

VOLUME:  I
PAGES:  1 - 85
EXHIBITS:  1 - 6

UNITED STATED DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x
MARK BOMBARD,
              Plaintiff,

vs.                                    Docket No.
                                       05-11389-REK

SHUSTER CORPORATION,
RDA CONSTRUCTION CO., INC., AND
SOUTHEAST DEVELOPMENT
CO., LLC,
              Defendants.
- - - - - - - - - - - - - - - - - - x



DEPOSITION of EUGENE KELLEY, a witness

called on behalf of the Plaintiff, taken pursuant to

notice before Deborah L. Maren, Registered Professional

Reporter and Notary Public in and for the Commonwealth of

Massachusetts, at the Law Office of Joseph G. Abromovitz,

P.C., 858 Washington Street, Third Floor, Dedham,

Massachusetts, on Thursday, January 18, 2007, commencing at

2:02 p.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
ONE STATE STREET
BOSTON, MASSACHUSETTS 02109
TEL: 617-742-6900/FAX: 617-973-9500

Page 22

1   Q.    Were you there prior to the defendant's accident?

2   A.    I was there after the accident.  I may have been there

3   before the accident.  I was there several times.

4   Q.    And was that during the time period of July 17th,

5   2002, to August 19th, 2003?

6   A.    Yes.

7   Q.    And why were you there?

8   A.    We had a project going on.

9   Q.    The project that included the date of the plaintiff's

10  accident?

11  A.    Yes.

12  Q.    And why were you specifically there?  I know you said

13  it was because of the project.  But did you go for a

14  specific reason?

15  A.    I would visit the job site from there by boat at

16  times.

17  Q.    By boat from where?

18  A.    From the Barge yard, C.

19  Q.    I'm sorry?

20  A.    The barge, after we mobilized the job out in the

21  ocean -- it was probably 30 miles from there -- we would

22  come back to that dock.

23  Q.    Okay.  What was the project that RDA was involved in

24  requiring utilizing Shuster Wharf?

1   A.   We were contracted to build a tower behind Martha's

2   Vineyard that monitored for NOAA.  It was under contract

3   with the government to provide some sort of fog information

4   and track fog.  And we built them a tower and put some

5   instrumentation on it for them.

6   Q.   Okay.  So NOAA contracted with you to build this

7   tower?

8   A.   Yes.

9   Q.   Is there a written contract?

10   A.   Yes.

11   Q.   Do you know where that's located?

12   A.   Yes.

13   Q.   Can you tell me where?

14   A.   216 Ricciuti Drive.

15   Q.   So in RDA's files?

16   A.   Yes.

17   Q.   Do you know who signed the NOAA written contract on

18   behalf of NOAA?

19   A.   No.

20   Q.   Did you sign the contract --

21   A.   Yes.

22   Q.   -- as the president of RDA?

23   A.   Yes.

24   Q.   Okay.  How long was this -- let me go back.  How long

Page 26

1    A.    Yes.

2    Q.    Thank you.  Now, I understand you described the

3    overall project that you were -- that RDA was involved in.

4    Can you describe to me specifically why you needed Shuster

5    Wharf and what was to be done there during that time period?

6    A.    We had -- part of this project, we had some very large

7    pipe piles to drive, which we had placed down in New

8    Bedford.

9         In addition, we had some metal fabrication work

10   purchased down in New Bedford that was too big to truck over

11   the road.  So we took our barge down there in New Bedford

12   and had to lay up and get the materials onto the barge.  And

13   the dockage that we utilized down in New Bedford was Shuster

14   Wharf while we waited to get the material and prepare the

15   barge a little further.

16        We had to tie -- we had to tie -- once we loaded

17   them on the barge, we had to take a few days down in New

18   Bedford and tie everything down before it went out.  It was

19   a pretty rough place where we were.

20   Q.    When you say rough place, what do you mean?

21   A.    The water.  It was a long tow out.  And we had to

22   secure the barge.  After we towed down from Boston, we came

23   there.  We had to put the materials on, secure the

24   materials -- not secure, we had to weld them down to the

Page 31

1  next day, tie them up, and maybe take them out to the job

2  site on that day?

3          MR. MCALEER:  Objection.

4  A.    I couldn't tell you the specifics of that schedule.

5  But generally you would tie them down and go.

6  Q.    I'm sorry?

7  A.    You would tie them down, secure the equipment, and

8  then go.

9  Q.    But, as you testified, you couldn't do that in one

10  day?

11  A.    Probably not, no.

12  Q.    Take a look at the invoices again.  Is it fair to

13  say -- certainly looking at Invoice No. 13837 and 13844 --

14  that the agreement relative to use of the wharf included,

15  obviously, dockage of your barge?

16  A.    Yes.

17  Q.    And, again, if you look at the invoices -- and in

18  particular I'm looking at Invoice No. 13833 of Exhibit 4 --

19  that you were also charged for five days' bulkhead; correct?

20  A.    Correct.

21  Q.    Do you know what that involved?

22  A.    I wouldn't be involved.  You have to tie up next to

23  the bulkhead.  That's commonly known.

24  Q.    So there's -- they are charging you a separate charge

Page 43

1    Q.    Well, then the RDA employees, under that circumstance,

2    would need a gangway or some sort of mechanism to get on the

3    boat and then go onto the barge; correct?

4    A.    Correct.

5    Q.    Would RDA, under those circumstances, still be

6    responsible to supply a gangway?

7              MR. MCALEER:  Objection.

8    A.    We would be -- we would be responsible to get the

9    employees on and off the boats or to and from the barge

10   either by means of a gangway or another means of safe

11   access.

12   Q.    Well, Mr. Bombard has identified the access of --

13   means of ingress and egress on the day of his accident to

14   have been a plank.  And I believe -- and I'll represent this

15   to you -- he distinguished it from a gangway.

16              Do you know -- and, again, I could have -- strike

17   that.  I didn't ask you this.  In addition to gangways, do

18   you have anything that you would call a plank to get on and

19   off a vessel?

20   A.    Well, we would use ladders.  We might -- there are

21   many different ways.  We would also use steel beams that had

22   railings on them.  There's many ways that you could get on

23   and off safely.

24   Q.    Did the gang -- do the gangways that you have, do they

Page 59

1  not having exclusive use to the bulkhead?

2  A.    No.

3  Q.    Do you know what time Mr. Bombard's accident happened?

4  A.    I believe it was the very end of the day.  They were

5  leaving the barge.  I believe it was 3:00-ish, 3:00 --

6  between 3:00 and 3:30.

7  Q.    Prior to the happening of Mr. Bombard's accident, do

8  you know how RDA employees would get on and off the barge?

9  A.    Gangways.  What we call gangways.

10 Q.    Okay.  Was a gangway in place at the time of

11 Mr. Bombard's accident?

12          MR. MCALEER:  Objection.

13 A.    We couldn't put it in place.

14 Q.    Okay.  But prior --

15 A.    No.  No, it was not.

16 Q.    And do you know how RDA's employees, prior to

17 Mr. Bombard's accident on that day itself, how they would

18 get on and off the barge?

19 A.    No, I don't know.

20 Q.    Did Mr. Soza ever tell you how RDA employees got on

21 and off the barge on the date of Mr. Bombard's accident?

22 A.    Yes.

23 Q.    And what did he tell you?

24 A.    That they would climb from the barge to the gunnel to

Page 60

1    the deck, back up to step on the gunnel and onto the

2    bulkhead.

3    Q.    And prior to Mr. Bombard's accident, did any RDA

4    employees have any problems with doing that?

5             MS. MORELLO:   Objection.

6    A.    No, not that -- not that they notified me of, anyway.

7    Q.    Did any RDA employees make any complaints to Mr. Soza

8    about the methodology or the way that you just described

9    about getting on and off the barge?

10   A.    He has conveyed to me that nobody complained about

11   that.

12   Q.    And did Mr. Soza instruct RDA employees how to get on

13   and off the barge?

14   A.    I don't know.

15   Q.    What was Mr. Bombard's position at the time of the

16   accident?

17   A.    Pile driver.

18   Q.    And is he still employed by RDA?

19   A.    No.

20   Q.    When did he stop working for RDA?

21   A.    The date of this incident, although I did keep him on

22   the payroll for several months.

23   Q.    Did you ever evaluate Mr. Bombard's performance?

24   A.    Not written officially, no.

Page 68

1  Q.    At the time of Mr. Bombard's accident, did RDA have

2  any policies regarding its employees getting on and off

3  vessels?

4  A.    Yes.

5  Q.    And what were RDA's policies regarding that?

6  A.    They are specific in our health -- in our safety plan,

7  safe means of egress and loading equipment by the use of

8  ladders -- I can't quote it.  But it would be ladders,

9  gangways.

10  Q.    And was it RDA's responsibility to provide a safe

11  means of egress and ingress to its employees?

12  A.    Yes.

13        MR. MCALEER:  Objection.  In what capacity?  That

14  was the question.  Egress to what?

15        MS. HARDY:  To the vessel.  I'll rephrase it.

16  Q.    You testified about the safety policy regarding egress

17  to and ingress from vessels; correct?

18  A.    Correct.

19  Q.    Okay.  And was it RDA's position that it was

20  responsible to provide its employees with a safe means to

21  egress to and from vessels?

22  A.    Yes.

23        MR. MCALEER:  I still -- when?  Where?  In

24  general?

EXHIBIT 3

1

ORIGINAL

1　　　　　　　　　　　　　　　Volume:　　　　I

2　　　　　　　　　　　　　　　Pages:　　1-189

3　　　　　　　　　　　　　　　Exhibits　　　5

4　　　　　　　UNITED STATES DISTRICT COURT

5　　　　　　　　　　　　FOR THE

6　　　　　　DISTRICT　OF　MASSACHUSETTS

7　- - - - - - - - - - - - - - - x

8　MARK　BOMBARD,

9　　　　　　　　　Plaintiff

10　　　VS.　　　　　　　　　　　　　Civil Action

11　SHUSTER　CORPORATION,　RDA　　　No.　05-11389REK

12　CONSTRUCTION CO., INC., and

13　SOUTHEAST DEVELOPMENT CO., LLP,

14　　　　　　　　　Defendants

15　- - - - - - - - - - - - - - - x

16　　　　　　DEPOSITION of MARK BOMBARD, a witness called

17　by and on behalf of the Defendants, taken pursuant to

18　the provisions of the Massachusetts Rules of Civil

19　Procedure, before Arlene R. Boyer, a Professional

20　Court Reporter and Notary Public, in and for the

21　Commonwealth of Massachusetts, at the offices of

22　Melick, Porter & Shea, LLP, 28 State Street, Boston,

23　Massachusetts, 02109, on Tuesday, October 3, 2006,

24　commencing at 10:30 a.m.

33

1    particular boat.

2  Q  But you just said that depending on how the tides

3     were, you might go over the railing. Those were

4     your words, right?

5  A  Yeah, possibly we could go over the railing or

6     down the ladder for it.

7  Q  Now, during any of your scuba diving instruction

8     or commercial diving instruction, did any of your

9     instructors tell you that the safest way to gain

10    access to and from a vessel that is docked is to

11    go over a railing?

12 A  No.

13 Q  Has anyone ever told you that that's an

14    acceptable safe means to access and exit a vessel

15    that's docked at a wharf?

16 A  No.

17 Q  So that would be a decision that you would make

18    for expedience purposes, right?

19             MS. MORELLO:  Objection.

20 A  At times.

21 Q  And you'd make that judgment call when you worked

22    at Clearwater Solutions based on the tides,

23    right?

24 A  Yes.

36

1     instruction or commercial diving instruction that

2     jumping from a higher boat to a lower wharf was a

3     good and safe acceptable means of exiting a

4     vessel?

5  A    No.

6  Q    When you were a scuba instructor, did you ever

7     teach any of your students that a safe way to get

8     off a boat is to jump from a higher boat height

9     down to a lower wharf?

10  A    No.

11  Q    That wouldn't be a safe way for your students to

12     exit, right?

13            MS. MORELLO:  Objection.

14  A    No, it would not.

15  Q    Now, moving forward, sir, and I'm skipping over

16     your part-time bartending position, the next

17     construction-related position is with Modern

18     Continental in November of 1999 through August of

19     2000; is that correct, sir?

20  A    That's correct.

21  Q    I note, sir, that the Modern Continental and

22     Clearwater Solutions dates overlap; is that

23     right, sir?

24  A    That's correct.

46

1    over a rail to exit a vessel onto a dock prior to

2    August 1 of 2002?

3  A    No, not in any kind of work capacity.

4  Q    So for all the years that you worked in the

5    marine industry from 1999 up through the date of

6    your accident, you never saw anyone jump off a

7    vessel to gain access to a wharf or a dock in a

8    commercial  environment,  right?

9  A    That's  correct.

10  Q    So the day of your accident would be the first

11    time that you've ever even done it yourself,

12    right?

13         MS. MORELLO:  Objection.

14  A    In a commercial --

15  Q    Commercial.

16  A    In a work environment, yes, that was probably the

17    first time.

18  Q    You would agree with me the reason is that over

19    the years of maritime work, diving, pile driving,

20    that you've never seen anyone do it is because

21    that's not a safe way of exiting a vessel onto a

22    dock,  right?

23         MS. MORELLO:  Objection.

24  A    I would say it's not a safe way, and there was

47

1      always better means.

2  Q   You told us that safety is of paramount concern

3      to you in your work environment, right?

4  A   I would say safety is very important.

5  Q   Now, moving up to Jay Cashman, sir, you,

6      according to your resume, began with them in the

7      year August of 2000, but at least according to

8      your resume, you only worked for them for a week;

9      is that right?

10  A   Yeah.  It was a short job that they needed some

11      help for.

12  Q   You were working as a pile driver, right?

13  A   That's  correct.

14  Q   But you said a few moments ago that you did

15      receive some safety training when you were with

16      Cashman,  right?

17  A   That's  correct.

18  Q   So during that one-week period of time, August

19      24, 2000 to September 1, 2000, what safety

20      training did Cashman give you?

21  A   They would have safety meetings.  I believe

22      earlier on, they had a serious accident on the

23      job site, and Cashman was taking their safety

24      program very seriously.

1      you said "the barge was nested between two

2      fishing boats, and then there was the wharf."

3   A  Okay.  Basically, we had Shuster's Wharf.  Tied

4      up to the wharf, there were two fishing boats

5      under various stages of construction.  Tied to

6      those two fishing boats on the outside was the

7      barge that we were loading the piles onto.

8   Q  Are you capable of drawing a rough sketch for us

9      as to the wharf location, the two fishing

10     vessels, and the barge?

11  A  I can give that an attempt.

12  Q  Why don't you take this piece of paper, sir, and

13     just outline for us, if you will, Shuster's

14     Wharf, the two fishing vessels, and the location

15     of the barge, and label each thing, if you don't

16     mind, please.

17  A  (Witness  complies.)

18  Q  Would you mind just signing and dating that for

19     us, Mr. Bombard?  Today is October 3.

20  A  Sure.

21     (Witness  complies.)

22           MR. SHEA:  Can we mark this as Exhibit

23     Number 2, please.

24

77

1    Q    When you say that there was a plank, sir, where

2         was the plank that you described to access the

3         barge?  Use the pen, if you will, and label it

4         "plank."

5         (Witness  complies.)

6    Q    You've marked the plank towards the stern of the

7         front boat?

8    A    That's  correct.

9    Q    Can you describe that plank for us in dimensions,

10        sir?

11   A    Roughly it was like a two-by-ten, probably eight

12        to ten feet long.

13   Q    You mentioned that Jay made comment about look at

14        the plank; is that right, sir?

15   A    Yes.

16   Q    What conversation, if any, did you have relative

17        to the plank before ever setting foot on it?

18   A    We were just commenting on how unsafe it looks.

19        At that point, there was boat traffic going by,

20        so the fishing boats are rocking up and down.

21        The plank looked rickety.

22   Q    Who provided that plank?

23   A    I don't know.

24   Q    What conversation, if any, did you have with your

82

1    barge?

2  A  How did we get from the boat.  Basically, it was

3     just right over the railing.  It was -- the

4     levels were similar enough where it wasn't a big

5     deal.

6  Q  So that you would access the fishing boat marked

7     in Exhibit 2 by way of a plank and then simply go

8     over the rail of the fishing boat and then over

9     the rail onto the barge?

10  A  Yes.

11  Q  As the boat and the barge were bobbing in the

12     water, how did you accomplish that, just grab it

13     and jump?

14  A  It wasn't that much of an issue.  The heights

15     were similar enough where it wasn't too big of an

16     issue getting back and forth.

17  Q  What was the distance between the side of the

18     barge and the side of the boat?

19  A  I don't know.  It was close.

20  Q  Now, with respect to the plank, sir, you said

21     that it was a two-by-ten-foot plank?

22  A  I'm guessing, yeah.

23  Q  Two inches thick, ten feet long?

24  A  Ten inches wide.

83

1  Q   Oh, ten inches wide, I'm sorry.

2  A   Two-by-ten, and roughly eight to ten feet long.

3  Q   Now, when you first began accessing the fishing

4     boat by way of the plank, sir, did you have any

5     problems getting on board the fishing boat?

6  A   I was just careful, and I didn't have any problem

7     getting on.

8  Q   What was the condition of the tide when you first

9     started accessing the boat?

10  A   The tide was low, so we probably first started

11     accessing around, say, 7:00 a.m.

12  Q   Was the plank already in place when you started,

13     or --

14  A   Yes.

15  Q   -- did someone from your crew put it in place?

16  A   The plank was already in place.

17  Q   Who put it in place?

18  A   I don't know.

19  Q   Did you ever ask anyone?

20  A   No.

21  Q   How was the plank secured to the fishing boat?

22  A   To my knowledge, it wasn't.

23  Q   Was it resting on a rail, was it under a rail?

24  A   I don't exactly recall.

87

1  Q    Did you see any of your fellow workers jumping

2       over the railing?

3  A    I believe so early on.

4  Q    Who?

5  A    I believe Jay and Jim Souza.

6  Q    So you're confident that you saw Jay go over the

7       railing, and you're confident that you saw Jim go

8       over the railing; is that your testimony?

9  A    I'm pretty sure I saw them both, you know, step

10      over it when it was fairly low early in the

11      morning.

12 Q    So you saw them both step over the railing when

13      it was fairly low early in the morning, meaning

14      that the railing height, the difference between

15      the railing height and the wharf, was minimal?

16 A    Yes.

17 Q    And as the tide rose that day, the height between

18      the railing height of the fishing boat and the

19      wharf  increased,  correct?

20 A    Correct.

21 Q    And you didn't see Jay Huron go over the railing

22      when the height increased from a minimal level,

23      did you?

24 A    No.

1    right?

2  A    I don't recall him -- I'm trying to remember if

3        he actually went on the barges or not.

4  Q    Is it your testimony, sir, that you never saw Jim

5        Souza go down the plank from the fishing boat to

6        the wharf, yes or no?

7  A    No, I've seen Jim Souza go down the plank, yes.

8  Q    He went down the plank after the tide rose,

9        right?

10 A    Yes.

11 Q    And you saw Jay Huron go down the plank after the

12       tide rose?

13 A    Yes.

14 Q    And you're the only one who made the decision to

15       go over the rail and jump off the fishing boat

16       onto the wharf after the tide rose, right?

17            MS. MORELLO:  Objection.

18 A    I was the one that went over the railing after

19       the tide rose.

20 Q    You're the only one?

21            MS. MORELLO:  Objection.

22 A    I don't know that.

23 Q    Well, let me ask you this.  Did you see anyone

24       other than yourself go over the railing and jump

90

 1      from the fishing boat onto the wharf after the

 2      tide rose?

 3  A   No.

 4  Q   Now, you told us, sir, that you jumped

 5      approximately four to eight times coming off the

 6      boat onto the wharf that day prior to your

 7      accident,  right?

 8  A   Yes.

 9  Q   What were the various heights that you jumped

10      during that four to eight time period?

11  A   I would say anywhere between two to, you know,

12      six, possibly even eight feet at the point of the

13      injury.

14  Q   During each of the times that you made the

15      decision to jump off the fishing boat onto the

16      wharf, the plank was still in place, right?

17  A   As far as I know.

18  Q   Well, did you look for it, or did you just decide

19      to go over the railing and jump off?

20  A   I've seen it there.

21  Q   Did you have any conversation with anyone from

22      RDA Construction or any of the crew that day when

23      you were making the decision to jump over the

24      side that hey, fellows, I'm not going down that

93

1  A    The plank.

2  Q    So you walked up the allegedly dangerous steep

3       plank that you commented about, right?

4            MS. MORELLO:   Objection.

5  A    Yeah.

6  Q    And you didn't make the decision not to go up

7       there because you felt you could still negotiate

8       going up the plank, right?

9            MS. MORELLO:   Objection.

10 A    Yeah.

11 Q    And before you commented to Jay during a coffee

12      break that it looked steep, you had already been

13      jumping over the side of the railing and not

14      using the plank, right?

15 A    Yes.

16 Q    So that was a personal decision that you made,

17      regardless of the height and angle of the plank,

18      right?

19            MS. MORELLO:   Objection.

20 A    Yes.

21 Q    So when the plank was at an angle and height that

22      wasn't very steep, you still were going over the

23      railing because it was quicker and easier for

24      you, right?

94

<table>
<tr><td>1</td><td></td><td>MS. MORELLO:  Objection.</td></tr>
<tr><td>2</td><td>A</td><td>It would depend on the location, but yeah.</td></tr>
<tr><td>3</td><td>Q</td><td>What do you mean it depends on the location?</td></tr>
<tr><td>4</td><td>A</td><td>If I had actually egressed -- can I see the</td></tr>
<tr><td>5</td><td></td><td>drawing?</td></tr>
<tr><td>6</td><td>Q</td><td>Sure.</td></tr>
<tr><td>7</td><td>A</td><td>If I had actually come off -- you know, say we</td></tr>
<tr><td>8</td><td></td><td>were working on this part of the barge, there</td></tr>
<tr><td>9</td><td></td><td>were times where I actually did go on that plank.</td></tr>
<tr><td>10</td><td></td><td>Where you came over this area, it actually just</td></tr>
<tr><td>11</td><td></td><td>made sense to go down the plank at that time.</td></tr>
<tr><td>12</td><td>Q</td><td>So if you're working on the barge area near the</td></tr>
<tr><td>13</td><td></td><td>plank or the stern end of that fishing boat, you</td></tr>
<tr><td>14</td><td></td><td>used the plank.  If you're working at the barge</td></tr>
<tr><td>15</td><td></td><td>at the bow end of the fishing boat, you'd jump</td></tr>
<tr><td>16</td><td></td><td>over the railing?</td></tr>
<tr><td>17</td><td>A</td><td>Until it started getting high, in which case I</td></tr>
<tr><td>18</td><td></td><td>would walk to the railing.</td></tr>
<tr><td>19</td><td>Q</td><td>So when it started getting high, you made a</td></tr>
<tr><td>20</td><td></td><td>personal decision to use the railing rather than</td></tr>
<tr><td>21</td><td></td><td>the plank?</td></tr>
<tr><td>22</td><td>A</td><td>Yes.</td></tr>
<tr><td>23</td><td>Q</td><td>Was that based on any observation that you made</td></tr>
<tr><td>24</td><td></td><td>from the fishing boat looking down the plank</td></tr>
</table>

96

1  Q    How many times did they go down the plank after

2       the tide was high?

3  A    I would imagine a similar amount as I, four to

4       eight  times.

5  Q    So after the tide was high, each of the three

6       fellow workers on board the boat and the barge

7       would have gone down four to eight times apiece,

8       so that would be four times three, or 12 safe

9       exits by them, or eight times three, or 24 safe

10      exits by them; is that right?

11 A    Yes.

12 Q    So that at least at a low of 12 times and at a

13      high of 24 times, your fellow workers were able

14      to come down that allegedly steep plank without a

15      problem?

16 A    Yes.

17 Q    And you made a decision not to follow their safe

18      path, but to go over the rail?

19           MS. MORELLO:  Objection.

20 A    Yes.

21           MR. SHEA:  Let's go off the record for

22      a minute.

23

24           (Whereupon, a discussion was held off

1  A    The actual landing point?

2  Q    Yes, sir.

3  A    I would say roughly two to three feet.

4  Q    So you were jumping six to eight feet in height

5       and over two to three feet to land on the ground?

6  A    That's correct.

7  Q    And certainly you were landing on the surface of

8       the wharf, which was what, concrete or asphalt?

9  A    Yes.  It looked like it was more asphalt.

10 Q    And the decision to jump was made by you?

11 A    Yes.  I consciously looked over the side.  I

12      figured it wasn't out of my bounds.  I put my

13      hands on the railing, swung my legs out over the

14      railing to try to, you know, minimize the drop

15      time, and as I was in the air, my body spun a

16      little bit, planted with my right leg first

17      before my left leg came down, my knee blew out,

18      and I was on the ground.

19 Q    What were you going to do at the time of your

20      accident?  Why were you exiting the vessel at

21      that time that you recall?

22 A    We had just unloaded a -- just landed a pile, and

23      we were going back to shore.

24 Q    When you say "we were going back to shore," that

100

| 1 | | means the whole crew was coming off to go back to |
| 2 | | shore, right? |
| 3 | A | I believe so, yes. |
| 4 | Q | Now, do you recall what the order of exit was; in |
| 5 | | other words, were you the first one over? Were |
| 6 | | the other guys already off, and then you were |
| 7 | | catching up to them? |
| 8 | A | The other guys were already off. |
| 9 | Q | Were you running behind for any reason? |
| 10 | A | I wasn't running behind, no. |
| 11 | Q | And each of the three other fellows came down the |
| 12 | | plank and safely exited right under the same tide |
| 13 | | and wharf conditions that you jumped and were |
| 14 | | injured, right? |
| 15 | A | That's correct. |
| 16 | Q | When you said that you looked over the side and |
| 17 | | you felt that it was within your range, is it |
| 18 | | your testimony that jumping from a height of six |
| 19 | | to eight feet through the air another two to |
| 20 | | three feet to land on a concrete or asphalt |
| 21 | | surface was something that you felt was a safe |
| 22 | | means of exiting this fishing vessel? |
| 23 | | MS. MORELLO: Objection. |
| 24 | A | I had been doing -- like I said, I'd been going |

AMBASSADOR LEGAL SERVICES (800) 486-9868

106

1  A    Both Jim Souzas actually visited me in the

2       hospital.  The status about the accident, I mean,

3       I think we were more talking about my physical

4       condition.  They never really talked about the

5       accident itself.  It was more always checking up

6       seeing how I was doing.

7  Q    Is it your testimony today, sir, that from August

8       1 of 2002 through today, you've had no

9       conversation with James Souza, the supervisor,

10      relative to issues relative to the plank or the

11      lack of a gangway and you jumping off the vessel?

12 A    Since the accident, I don't recall.  I know he

13      called me during -- at home once.  Basically, he

14      was checking up to see how I was doing, but I

15      don't recall any conversations.

16 Q    Did you ever tell him that you felt like you did

17      something stupid?

18           MS. MORELLO:  Objection.

19 A    No, I don't recall that.

20 Q    Did you tell that to anyone, that this was a

21      stupid thing for me to do?

22 A    Well, now that I look back at it, I do think it

23      was a stupid thing to do.

24 Q    With respect to I'll call him Jim Sousa just for

EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11389 REK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MARK BOMBARD                                        \*
                                                                         \*
v.                                                                        \*
                                                                         \*
SHUSTER CORPORATION,                          \*
RDA CONSTRUCTION CO., INC., and          \*
SOUTHEAST DEVELOPMENT CO., LLC      \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S ANSWERS TO DEFENDANT, SHUSTER CORPORATION'S FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1:

Please identify yourself fully, stating your full name, date of birth, social security number, residential address, business address and occupation.

### ANSWER NO. 1:

> Mark David Bombard
> 37 Pinecrest Drive
> Exeter, RI 02822
> Date of Birth: 9/25/69
> Social Security No. 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
> Business Address:   387 Main Street, East Greenwich, RI 02818
> Occupation:  Realtor/Sales

### INTERROGATORY NO. 2:

Please describe fully and in complete detail all injuries or injurious effects which you claim to have received as result of the events alleged in your complaint.

### ANSWER NO. 2:

Injury:  Tibia plateau fracture with ruptured ACL ligament to right knee.  I had

emergency surgery to repair bone.  I stopped breathing in surgery, due to trouble with

anesthesia and pain medicine.  They had to put me on Narcan to remove all pain

medication from me.  I was in unbearable pain for hours.  I was then confined to bed for

a few days in the hospital.

Upon release from hospital I was slowly recuperating for 6 months with physical

therapy.  I underwent my second surgery, where they performed an osteotomy and

reconstructed my ACL ligament.  I again slowly improved with months of physical

therapy.  While I was able to regain some strength and stability I still have problems.  It

was necessary to have a third surgery to remove steel hardware which was causing

further discomfort to my knee.  This was followed by more physical therapy.  The

injury to my knee coupled with three surgeries, have left me with scar tissue, rough

cartilage, deformities to my leg causing.  Injurious effects:  weakness, instability, pain

and discomfort.

## INTERROGATORY NO. 3:

If as a result of the injuries or injurious effects referred to in Interrogatory No. 2 you
received medical or any other treatment or examination, please state for each doctor
and/or institution treating you:

    a.     the name and address of the person or institution;
    b.     the dates of each treatment and examination and the nature (type) of
           treatment and examination on each such occasion; and
    c.     an itemized account of all expenses incurred for each and every above-
           referred-to treatment.

## ANSWER NO. 3:

    Roger S. Pocze, M.D.
    Southcoast Hospital Group
    New Bedford, MA 02740
    -8/01/02 – 8/06/01 Emergency surgery to repair knee

Medical bills ultimately paid by Liberty Insurance

Visiting Nurses of Rhode Island
About 6 home visits in August for post surgical care

Paid by Local Union 54 health fund (Special intervention from BA to get it paid for)

Dr. Fitzgerald & Dr. Marchand
South County Orthopedics
One High Street
Wakefield, RI 02879
-two surgeries and numerous office visits

## INTERROGATORY NO. 4:

Please describe fully and in complete detail any and all injuries, diseases, operations or injurious effects which you have suffered from at any time involving your right leg, including but not limited to your right knee.

## ANSWER NO. 4:

One injury of August 1, 2002 as described above.

## INTERROGATORY NO. 5:

Please describe any treatment that you received, including the name and business address the treating physician, relative to any injury, disease, operation or injurious effect set forth in your answer to the preceding interrogatory.

## ANSWER NO. 5:

Only as described in Answer to Interrogatory No. 3.

## INTERROGATORY NO. 6:

If you were confined as a result of the events alleged in your complaint, please state the dates upon which you were confined to your bed and to your home.

## ANSWER NO. 6:

Hospitalized August 1, 2002 – August 6, 2002.
No weight bearing for periods after initial surgery.

## INTERROGATORY NO. 7:

Please describe fully and in complete detail each and every injury and injurious effect of the events alleged in your complaint from which you are now suffering, stating, which, if any, will in your opinion be permanent or if you have recovered, please state the approximate date on which you recovered from each such injury or injurious effect.

## ANSWER NO. 7:

Injury:  Tibia plateau fracture with ruptured ACL
-Weakness, instability, pain and discomfort
-Have trouble going down stairs or steep slopes
-Pain when kneeling, squatting, pivoting, bumped, impacted, caught in sheets, and slips
-Difficulty with lateral movements
-Aches when tired or poor weather
-Some swelling after workouts or long bike ride
-Can't stand for long period time.  Uncomfortable when sitting for too long in cramped space
-Condition is thought to be permanent

## INTERROGATORY NO. 8:

Please state in itemized form all expenses or damages suffered by you or incurred by anyone on your behalf as a result of the events alleged in your complaint.

## ANSWER NO. 8:

Unknown at this time.  This answer will be seasonably supplemented.

## INTERROGATORY NO. 9:

If as a result of the events alleged in your complaint you lost any time from any occupation or employment which you may then have had, please state fully and in complete detail:

a.   what your occupation was at the time of the events alleged in your complaint, including the full name and address of your employer;

b.   the dates on which or between which you were incapacitated, setting forth the date on which you first returned to work after the events alleged in your complaint;

c.   the average weekly income received by you from your work at the time of the events alleged in your complaint;

d.    the amount of financial loss suffered by you as a result of your incapacity to work;

e.    the names and addresses of all of your employers during the five years prior to the events alleged in your complaint, stating for each a full description of your duties, the dates of such employment, and your average weekly income when last employed by each such employer; and

f.    the names and addresses of all your employers subsequent to the events alleged in your complaint, stating for each a full description of your duties, the dates of each such employment and your average weekly income when last employed by each such employer.

## ANSWER NO. 9:

(a)    Commercial diver/pile driver
RDA Construction
111 Sumner Street
East Boston, MA 02128

(b)    August 1, 2002, date of injury.  Have not returned to work.
Now training to be a realtor/sales agent.  Have not made any money yet.

(c)    Average weekly wage $1,115 per week (figured by going back 52 weeks from the date of the accident.  Dividing the number of weeks worked by total wage earned.  This does not include earnings from benefits such as annuity, pension and health.).

(d)    Uncertain at this time.  This answer will be seasonably supplemented.  I received weekly benefits from workers compensation at different rates over injury period.

(e)    RDA Construction
111 Sumner Street
East Boston, MA 02128
Position:  Commercial diver/pile driver
Heavy marine construction
Average wage:  $1,115 per week
Employed:  February 2001 – date of injury (8/1/02)

C.R.C. Co
77 Federal Avenue
Quincy, MA
Position:  Commercial diver
Heavy marine construction

Average wage:  unknown
Employed:  Off and on October 25, 2000 through 2001

Jay Cashman
20 West Howell Street
Boston, MA 02125
Position:  Pile driver
Heavy marine construction
Average wage:  unknown
Employed:  August 2000 – September 2000

Modern Continental
600 Memorial Drive
Cambridge, MA 02139
Position:  Commercial diver/pile driver
Heavy marine construction
Average wage:  (VERY HIGH)
Employed:  November 1999 – August 2000

Clearwater Solutions
341 Boston Post Road, Unit s1
Old Saybrook, CT 06475
Position:  Commercial diver
Heavy marine construction
Average wage:  unknown
Employed:  April 1999 – October 2000

Underwater Construction Corp.
P.O. Box 699
110 Plains Road
Essex, CT 06426
Position:  Diver
Heavy marine construction
Average wage:  unknown
Employed:  September 1999 – October 1999

MIG Corporation
21 Alpine Lane
Chelmsford, MA 01824
Position:  Laborer
Bridge construction
Average wage:  unknown
Employed:  August 1999 – September 1999

Underwater Safaries
5300 Long Bay Road, Suite 2
P.O. Box 8469
St. Thomas, USVI 00802
Position: Scuba instructor
Dive lessons & tours
Average wage: unknown
Employed: December 1997 – April 1998

(f)     Century 21 Access America
387 Main Street
East Greenwich, RI 02818
Position: Realtor/agent
Help by and sell property
Average wage: $0 training/self-employed
Employed: August 2005 - present

## INTERROGATORY NO. 10:

If during the period from ten years prior to the date of the events alleged in your complaint to the present you have made any legal claim against any person or corporation for any personal injury sustained or against any Worker's Compensation policy, please state as accurately as possible:

    a.    the nature of each such injury, sickness or incapacity and the date upon which each such injury, sickness or incapacity first occurred; and

    b.    the name of the person, corporation or insurance company against whom each such claim was made, their file number and the result of each such claim.

## ANSWER NO. 10:

Not applicable.

## INTERROGATORY NO. 11:

Please state the full name and last known address, giving street, number, city and state of every witness known to you or to your attorneys who has any knowledge regarding the facts and circumstances surrounding the happening of the events alleged in your complaint, including, but not limited to eyewitnesses to such events and other persons having knowledge thereof.

**ANSWER NO. 11:**

      James Souza (pile driver superintendent) RDA
      James Soza (crane operator) RDA
      Jay Hueron (pile driver) RDA
      Tug Boat Captain – name unknown
      Tug mate – name unknown
      Non union pile driver – name unknown

**INTERROGATORY NO. 12:**

If you, your agents, servants, employees or anyone acting on your behalf have ever spoken to any alleged witnesses named above in your answer to the previous interrogatory, please state:

    a.    the names and addresses of all persons participating in the making of each such conversation or statement, including the names and addresses of all other persons present at the time that each such conversation or statement was made;

    b.    the date, time and place that each such conversation or statement was made; and

    c.    the substance of each such conversation or statement and a full description of my documentation of each such conversation or statement, including each and every recording photograph, drawing and signed or unsigned document which reflects, represents or pertains to same.

**ANSWER NO. 12:**

    N/A

**INTERROGATORY NO. 13:**

For each expert witness whom the plaintiff expects to call at the trial of this action, please state:

    a.    the name, business address, residential address, and qualifications;

    b.    the subject matter on which each such expert witness is expected to testify or was retained or employed to consider;

    c.    the substance of the facts and opinions to which each such expert is expected to testify or was retained or employed to consider; and

    d.    a detailed summary of all grounds for each such opinion together with the substance of all facts upon which such opinions are based.

**ANSWER NO. 13:**

Unknown at this time.  Plaintiff reserves the right to seasonably supplement this answer.

**INTERROGATORY NO. 14:**

If you allege that the defendant violated any federal, state or municipal statute, rule, standard, regulation, by-law or other law, please identify fully including title and citation and state fully and in complete detail how each such alleged violation either caused or contributed to your injury or damages.

**ANSWER NO. 14:**

Did not provide proper gangway for access to barge.  Working short handed for crane operations.

**INTERROGATORY NO. 15:**

Please state the date, the form and the substance of any notice you gave the defendant or other person or corporation with regard to your alleged accident, and to whom such notice was given.

**ANSWER NO. 15:**

See answer to Interrogatory No. 16.

**INTERROGATORY NO. 16:**

Please describe fully and in complete detail how the events alleged in your complaint occurred, stating what you saw, what you heard, what you did and what happened to you in the order in which each such events took place, including the date, time and place of the events alleged in your complaint.

**ANSWER NO. 16:**

On August 1, 2002 I drove to Shuster's Wharf in New Bedford, MA and met crew to load piles onto the barge.  Crew consisted of people listed in Answer to Interrogatory No. 11.  While gathering before work I asked who else was showing up, Jim Souza

replied this is it.  As we were walking toward the barge to go to work, Jay Hueron

pointed out our wooden plank to get on and off the boat which barge was nested with.

We commented how unsafe it was, remarking "typical RDA."  (Relating it to the

obstacle necessary to get to other barges at RDA yard in East Boston).

We went from wharf to barge and back numerous times that day.  Using both

plank and going over the railing.  The tide was relatively low when we started in the

morning and getting on and off wasn't too much trouble.  As the tide rose the plank

was looking less and less safe due to the pitch and rocking of boats in the water.

At around 2:30 p.m., I was making my way back to the wharf.  The tide was high,

so the drop to the wharf was about 6 to 8 feet.  The plank was at a steep angle because it

was so short.  I choose to go over the railing as I had done several times earlier.  It

looked high but not out of my limits.  I put my hands on the railing and swung my legs

out over the spring line and dropped to the wharf below.  My body was slightly

rotating as I dropped.  I landed with my right leg first.  Before my left leg hit the ground

there was a snap in my right knee followed by excruciating pain.  The crew ran to me

and could visually see the deformity in my leg.  I asked for an ambulance.  Jim Souza

informed me the hospital was very close and asked if they could drive me.  I said yes.  I

was taken to South Coast Hospital in New Bedford, MA.

## INTERROGATORY NO. 17:

Please state fully and in complete detail each and every thing the defendant did or did
not do which you allege was negligent and state how such negligence caused or
contributed to your injuries.

**ANSWER NO. 17:**

Defendants should have provided proper access to barge. Defendants should have had proper man power for crane operations as dictated by local union 56.

**INTERROGATORY NO. 18:**

If you claim that the negligence of any other person or persons contributed to cause your alleged injury, please state their name(s) and addresses and the manner in which they contributed to cause your injury.

**ANSWER NO. 18:**

See answer to Interrogatory No. 16.

**INTERROGATORY NO. 19:**

Please state each and every fact which you claim supports your conclusion as set forth in paragraph 12 of your complaint that the defendant owed you a duty to provide you with a "reasonably safe ingress to and egress from the said vessel."

**ANSWER NO. 19:**

See answer to Interrogatory No. 16.

**INTERROGATORY NO. 20:**

Please state the reason you jumped from the vessel upon which you were working on to the dock you allege was owned and controlled by the defendant on the date of the incident alleged in your complaint including in your answer the process by which you normally exited of off said vessel.

**ANSWER NO. 20:**

See answer to Interrogatory No. 16. Plank seemed unsafe; jumping as I had done several times seemed the better option. There was no other way to get to and from the barge.

**INTERROGATORY NO. 21:**

Please describe the length of time that the barge upon which you were working was moored off of Shuster's Wharf as alleged in your complaint prior to the date of your alleged accident.

**ANSWER NO. 21:**

Unknown.  The week before the barge was in Boston at Cashmans Yard.

**INTERROGATORY NO. 22:**

Please state whether you were aware of the height from which you were jumping from the barge to the wharf on the date of the incident alleged in your complaint and whether you had jumped from the barge to the wharf on a previous date.

**ANSWER NO. 22:**

I looked before I jumped when I was injured.  I thought it not outside of my ability.  I jumped several times that day.  The tide had been rising all day thus increasing the drop all day.  August 1, 2002 was the only day I worked at Shuster's Yard and went from wharf to barge.

**INTERROGATORY NO. 23:**

Please state whether at any time prior to the incident alleged in your complaint you informed any person or entity that you believed you did not have a safe ingress to and egress from barge you claim you were working upon as alleged in your complaint.

**ANSWER NO. 23:**

Had talked with Jay Hueron about unsafe plank and mentioned to Jim Souza about using gangway from RDA's yard.  He said it was too late.  We had to load the barge and set off for Martha's Vineyard before the bad weather set in.  That we only to do it for the day.

**INTERROGATORY NO. 24:**

If you claim that the only means that you had to exit the barge upon which you were working on the date of the incident alleged in your complaint was to jump from the deck of the barge onto the wharf below, please state whether you inquired as to any alternative means of exiting said vessel prior to jumping or otherwise explored other ways to exit the vessel.

**ANSWER NO. 24:**

As previously stated there was a short plank 10' or less, 2x10.  I had suggested to

Jim Souza using gangway from RDA's yard.  He thought it was a good idea, but too

late.  We had to load the barge and set off as soon as possible.

**INTERROGATORY NO. 25:**

Please state the length of time you had been working in the area of Shuster's Wharf prior to the incident alleged in your complaint and whether during that time you complained to any person or entity about the condition of Shuster's Wharf.

**ANSWER NO. 25:**

I had worked at Shuster's Wharf only the day of the accident, August 1, 2002.  I

had been to wharf once the week prior with Jim Souza to check on welders working

with piles.  The barge was not in site.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THE    DAY OF, 09
FEBRUARY, 2006

_Mark Bombard_
Mark Bombard

As to objections:
JOSEPH G. ABROMOVITZ, P.C.

Joseph G. Abromovitz
BBO#: 011420
858 Washington Street
Third Floor
Dedham, MA 02026
Phone: (781) 329-1080

## CERTIFICATE OF SERVICE

I, Joseph G. Abromovitz, counsel for the plaintiff, hereby certify that on the

day of February, 2006 I served a copy of the within document via postage prepaid mail

to the following counsel of record:

Megan E. Kures
Melick, Porter & Shea, LLP
28 State Street
Boston, MA 02108-1775

Patrick O. McAleer, Esquire
Looney & Grossman, LLP
101 Arch Street
Boston, MA 02110-1112

Joseph G. Abromovitz

EXHIBIT 5

Page 1

Volume I
Pages 1-118

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11389REK

MARK BOMBARD,                           :
            Plaintiff,                   :
                                        :
vs.                                     :
                                        :
SHUSTER CORPORATION and                 :
RDA CONSTRUCTION CO., INC.,             :
and SOUTHEAST DEVELOPMENT CO.           :
LLC,                                    :
            Defendants.                 :

        DEPOSITION of STEVEN LEWIS SHUSTER, taken
on behalf of the Plaintiff, pursuant to the
applicable provisions of the Massachusetts Rules
of Federal Procedure, before Barbara M. Montijo,
a Registered Professional Reporter and Notary
Public within and for the Commonwealth of
Massachusetts, at the Law Offices of
Joseph G. Abromovitz, 858 Washington Street,
Dedham, Massachusetts, on January 15, 2007,
commencing 10:00 a.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA   02109
(617) 742-6900

COPY

DUNN & GOUDREAU

1  A.    Yes.

2  Q.    Could you please describe the business entity

3        that is Southeast Development?

4  A.    Southeast Development is a company that owns the

5        building and the property on which the building

6        sits in the City of New Bedford.

7  Q.    Actually, I should have asked you, is this a

8        limited partnership that you and your brother

9        are involved in?

10 A.    It's a limited liability corporation.  I really

11       couldn't say whether it's a limited

12       partnership.  I don't know.  I'd have to consult

13       with my attorney.

14 Q.    Are there any other partners besides you and

15       Richard?

16 A.    No.

17 Q.    And it was formed 30 years ago?

18 A.    Approximately.

19 Q.    When you say Southeast owns the building and

20       property situated in New Bedford, can you

21       identify that a little more precisely?

22 A.    Yes.

23 Q.    Please do so.

24 A.    It's located at 4 Wright Street, that's

1    W-R-I-G-H-T, New Bedford, Massachusetts.

2  Q.  What are the buildings located at 4 Wright

3      Street in New Bedford?

4  A.  There's only one building.

5  Q.  What is that?

6  A.  What do you mean by that question?

7  Q.  What kind of building is it?

8  A.  It's a split-ribbed single-story masonry

9      building.

10 Q.  What is the purpose of the building?

11 A.  It's a warehouse facility.

12 Q.  Is the parking lot on 4 Wright Street?

13          THE WITNESS:  Is there a parking lot

14      on 4 Wright Street?

15          MS. MORELLO:  Correct.

16 A.  Yes.

17 Q.  Strike that.  Is there a parking lot that

18      encompasses the property on 4 Wright Street?

19 A.  A portion thereof, yes.

20 Q.  So, so far we have a parking lot and a warehouse

21      facility, correct?

22 A.  Yes.

23 Q.  What is the purpose of the warehouse?

24 A.  To warehouse the products of the business that

Page 16

1   Q.   And if you go to the last page -- or, excuse me,

2        the second to the last page, the signature is

3        that of Richard Shuster, your brother?

4   A.   Yes.

5   Q.   Now, you've seen this document before, have

6        you?

7   A.   Yes.

8   Q.   Did you help your brother answer the questions?

9   A.   No.

10  Q.   I would direct your attention to Answer Number 1

11       on the first page and contained within that

12       answer -- I'm going to read from it.  Please

13       read along with me.  In your head, of course.

14       "Southeast owns the premises at 4 Wright Street

15       and rents space to Shuster Corporation.  The two

16       entities also share principals."  Did I read

17       that correctly?

18  A.   That's correct.

19  Q.   Now, you've testified that the premises owned at

20       4 Wright Street consists of a building, which

21       is a warehouse facility, and a parking lot,

22       correct?

23  A.   Yes.

24  Q.   Now, what is the space that Southeast rents to

1      Shuster Corporation?

2   A.   Would you repeat that question?

3   Q.   Right.   What is the space that Southeast rents

4        to Shuster Corporation?

5   A.   The warehouse facility and the access to the

6        warehouse facility so it can operate as a

7        warehouse.

8   Q.   Well, when you say "the access," what do you

9        mean precisely?

10  A.   Precisely that.  You can drive a truck in and

11       either offload or load the products that Shuster

12       Corporation deals with to either receive them or

13       ship them.

14  Q.   And the two entities that share principals, I

15       take it that's you and your brother?  The rest

16       of the answer that I read was, "The two

17       entities," that is, Southeast and Shuster

18       Corporation, "also share principals."  That

19       would be you and your brother, correct?

20  A.   Yes.

21  Q.   It's fair to say that the premises on 4 Wright

22       Street include what is commonly known as a

23       wharf?

24            MS. HARDY:  Objection.  You can

1    Q.    For the record, can you define bulkhead?

2    A.    A bulkhead is the wall that was installed to

3          keep the earth from falling into the harbor.

4    Q.    Does the property on 4 Wright Street abut a

5          harbor?

6    A.    No.

7    Q.    Does it abut a bulkhead?

8    A.    No.

9    Q.    What does it abut?

10   A.    It abuts a 5 foot strip of land --

11   Q.    And who owns this 5 --

12   A.    -- that partitions --

13   Q.    I'm sorry, go ahead.

14   A.    -- the property from the bulkhead.

15   Q.    I'm sorry, could you repeat that?  It abuts a

16         5 foot strip of land?

17   A.    Along the bulkhead that partitions the property

18         from the bulkhead.

19   Q.    Partitions, did you say?

20   A.    Yes.

21   Q.    Who owns that strip of land?

22   A.    The City of New Bedford.

23   Q.    Now, when you say "a 5 foot strip of land," are

24         you saying 5 feet wide?

Page 22

1    A.    Yes.

2                   MS. MORELLO:  Why don't we do this.

3          Why don't you draw a diagram.  Off the record

4          for a minute.

5                        (OFF THE RECORD)

6    Q.    This will not obviously be to scale and will be

7          kind of rough.  Can you just draw a diagram of

8          the property that you described as comprising

9          4 Wright Street, including the strip of land and

10         the bulkhead?

11   A.    Sure.  This is not to scale, mind you.

12   Q.    Right.

13   A.    The property is basically a rectangle; and

14         that's what this piece of paper is, a rectangle.

15         It's a rectangle that basically -- that's

16         approximately 3 acres, okay.

17   Q.    Okay.

18   A.    And along one side of this property there is

19         water.

20   Q.    Can you just put an arrow?

21   A.    I already have.

22   Q.    I'm sorry.

23   A.    Where this piece of paper leaves off and the

24         table begins is the water.  This line, this edge

Page 41

1   Q.   Now, in order for a vessel to be moored or

2        docked, attached to that bulkhead, do they need

3        permission from Southeast Development?

4   A.   Yes.

5   Q.   Why?

6   A.   Because in order for them to access their boat,

7        they need to go across the property that

8        Southeast Development owns.

9   Q.   Well, in order to have access to the boat, they

10       have to go over, according to your diagram,

11       property that's owned by the City of New Bedford

12       as well, correct?

13  A.   That's true.

14  Q.   Did or do vessel owners charge -- strike that.

15       Does Southeast Development charge vessel owners

16       to dock their vessel?

17  A.   Yes.

18  Q.   Does the charge include access to the vessel?

19                MS. HARDY:  Objection.  You can

20       answer.

21  A.   That's what we charge for, is access to the

22       vessel.

23  Q.   I want to draw your attention to Exhibit Number

24       4, the diagram that Mr. Bombard drew at his

Page 44

1    Q.   The actual, physical means of access from the

2         vessel, not this case now, but from any vessel

3         to the land, who provides that?  Does Southeast

4         provide that typically?

5    A.   No.

6                   MS. HARDY:  Objection.

7    Q.   Has Southeast ever provided that for any vessel?

8    A.   No.

9    Q.   So, this plank, going back to Mark Bombard's

10        diagram, this plank that he identified being

11        used for access for RDA employees to get onto

12        this vessel and onto the barge was not supplied

13        by Southeast Development?

14   A.   No.

15   Q.   Was it supplied by Shuster?

16   A.   No.

17   Q.   Do you know if RDA Construction supplied that

18        plank?

19   A.   No.

20   Q.   You don't know one way or the other?

21   A.   Yes.

22   Q.   You don't know whether they did or they didn't,

23        correct?

24   A.   Yes.

Page 47

1        document of the dockage service that you

2        provided to RDA?

3    A.  No.

4              MS. HARDY:  Objection.

5    Q.  Has Southeast Development provided dockage

6        services to other entities besides RDA?

7    A.  Yes.

8    Q.  What does it usually and typically involve?

9    A.  There is no usual and typical, but what it

10       always means is that somebody needs to access

11       the waterfront through our property.  Save that,

12       it's difficult for me to specifically tell you

13       unless I know what the specific circumstances

14       are governing that particular transaction.

15   Q.  Well, in your experience at Southeast, has

16       dockage ever involved providing physical access

17       to a vessel?

18             MS. HARDY:  Objection.  Go ahead.

19   A.  Only access through our property.  The actual

20       access of the boat, getting on and off it?

21   Q.  Yes.

22   A.  We have nothing to do with that.

23   Q.  Okay.  Thank you.

24   A.  You're welcome.

Page 69

1        Interrogatory Number 5, "Relative to the

2        incident described in the Plaintiff's complaint,

3        please state whether or not the Shuster

4        Corporation and/or the Shuster Wharf controlled,

5        oversaw, and/or had any responsibility

6        whatsoever for the subject barge and/or any

7        other vessels appurtenant thereto, including but

8        not limited to providing ingress or egress to

9        the barge and/or any other vessels appurtenant

10       thereto."

11            The answer from RDA Construction Company

12       was, "I am informed and I believe that Southeast

13       Development Company and/or its sister company,

14       Shuster Corporation as wharfinger, was obligated

15       to provide RDA with a safe berth and wharf for

16       its vessels and employees."  Do you agree with

17       that statement?

18   A.   No.

19   Q.   Why do you disagree?

20   A.   Because our arrangement with RDA Construction

21       was to rent them use of the yard and the ability

22       to access a vessel when and if they chose to

23       bring a vessel adjacent to our property.

24   Q.   And as you testified before, that access does

Page 70

1     not involve a physical means of a ramp and/or a

2     plank to get from the yard to the vessel; is

3     that not correct?

4  A.  That is not correct.

5  Q.  That is not correct.  You do provide access?

6  A.  No.

7  Q.  Let me say it again.  You had described what

8     you -- you disagreed with their answer and you

9     described what it is that you provide to RDA;

10    and that included access to the vessel.  And

11    then I'm asking you, but when you say Southeast

12    Development provides access to the vessel,

13    you're not talking about the physical means,

14    such as a plank or a gangway from the wharf

15    property to a vessel, you don't supply that,

16    correct?

17 A.  Correct.

18 Q.  Has Southeast Development made a claim against

19    anyone else as a result of this accident?

20 A.  Would you repeat the question?

21 Q.  Yes.  Has Southeast Development made a claim

22    against anybody else as causing -- strike that.

23    Does Southeast blame anyone else for this

24    accident?

DUNN & GOUDREAU

Page 86

1   A.   Yes.

2   Q.   Is there any other way that dockage is dealt

3        with other than invoices?  Any other way that

4        charges are forwarded to a vessel?

5   A.   No.

6   Q.   How long has Southeast and/or Shuster been

7        charging vessels for dockage at the Wright

8        Street property?

9             MS. HARDY:  Objection.  You can

10       answer.

11  A.   Shuster has never been involved with dockage at

12       the premises.  Southeast Development has been

13       involved for approximately 30 years.

14  Q.   And is that true today?

15  A.   Shuster Corporation continues not to be involved

16       in anything having to do with dockage by virtue

17       of the fact that it's a tenant.  And Southeast

18       Development continues in the same business of

19       renting space as it has for approximately

20       30 years.

21  Q.   And are there vessels tied up alongside the

22       bulkhead right now, today?

23  A.   Perhaps.

24  Q.   Does any other individual, entity, company,

EXHIBIT 6

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No.  05-11389-REK

- - - - - - - - - - - - - - - - - - - - - - - - x

MARK BOMBARD,

Plaintiff,

vs.

SHUSTER CORPORATION,

RDA CONSTRUCTION, INC., and

SOUTHEAST DEVELOPMENT CO., LLC,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

VOLUME I                                    Pages 1 - 85

DEPOSITION OF JAMES SOUZA, a witness called
by counsel for the Plaintiff, taken before Suzanne M.
Hebert, Professional Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Law Office of Joseph G. Abromovits, P.C., 858
Washington Street, Floor 3, Dedham, MA, on Thursday,
March 22, 2007, commencing at 2:05 p.m.



Page 10

1      Q.    Were you a pile driver in the beginning

2   when you worked for RDA?

3      A.    I still am a pile driver.

4      Q.    Were you considered a pile driver when you

5   first started to work with RDA in 1989?

6      A.    Yes.

7      Q.    And as a pile driver, what were your

8   responsibilities and duties in 1989?

9      A.    Monkey.

10      Q.    So pile drivers climb sheaths as you

11   originally described?

12      A.    Yes.

13      Q.    What else do they do?

14      A.    We weld, we cut, we use chain saws, we

15   build docks, we build piers, we do salvage work.

16      Q.    Do you work with vessels on occasion?

17      A.    Almost every day with RDA.  We're mostly a

18   marine contractor, the end that I work on.

19      Q.    Now, in 1989, for want of a better word,

20   who was your boss?

21      A.    Gene Kelly.

22      Q.    Now, on the date of the accident, which was

23   August 2002, what was your position with RDA at that

24   time?

Page 11

1        A.    Superintendent/foreman.

2        Q.    And what were your responsibilities as the

3    superintendent/foreman?

4        A.    Load the barges, get the equipment

5    mobilized for the job, as well as push the men in the

6    direction to do the job.

7        Q.    Did you in addition to getting the men to

8    do the job, did you also do the job that the people

9    you supervised did as well?

10       A.    It's kind of weird.  We're like a little

11   family on the barge.  Once you get on that barge,

12   you're in your own little city.  That's how I become

13   the superintendent and foreman, get everything I need

14   on the barge, get the men together.  I drop the

15   superintendent position.  I become the foreman.  We

16   do the job.

17       Q.    You do some of the job your employees do;

18   is that correct?

19       A.    Correct, hands-on.

20       Q.    As of the date of the accident, was

21   Mr. Kelly your boss?

22       A.    Yes.

23       Q.    I think you said before you were employed

24   with RDA you were at Cashman; is that correct?

Page 52

1      Q.    Now, Mr. Bombard drew a plank or he drew

2   and then identified this rectangle as a plank as the

3   means of access for the RDA employees to get onto the

4   boat, and then from the boat, they would go onto the

5   barge; do you see that?

6      A.    Yes.

7      Q.    Was there such a plank?

8      A.    I don't recall a plank there.

9      Q.    You don't recall the plank?

10     A.    Nope.

11     Q.    How did the employees then on the date of

12   the accident in particular get from the waterfront to

13   the boat, fishing boat?

14     A.    I took and climbed through the scuppers on

15   the vessels.  It's got notched out scuppers like a

16   ladder.

17     Q.    You're talking about the fishing vessel?

18     A.    Yes.

19     Q.    Where are the scuppers located?

20     A.    On the side wall.

21     Q.    Of the fishing vessel?

22     A.    Yes.

23     Q.    So you didn't use this plank to get onto

24   the boat?

1    there.

2        Q.    On the diagram that you have that

3    Mr. Bombard gave us, can you just indicate where it

4    was that -- I think we can use this, or should we do

5    another one?  Why don't we just use this.

6              On this, can you just mark where it

7    was that you would use the scupper holes to get on

8    and off this vessel.

9        MS. HARDY:  I have a red pen.  Maybe color

10   copy it.

11       MS. MORELLO:  Right.

12       A.    It's actually right where Mark says he got

13   hurt.  I believe right there (indicating) and Mark

14   was here.  Just before this bow starts turning in,

15   this is a straight wall (indicating).  It's just

16   before the wall starts bending in.

17       Q.    But where he indicated the accident

18   occurred?

19       A.    Correct.  I was here (indicating) and I

20   believe Mark was right here (indicating), because the

21   scupper holes are right at the turning point of the

22   bow, which comes up to a point.

23       MR. McALEER:  Marsha, can we have him --

24              Draw an arrow where you move Mark to.

Page 69

```
 1        A.    (Witness complies).

 2        Q.    And write your initials in underneath it?

 3        A.    (Witness complies).

 4        Q.    Same thing over here, draw an arrow,

 5    scuppers?

 6        A.    (Witness complies).

 7        Q.    Initial that, too?

 8        A.    (Witness complies).

 9        Q.    Okay.  So then you were very close to him

10    at the time of the accident?

11        A.    Within three feet, yes.

12              MS. MORELLO:  I don't think I have any

13    further questions.  Give me a minute, though.  Let's

14    take a break.

15              (Off the record)

16        Q.    Do you know what a wharfinger is?

17        A.    No.

18        Q.    Have you ever heard that phrase before?

19        A.    No.

20              MS. MORELLO:  I have no further questions.

21              (Off the record)

22                        EXAMINATION

23    BY MS. HARDY:

24        Q.    Good afternoon, Mr. Souza.  We met earlier.
```

1      Q.    Did any of the RDA Construction employees

2    present give him any instructions regarding how to

3    access the barge?

4      A.    No.

5      Q.    How did he know how to access the barge

6    from the head wall?

7      A.    How do you know how to get into your car

8    every day?  You work it out.  If your car is in a

9    puddle, are you going to walk through the puddle to

10   get to it?  Same thing, you look at it and you take

11   your safest route.

12     Q.    Did Mr. Bombard ever observe you accessing

13   the barge?

14     A.    Yes.

15     Q.    Is it fair to say that he knew how to

16   access the barge by observing what you did?

17     A.    Yes.

18     Q.    And you testified earlier that your

19   practice was to access the barge by using the scupper

20   holes; is that correct?

21     A.    Yes.

22     Q.    Did you, yourself, ever have any issues

23   accessing the barge by using the scupper holes

24   walking across the fishing vessel and getting onto

1    the barge?

2        A.    No.

3        Q.    Did you feel that that was a safe way to

4    access the barge from the bulkhead or head wall?

5        A.    Yes.

6        Q.    It's fair to say that, at the time of

7    Mr. Bombard's accident, he could have used the

8    scupper holes like you did in getting off of the

9    fishing vessel; is that correct?

10       A.    Yes.

11       Q.    Instead, he chose actually to swing his leg

12   around and landed on the bulkhead; is that correct?

13       A.    Yes.    The way I went over, and I was using

14   the scupper holes, I went like this (indicating).    I

15   came over the wall and I looked and then Mark was

16   down.

17       Q.    Just for the record, you swung your left

18   leg around; is that correct?

19       A.    Left leg around, put it into the top

20   scupper hole, then I swung my right into the second

21   scupper hole down.

22       Q.    Had Mr. Bombard kind of waited for you to

23   actually get off of the scupper holes, instead he

24   passed you; is that correct?