UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    )
MARK BOMBARD                        )
              Plaintiff             )
v.                                  )
                                    )        C.A. NO. 05-11389-RBC
SHUSTER CORPORATION,                )
SOUTHEAST DEVELOPMENT CO.           )
AND RDA CONSTRUCTION CO., INC.,     )
              Defendants            )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF RDA CONSTRUCTION CO., INC.'S
OPPOSITION TO SHUSTER CORPORATION AND SOUTHEAST
DEVELPOMENT CO.'S MOTION FOR SUMMARY JUDGMENT**

I.    **Background**

In this case, the Plaintiff Mark Bombard ("Plaintiff") seeks to recover damages for

injuries that he allegedly suffered on August 2, 2002 on a wharf in New Bedford, Massachusetts.

Plaintiff alleges that he was a commercial diver employed by defendant RDA Construction Co.,

Inc. ("RDA"), and that he was employed "as a crewmember of a barge to perform work on

navigable waters of the United States." (Ex. 4, Plaintiff's Amended Complaint, ¶ 4).

Plaintiff alleges that RDA "had chartered a barge for the purpose of using it as a work

platform to construct a tower for NOAA."[1] (Ex. 4, Plaintiff's Amended Complaint, ¶ 6).  During

the process of loading equipment from the wharf to the barge the Plaintiff was injured when he

jumped from the gunwale of docked fishing vessel onto the wharf, landing on his right leg.  The

Plaintiff asserts a Jones Act claim against RDA, and common law negligence claims against

Shuster Corporation ("Shuster") and Southeast Development Co., ("Southeast").  He alleges that

---

[1] The National Oceanic & Atmospheric Administration.

Shuster and Southeast "owned and was in control of Shuster's Wharf (Ex. 4, Plaintiff's Amended Complaint, ¶¶ 12, 17) and owed a duty to provide the plaintiff "with reasonably safe ingress and egress" from the barge. (Ex. 4, Plaintiff's Amended Complaint, ¶¶ 13, 18).

Defendant RDA contends that Shuster and/or Southeast breached their implied and contractual duties to RDA to provide exclusive dockage directly alongside the bulkhead pursuant to the verbal wharfage agreement, thus altering the means available for ingress and egress to RDA's vessel.  (Ex. 2, Deposition of Eugene Kelley, pp. 40-42).  Defendant RDA filed Cross-claims against Co-Defendants Shuster and Southeast for contribution and indemnification alleging negligent control, operation and/or maintenance of the subject pier, and a failure to provide a proper means of ingress and egress between the subject pier and moored vessels. (Ex. 5, Answer and Cross-Claim of Defendant RDA Construction Company, Inc. to Plaintiff's Complaint, ¶¶ 4-6) and (Ex. 6, Answer and Cross-Claim of Defendant RDA Construction Company, Inc. to Plaintiff's Amended Complaint, ¶¶ 4-6).

## II.  Issues Presented

RDA opposes Shuster and Southeast's motion because there are genuine questions of fact as to: (1) whether RDA's contract for bulkhead wharfage at 4 Wright Street in New Bedford, Massachusetts was entered into with Shuster, Southeast, or both entities, (2) whether Shuster and/or Southeast breached their implied and contractual duties and obligations as a wharfinger under the dockage contract with RDA, (3) whether said breach caused and/or contributed to the injuries allegedly sustained by RDA's employee, Mark Bombard ("Plaintiff") and (4) whether RDA is entitled to indemnification from Shuster and/or Southeast for their breach of implied and contractual duties and obligations as a wharfinger under the dockage contract.

### III.  <u>Argument</u>

A general issue of material fact exists as to whether RDA's contract for bulkhead wharfage at 4 Wright Street in New Bedford, Massachusetts was entered into between RDA and Shuster, RDA and Southeast, or RDA and both entities.  Payments in the form of checks were drafted by RDA to both Shuster and Southeast as well as deposited by both entities.  (Ex. 1, Deposition of Steven Shuster, pp. 53-55), (Ex. 2, Deposition of Eugene Kelley, pp. 63-64).  Although Shuster contends in its Statement of Undisputed Facts that it does not own the property abutting the wharf, a question of materiel fact exists as to what contractual obligations Shuster owed RDA and its employees under the wharfage contract.

A contract to provide wharfage or storage is a maritime contract and a breach of this contract is cognizable in admiralty.  *See Fireman's Fund Ins. Co. v. Boston Harbor Marina*, 406 F.2d 917, 919 (1st Cir. 1969).  As such, the wharfage contract is to be construed under federal maritime law as opposed to Massachusetts state law.  Further, the wharfage contract between RDA and Shuster and/or Southeast was a verbal one.  (Ex. 2, Deposition of Eugene Kelley, p. 20).  An oral contract for wharfage is a maritime contract and as such the statute of frauds is not applicable.  *See Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S. Ct. 886, 6 L. Ed. 2d 56 (1961).

A question of fact exits as to whether Shuster and/or Southeast breached their implied and contractual duties and obligations as a wharfinger under the verbal dockage agreement with RDA and whether said breach caused and/or contributed to the injuries allegedly sustained by RDA's employee, Mark Bombard.   In addition to any specific contractual obligations, it is implied by law that the wharfinger must exercise reasonable diligence to provide a safe berth to vessels lawfully utilizing its facilities.  *See Sailor Inc. F/V v. City of Rockland*, 428 F.3d 348, 351 (1st Cir. 2005).

In this case there is sufficient evidence that RDA specifically requested exclusive use of the bulkhead which would have allowed RDA employees to gain access to and from the vessel via gangways. Although specifically requested by RDA, Shuster and/or Southeast did not afford RDA this option.  (Ex. 2, Deposition of Eugene Kelley, pp. 40-42).   As such a question of fact exists as to whether or not Shuster and/or Southeast breached the agreement to provide RDA with exclusive bulkhead access, and if said breach caused and/or contributed to the plaintiff's alleged injuries.

Additionally, pursuant to a maritime wharfage contract, there is an implied warranty of workmanlike performance which runs from a wharfinger to a shipowner.  *See Sims v. Chesapeake and Ohio Railway Co.*, 520 F.2d 556, 561 (6 Cir. 1975).  In *Sims* the court further found that… "The implied warranties of a wharfinger relate to the conditions of berths and the removal of dangerous obstructions or giving notice of their existence to vessels about to use the berths . . . A wharfinger also owes a duty to furnish a safe means of egress and ingress to berthed ships." Id.

In the instant matter there is ample evidence to establish that RDA contracted to exclusively utilize the bulkhead.  Shuster and/or Southeast breached its agreement to provide RDA with exclusive use of the bulkhead, thus causing RDA to "nest" its barge along side two fishing vessels tide to the bulkhead.  (Ex. 2, Deposition of Eugene Kelley, pp. 40-42).  Shuster and/or Southeast's breach left RDA with no other options in that RDA's equipment and supplies (including several piles 142 feet long and weighing approximately 15 tons each) were stored in Shuster's yard next to the pier.  (Ex. 2, Deposition of Eugene Kelley, pp. 40-42).  Additionally, RDA was under contractual obligations with NOAA and constrained by a closing window of decent weather in which to transport the barge and materials to the build site off the coast of

Martha's Vineyard.  (Ex. 2, Deposition of Eugene Kelley, pp. 29, 35).  Representatives of

Shuster and/or Southeast were aware of RDA's operational needs and had removed vessels from

the bulkhead in the past in order to accommodate vessels loading equipment from the pier.  (Ex.

2, Deposition of Eugene Kelley, p. 40), (Ex. 1, Deposition of Steven Shuster, pp.83-84).

It has been settled that a shipowner may recover as indemnity from a wharfinger those

damages the shipowner has been required to pay as a result of a breach of its warranty of

workmanlike service.  *See Vierling v. Celebrity Cruises, Inc.*, 339 F.3d 1309, 1319 (11th Cir.

2003).   In the event RDA is found to be responsible in whole or in part for any damages

sustained by the Plaintiff arising from his fall on August 2, 2002, a genuine issue of fact would

exist as to whether or not RDA is entitled to indemnification from Shuster and/or Southeast for

breach of their implied duty of workmanlike performance under the verbal maritime wharfage

contract.

## IV.    <u>Summary Judgment Standard</u>

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment will

be granted when all the relevant pleadings, viewed in the light most favorable to the non-moving

party, present no genuine issue of material fact such that the moving party is entitled to judgment as

a matter of law.  Fed. R. Civ.P. 56(c); *See Aponte-Santiago v. Lopez-Rivera*, 957 F.2d 40, 41 (1st

Cir. 1992); *Olivera v. Nestle Puerto Rico, Inc.* 922 F.2d 43, 45 (1st Cir. 1990); *Griggs-Ryan v.

Smith*, 904 F.2d 112, 115 (1st Cir. 1990).

To attain summary judgment, the movant bears an initial burden of demonstrating that no

genuine issues of material fact are present.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106

S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  The burden then shifts to the non-moving party who

must point out specific facts which create disputed factual issues.  *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In making its inquiry under Rule 56(c), "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *See Stepanischen v. Merchants Despatch Trans. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983); *United States v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir. 1992).

Shuster and/or Southeast have failed to demonstrate that no genuine issues of material fact exist as to; which entity RDA verbally contracted with for wharfage, whether the movants breached their implied and/or contractual obligations as a wharfinger to RDA, whether said breach contributed to and/or caused the plaintiff's injuries and, in the event RDA is found fully or partially liable for the plaintiff's injuries, whether RDA is entitled to indemnification from Shuster and/or Southeast under the implied doctrine of workmanlike performance.

**V.     Conclusion**

For the above stated reasons, RDA Construction Co., Inc., respectfully requests that Shuster Corporation and Southeast Development Co.'s motion for summary judgment be denied.


                                        RDA CONSTRUCTION CO., INC.
                                        By its attorneys,


May 16, 2007                            /s/ Patrick O. McAleer
                                        Bertram E. Snyder (BBO #471320)
                                        Patrick O. McAleer (BBO #642627)
                                        LOONEY & GROSSMAN, LLP
                                        101 Arch Street
                                        Boston, Massachusetts 02110
                                        (617) 951-2800

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non registered participants.

/s/ Patrick O. McAleer
Patrick O. McAleer

# EXHIBIT 1

Page 1

Volume I
Pages 1-118

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11389REK

MARK BOMBARD,                          :
         Plaintiff,             :
                                       :
vs.                                    :
                                       :
SHUSTER CORPORATION and                :
RDA CONSTRUCTION CO., INC.,            :
and SOUTHEAST DEVELOPMENT CO.          :
LLC,                                   :
         Defendants.            :

     DEPOSITION of STEVEN LEWIS SHUSTER, taken
on behalf of the Plaintiff, pursuant to the
applicable provisions of the Massachusetts Rules
of Federal Procedure, before Barbara M. Montijo,
a Registered Professional Reporter and Notary
Public within and for the Commonwealth of
Massachusetts, at the Law Offices of
Joseph G. Abromovitz, 858 Washington Street,
Dedham, Massachusetts, on January 15, 2007,
commencing 10:00 a.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA  02109
(617) 742-6900



DUNN & GOUDREAU

Page 53

1   A.   And therefore explains my inability to answer

2       your previous series of questions pursuant to

3       the matter of what this was all about.

4           MS. MORELLO:  Thank you.  Now, if we

5       could just go on to mark this as Exhibit

6       Number 8.

7       (EXHIBIT 8 MARKED FOR IDENTIFICATION)

8   Q.   Exhibit Number 8, you'll agree, is a check from

9       RDA Construction Corporation, Number 22746, paid

10      to Shuster Corporation, is it not?

11  A.   (Witness perusing document) Yes.

12  Q.   And it appears, when you compare it to Exhibit

13      Number 7, Invoice Number 13831, that this is the

14      check in payment of that invoice, correct?

15  A.   Yes.

16  Q.   Now, this check is made out to Shuster

17      Corporation.  Why is it made out to Shuster

18      Corporation instead of Southeast Development?

19  A.   I have no idea.  It's apparently a mistake.

20  Q.   Well, if we go back to Exhibit Number 7, Invoice

21      Number 13831, is there any reason, if you look

22      at the top left-hand corner where we have --

23      this is Invoice Number 13831, Exhibit Number 7

24      to this deposition?

Page 54

1    A.    Yes.

2    Q.    We have Southeast Development and its address

3          printed and then underneath someone has written

4          in the phone and fax number of Shuster

5          Corporation?

6    A.    Yes.

7    Q.    Why is that?

8    A.    I have no idea.

9    Q.    Well, the invoice to which this check refers is

10         the parking lot and that's in control of

11         Southeast Development, is it not?

12   A.    Yes.

13              MS. MORELLO:  Let's mark the next

14         exhibit.  It is Invoice Number 13833.

15         (EXHIBIT 9 MARKED FOR IDENTIFICATION)

16   Q.    In front of you do you have Invoice Number

17         13833, Mr. Shuster?

18   A.    Yes.

19   Q.    And this is another invoice from Southeast

20         Development issued to RDA Construction Corp., is

21         it not?

22   A.    Yes.

23   Q.    And it's for 7/27/02 through 8/5/02, correct?

24   A.    Yes.

Page 55

| | | |
|---|---|---|
| 1 | Q. | And again, we have parking lot use indicated? |
| 2 | A. | Yes. |
| 3 | Q. | Five days? |
| 4 | A. | Yes. |
| 5 | O. | And underneath that we have five days bulkhead? |
| 6 | A. | Yes. |
| 7 | Q. | And next to that 8/1/02 to 8/5/02.  What does |
| 8 | | five days bulkhead refer to? |
| 9 | A. | What that means is the vessel that was tied up |
| 10 | | at this location was right up against the |
| 11 | | bulkhead. |
| 12 | Q. | What vessel are you referring to? |
| 13 | A. | In this case, my recollection is it was a barge. |
| 14 | Q. | So, you're saying that the barge is RDA's -- do |
| 15 | | you understand that to be a barge that RDA |
| 16 | | either owned or rented? |
| 17 | | MS. HARDY:  Objection.  You can |
| 18 | | answer. |
| 19 | A. | I know nothing about whether they owned it or |
| 20 | | rented it. |
| 21 | Q. | Well, all right.  Is this a barge you understand |
| 22 | | they were utilizing? |
| 23 | A. | Yes. |
| 24 | Q. | That RDA was utilizing? |

DUNN & GOUDREAU

Page 76

1      tie up alongside the pier?

2  A.  No.

3  Q.  Is the yard at 4 Wright Street locked at night?

4  A.  No.

5  Q.  Is the yard at -- is Shuster and/or the

6      Southeast yard on Wright Street patrolled at all

7      by a security company or a night watchman?

8  A.  No.

9  Q.  Can you explain to me why the charge for

10     bulkhead is higher than the charge for dockage?

11 A.  Yes.

12 Q.  Why is that?

13 A.  Because when we reference bulkhead, that means

14     we are providing the exclusive use of the entire

15     width of the property to accommodate a vessel

16     that's going to be tied up by virtue of the fact

17     that it encompasses the entire width of the

18     property; therefore, closes any other

19     opportunity for us to use that space that's

20     immediately adjacent to our property.  As a

21     result, it commands a premium; so, instead of

22     charging $35 for ordinary dockage, you charge a

23     $100 for that, if you will, exclusivity.

24 Q.  These charges of $35 and $100, are they based

DUNN & GOUDREAU

Page 77

1          upon the length of the vessel, or are they just

2          set rates based upon the size of the bulkhead

3          and the pier you're providing?

4                    MS. HARDY:  Objection.  You can

5          answer.

6     A.   Could you ask that question again, please?

7     Q.   Sure.  The fee of $35 you referenced and the

8          $100 fee, are those set fees; or if the vessel

9          is a certain length, are you charging the vessel

10         by foot?

11    A.   We're never charging the vessel by the foot.

12    Q.   I'd like to refer back to Exhibits Number 9 and

13         Number 10, I refer first to Exhibit Number 9.

14         The second entry on it refers to five days

15         bulkhead, 8/1/02 to 8/5/02, am I reading that

16         correctly?

17    A.   Yes.

18    Q.   Directing your attention now to Exhibit Number

19         5, which is another invoice we looked at earlier

20         today.

21    A.   Yes.

22    Q.   Under dockage and yard use it has the date

23         7/27/02 through 8/5/02; is that correct?

24    A.   Yes.

Page 79

1          used by RDA Construction, correct?

2                    MS. HARDY:   Objection.

3     A.   I don't know.

4     Q.   On the day of the incident, which was August 1,

5          '02, the plaintiff in his diagram, which was

6          Exhibit 4, shows that there's two fishing

7          vessels along the bulkhead; is that correct?

8     A.   Yes.

9     Q.   And Invoice Number 13833, which is Exhibit 9, is

10         charging RDA for the bulkhead on 8/1/02; is that

11         correct?

12    A.   That's correct.

13    Q.   So, is it possible that this invoice is

14         incorrect, in that RDA's barge was not alongside

15         the bulkhead on 8/1/02?

16    A.   It's unlikely that this invoice is incorrect.

17    Q.   Let me ask you this:  We've been provided by

18         your counsel with these various invoices as well

19         as some checks.

20    A.   Yes.

21    Q.   And we've determined through your testimony that

22         Invoice Number 5 was in the amount of $1,025; is

23         that correct?  Exhibit Number 5, rather, Invoice

24         Number 13844?

Page 80

1   A.   13844 is $1,025.

2   Q.   And Exhibit Number 6 in your deposition, which

3        is a check from RDA Construction, was in the

4        amount of $1,025, correct?

5   A.   Yes.

6   Q.   I'll represent to you this, Mr. Shuster, I have

7        not been provided a check that coincides with

8        Number 13833, which is Exhibit Number 9.  Do you

9        see one in any of the exhibits that have been

10       provided today?

11  A.   No.

12  Q.   Is it possible that this invoice was never paid

13       by RDA?

14  A.   No.

15  Q.   Why is that?

16  A.   The reason why I know that is we had difficulty

17       collecting money from them and we finally

18       prevailed in collecting the money.  So, I always

19       etch those in my memory.

20  Q.   Can you explain to me why your counsel was able

21       to provide a check for -- that appears to

22       coincide with Invoice Number 13844, but I don't

23       have a check that coincides with Invoice Number

24       13833?

Page 81

1   A.   I cannot.

2   Q.   Would your accountant or the accountant for

3        Southeast Development be in possession of a

4        check that would coincide with Invoice Number

5        13833?

6   A.   It's possible.

7   Q.   Let me ask you this:  If the plaintiff's

8        testimony is correct, and he diagrammed it,

9        which is Exhibit 4 in this deposition.

10  A.   Yes.

11  Q.   And it shows two fishing vessels alongside the

12       bulkhead on August 1, '02.

13  A.   Yes.

14  Q.   If this diagram is correct and that in fact is

15       the case on August 1, '02, was RDA improperly

16       charged for bulkhead use on August 1, '02?

17  A.   If Document 4 is correct -- I'm sorry, if

18       Exhibit 4 is correct, then Exhibit 9 would be

19       incorrect.

20  Q.   You might have already answered this question.

21       Who specifically dealt with representatives of

22       RDA concerning the dockage at the Wright Street

23       facility?

24  A.   Steven Shuster.

DUNN & GOUDREAU

Page 82

1   Q.   That would be you?

2   A.   I am Steven Shuster.

3   Q.   As you sit here today, do you have any specific

4        recollection concerning a conversation with RDA

5        employees about dockage at the Wright Street

6        facility?

7   A.   No.

8   Q.   Would it refresh your memory or give you any

9        recollection that an employee or employees of

10       RDA specifically requested that they be able to

11       tie the barge alongside the bulkhead and not

12       have it nested alongside another vessel?

13            THE WITNESS:  Do I have a specific

14       recollection of that?

15            MR. McALEER:  Yes.

16  A.   No.  I do not have a specific recollection of

17       that.

18  Q.   Referring back to Exhibit Number 9.  If somebody

19       or a vessel owner was charged for five days of

20       bulkhead use, would that be because they

21       specifically requested to tie up alongside the

22       bulkhead?

23  A.   Yes.

24  Q.   So, it's safe to say that RDA was charged for

Page 83

```
 1        five days of bulkhead usage because they

 2        requested that the vessel be tied up alongside

 3        the bulkhead?

 4   A.   Yes.

 5   Q.   Would any situation occur where one vessel would

 6        trump another vessel as far as preference for

 7        the bulkhead as opposed to being rafted up

 8        alongside or nested alongside another vessel?

 9              MS. HARDY:  Objection.  You can

10        answer.

11   A.   I don't understand what your question is asking.

12   Q.   Let's just say Fishing Vessel A is tied up

13        alongside the bulkhead and Fishing Vessel B

14        comes in and wants dockage.  Is there any type

15        of hierarchy as to who would get the bulkhead or

16        who would have to raft up alongside the boat

17        that's already at the bulkhead?

18              MS. HARDY:  Objection.

19   A.   There is no hierarchy.

20   Q.   Are there situations or have there been

21        situations where a vessel that's alongside the

22        bulkhead has been asked to move and make room

23        for another vessel to tie up alongside the

24        bulkhead?
```

DUNN & GOUDREAU

Page 84

```
 1   A.   Yes.

 2   Q.   When circumstances like that arise, what is the

 3        reason why that may occur?  Why one may have to

 4        move for another?

 5   A.   One may have to -- by virtue of the fact that

 6        they need to be in the proximity of the bulkhead

 7        line, because maybe they're moving something on

 8        or off the vessel.  That's one example.  There

 9        are probably others, but that would be what

10        common sense would tell me.

11   Q.   Understandably.  As you sit here today, do you

12        have any other examples?  You said that's one.

13        Do you have any others that come to mind?

14   A.   Yes.  If somebody needed to fuel their vessel,

15        they would probably need to be alongside.

16   Q.   Does Shuster and/or Southeast provide fueling

17        facilities, or would this be when a mobile

18        fueling truck would come alongside?

19   A.   We don't nor do we allow fueling at our

20        facility.

21   Q.   We talked a little bit about shore power,

22        electrical power that's provided to the vessels

23        at the Wright Street facility.  Is there a

24        separate charge for that or is that included in
```

Page 86

1   A.   Yes.

2   Q.   Is there any other way that dockage is dealt

3        with other than invoices?  Any other way that

4        charges are forwarded to a vessel?

5   A.   No.

6   Q.   How long has Southeast and/or Shuster been

7        charging vessels for dockage at the Wright

8        Street property?

9            MS. HARDY:   Objection.  You can

10       answer.

11  A.   Shuster has never been involved with dockage at

12       the premises.  Southeast Development has been

13       involved for approximately 30 years.

14  Q.   And is that true today?

15  A.   Shuster Corporation continues not to be involved

16       in anything having to do with dockage by virtue

17       of the fact that it's a tenant.  And Southeast

18       Development continues in the same business of

19       renting space as it has for approximately

20       30 years.

21  Q.   And are there vessels tied up alongside the

22       bulkhead right now, today?

23  A.   Perhaps.

24  Q.   Does any other individual, entity, company,

Page 87

1      governmental agency have the right to charge for

2      dockage alongside the bulkhead at the Wright

3      Street property that we've been discussing

4      today?

5  A.  I do not know.

6  Q.  Does the City of New Bedford have the right to

7      charge vessels for docking alongside the Wright

8      Street property --

9          MS. HARDY:  Objection.  You can

10     answer.

11 Q.  -- as we've discussed here today?

12 A.  I do not know.

13 Q.  If a vessel was to come tie up alongside the

14     bulkhead that abuts the Wright Street property

15     we've been discussing today and was left

16     abandoned, whose obligation would it be to deal

17     with an abandoned vessel?

18         MS. HARDY:  Objection.  You can

19     answer.

20 A.  I'm quite sure it's the Harbor Development

21     Commission that attends to derelict vessels or

22     vessels that are sunk or what have you.

23 Q.  Who would contact them to advise them that such

24     a vessel was at the property?

DUNN & GOUDREAU

Page 91

```
 1        organization or is it a pseudo private
 2        organization, if you know?
 3   A.   It's a city department just like your water
 4        department, or sewer department, or rubbish
 5        collection or what have you.
 6   Q.   If it happened to snow today instead of sleet,
 7        who would be responsible for plowing for snow
 8        removal at the Wright Street parking facility?
 9   A.   On the property itself?
10   Q.   Correct, where the staging area was.  In this
11        particular instance with RDA who would have
12        plowed?
13   A.   Southeast Development Company.
14   Q.   Would that snow removal include 5 feet from the
15        bulkhead towards the property?
16   A.   I'm sorry?
17   Q.   Would the snow removal include the 5 foot by 205
18        foot space we discussed earlier in your
19        deposition?
20   A.   It may.
21   Q.   What was marked as Exhibit 2 to this deposition
22        was your Answers to Interrogatories.  Page 3,
23        could you go to Answer Number 7?
24   A.   Yes.
```

# EXHIBIT 2

Page 1

VOLUME:  I
PAGES:  1 - 85
EXHIBITS:  1 - 6

UNITED STATED DISTRICT COURT
DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - - - - - x
MARK BOMBARD,
            Plaintiff,

vs.                                    Docket No.
                                       05-11389-REK


SHUSTER CORPORATION,
RDA CONSTRUCTION CO., INC., AND
SOUTHEAST DEVELOPMENT
CO., LLC,
            Defendants.
- - - - - - - - - - - - - - - - - - x



            DEPOSITION of EUGENE KELLEY, a witness

called on behalf of the Plaintiff, taken pursuant to

notice before Deborah L. Maren, Registered Professional

Reporter and Notary Public in and for the Commonwealth of

Massachusetts, at the Law Office of Joseph G. Abromovitz,

P.C., 858 Washington Street, Third Floor, Dedham,

Massachusetts, on Thursday, January 18, 2007, commencing at

2:02 p.m.

                DUNN & GOUDREAU
        COURT REPORTING SERVICE, INC.
                ONE STATE STREET
            BOSTON, MASSACHUSETTS 02109
        TEL: 617-742-6900/FAX: 617-973-9500


DUNN & GOUDREAU

Page 20

1    A.    No.

2    Q.    But it's commonly referred to as Shuster Wharf where

3    the accident took place?

4          MS. HARDY:   Objection.

5    A.    Yes.

6    Q.    And that's known among your employees?

7    A.    Yes.

8    Q.    Well, you answered here that upon information and

9    belief, James Soza entered a verbal agreement for wharfage

10   at Shuster Wharf.  Do you know who he spoke to when he

11   entered into this verbal agreement?

12   A.    I don't recall.

13   Q.    You don't know with whom he discussed the agreement?

14   A.    No.

15   Q.    It was an oral agreement, however; correct?

16   A.    Yes.

17   Q.    Did he tell you who he talked with?

18   A.    Yes.

19   Q.    Who was that?

20   A.    I don't remember the names.

21   Q.    Do you remember if the last name was Shuster?

22   A.    No.

23   Q.    Well, you would assume, wouldn't you, if James Soza,

24   on behalf of RDA Construction Corp, entered a verbal

Page 29

1  day or not, then what was going to happen?

2  A.    They'd be secured, and then we'd go out to the job

3  site.

4  Q.    Okay.  So do you mean the piles would be secured to

5  the barge?

6  A.    Yes.

7  Q.    And then the barge would be taken to the job site?

8  A.    Yes.

9  Q.    And then what would happen?

10  A.    We were under a -- it was a time constraint.  We had

11  to get the job done.  And weather was a big factor here.  So

12  whenever there was good weather, we had to go.  And if it

13  was good weather, there was probably -- and I don't recall

14  the weather at the time.  But it was urgent to get going.

15  Q.    Why was it urgent to get going, other than the -- why

16  was there a time constraint?

17  A.    Contractually we had a time constraint.  Plus the

18  budget for the job was a time constraint.

19  Q.    What do you mean the budget was a time constraint?

20  A.    We were a fixed-priced contract.

21  Q.    Okay.  So, presumably, this contract that you had with

22  NOAA would spell this out, the time constraint --

23  A.    Yes.

24  Q.    -- more specifically?

DUNN & GOUDREAU

Page 35

1   know the agent of Shuster.  I do not know the name.

2   Q.    Okay.  So when you say Shuster, you're not talking

3   about a specific person.  You just know that Mr. Shuster

4   complained about how the barge was docked to Shuster?

5   A.    Correct.

6   Q.    It could have been anybody from Shuster?  It could

7   have been an agent or employee of Shuster Corporation, for

8   example?

9         MS. HARDY:  Objection.

10  A.    I'd have to ask him.

11  Q.    Well, did he tell you what they said or whoever it was

12  he complained to once he complained, what was their

13  response?

14  A.    Go somewhere else.  I mean, we didn't have much

15  choice.  The barge came there.  The pipe was there.  We

16  had -- we had no other -- there was really no other option.

17  It was like, basically, Too bad.

18  Q.    Did Jimmy try to negotiate a decrease in the charges?

19  A.    I don't know.

20  Q.    Do you know how long the barge was docked at Shuster's

21  wharf?

22  A.    No.

23  Q.    Do you have any idea how long?  Can you guess?

24  A.    From the invoice?

Page 40

1  A.    RDA -- Shuster knew our operation, knew we needed the

2  bulkhead, knew that rafting up against these boats was bad

3  for -- wasn't what we had asked for but what we got when we

4  got there, beyond our control.  We showed up.  Boats were

5  there.

6         As you can see from Mark's drawing there, we had

7  to hoist the piles that weighed probably -- a significant

8  amount of weight, lifting them over the boats, which was

9  not -- we had no choice.  We're there.  They wouldn't move

10 the boats.  What are we going to do?

11        So do I believe -- the question back -- I believe

12 that we made a deal to be up alongside that bulkhead, and we

13 didn't get it.

14 Q.    Okay.  But can you be a little more specific about the

15 proper means -- when you say -- is your answer to my

16 question what you mean by providing a proper means of

17 ingress and egress solely that that barge should have been

18 tied up against the bulkhead and not where it was?

19 A.    So that -- so that a proper means of --

20        MR. MCALEER:  Objection.  You can answer.

21 A.    Can you restate that again?

22 Q.    Right.  I asked you to describe what you mean by their

23 obligation, Southeast Development and/or Shuster, to provide

24 a proper means of ingress and egress.

DUNN & GOUDREAU

Page 41

1          Let me ask you this:  Identify what you mean by

2     ingress and egress.  To what?  From what to what

3     specifically?

4     A.    They had to provide for the work that we had asked

5     for, the deal that we had assumed that we were getting when

6     we spoke with them.

7          I think it was pretty clear that they knew what we

8     were doing.  We were putting piles that way, maybe 15 tons.

9     We had to -- we needed to be close to the pier so we could

10    actually put gangways onto a safe pier, not climb over boats

11    to get there, I guess.

12         It was just not -- I don't know how to be more

13    specific.

14    Q.    Okay.  Well, when you say we needed to put gangways --

15    a gangway close to the pier, if, in fact, the barge was tied

16    directly to the bulkhead, would RDA have provided the

17    gangway?

18    A.    Yes.

19    Q.    In this situation where it isn't, would RDA still

20    provide a gangway?

21         MR. MCALEER:  Objection.

22    A.    I don't believe in this situation that we could have

23    provided the gangway that we assumed we would need based on

24    the deal we made.

DUNN & GOUDREAU

Page 42

1   Q.   Well, did anyone on the day of the accident -- did any

2   employee from RDA bring a gangway with them?

3   A.   They might have.  Yes.

4   Q.   Who was that?  Who brought the gangway?

5   A.   That would be -- the company had gangways on board.

6   Q.   What company?

7   A.   RDA.

8   Q.   All right.  RDA had gangways on board what?

9   A.   The barge.

10  Q.   And one of these gangways was going to be used to

11  access the barge?

12  A.   Correct.

13  Q.   Okay.  But what happened was -- and you understood

14  that the barge would be tied to the bulkhead --

15  A.   Correct.

16  Q.   -- and the gangway that you had on the barge would be

17  used for access to the barge by RDA employees?

18  A.   Correct.

19  Q.   But what happened when Mr. Soza got there and the

20  other RDA employees was that the barge was not directly

21  attached to the bulkhead; it was tied to these two vessels.

22  Correct?

23          MS. HARDY:  Objection.

24  A.   Correct.

DUNN & GOUDREAU

# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No.  05-11389-REK

- - - - - - - - - - - - - - - - - - - - - - - - x

MARK BOMBARD,

Plaintiff,


vs.


SHUSTER CORPORATION,

RDA CONSTRUCTION, INC., and

SOUTHEAST DEVELOPMENT CO., LLC,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

VOLUME I                          Pages 1 - 85



        DEPOSITION OF JAMES SOUZA, a witness called

by counsel for the Plaintiff, taken before Suzanne M.

Hebert, Professional Shorthand Reporter and Notary

Public in and for the Commonwealth of Massachusetts,

at the Law Office of Joseph G. Abromovits, P.C., 858

Washington Street, Floor 3, Dedham, MA, on Thursday,

March 22, 2007, commencing at 2:05 p.m.



DUNN & GOUDREAU

Page 26

1      Q.   Did you consider that a major part of the

2  contract?

3           MS. HARDY:   Objection.

4      A.   Yes.

5      Q.   Just going back now, when you spoke to Gene

6  Kelly, you said you called him after you spoke to

7  Steven Shuster?

8      A.   Yes.

9      Q.   You said, "Looks like we have got a good

10  spot," and what did he say?

11     A.   "Great."

12     Q.   Then what did he do or say?

13     A.   I gave him the number and I didn't

14  follow-up it up much further until he told me we had

15  it.

16     Q.   So you gave him the number, and is it your

17  understanding then at some point he obviously called

18  Mr. Shuster?

19     A.   Yes.

20     Q.   And is it your understanding, then, he

21  finalized the deal?

22     A.   Yes.

23     Q.   And he told you at some point, "It's a done

24  deal"?

Page 27

1      A.   Yes, because I started shipping equipment

2   there.

3      Q.   When did he start to ship equipment?

4      A.   Maybe two weeks after that, right around

5   there.

6      Q.   Do you have any idea what month that was?

7   This was in 2002, certainly, was it not?

8      A.   I know it was hot, so, July.

9      Q.   The accident was August 2, 2002, so is it

10  safe to say you were shipping materials --

11     A.   Three weeks prior to that.

12     Q.   When saying "shipping materials," what were

13  you shipping, the pilings?

14     A.   The pilings are 142 feet long.  You can't

15  truck them that long, so we started receiving them in

16  pieces.  That's why we're building them in Shuster's

17  yard.

18     Q.   So the pieces of the pilings were being

19  shipped to Shuster's yard?

20     A.   Yes.

21     Q.   That started three weeks before the date of

22  the accident?

23     A.   Not exactly sure.

24     Q.   Approximately?

Page 44

1      Q.   Would you agree that RDA 99% of the time

2  provides access for its employees, would you agree

3  it's RDA's responsibility to employees to provide a

4  safe way for the access of the vessel for its

5  employees?

6           MR. McALEER:  Objection.

7      A.   Depends what you consider safe.

8      Q.   Well, I'm sure RDA wouldn't provide access

9  saying, "This isn't safe, we're going to use it any

10  way"?

11      A.   No, definitely not.

12      Q.   So you certainly would try and do something

13  that appears safe to you?

14      A.   Correct.

15      Q.   Now, do you know what RDA planned to use

16  for this particular project as access to the barge?

17      A.   Going to the head wall I would put a

18  gangway out like I normally do.  There was two

19  gangways on the barge.

20      Q.   So this barge had two gangways on it?

21      A.   Correct.

22      Q.   The barge that was at Shuster's Wharf?

23      A.   Correct.

24      Q.   I think you just said, is your testimony,

Page 46

1    traveled from far north.  I believe he lives in

2    Beverly, and if I wasn't using the tugboat, I didn't

3    mind if he didn't show up until 7:30, 8:00, 9:00.

4    Every day he showed up a little different.  I didn't

5    mind.

6        Q.    Were you using the tugboat during this

7    period of time?

8        A.    No.

9        Q.    Now, on the day of the accident, other than

10    the RDA employees in the morning, did you observe

11    anyone else at the wharf?

12        A.    Yes.

13        Q.    Who?

14        A.    The people from the welding company we

15    hired to help weld these piles together.

16        Q.    How many were there?

17        A.    Two guys there.

18        Q.    They don't work for RDA?

19        A.    No.

20        Q.    They were helping you with putting together

21    the piles?

22        A.    They had the contract of welding the piles

23    together.

24        Q.    At the time, the day of the accident, did

Page 47

1   you before starting for work meet with the employees

2   informally and say, "This is what we're going to do

3   today"?

4        A.   I do that every morning.

5        Q.   You did that the day of the accident?

6        A.   Give them a lowdown what the plan is to

7   start the day out.

8        Q.   What was the plan that day?

9        A.   We had some smaller steel on board, stuff I

10  wanted to start landing on the barge.

11       Q.   Did you tell them you wanted to accomplish

12  a certain amount of work by the end of the day?

13            MR. McALEER:  Objection.

14       A.   No.  I wanted to get the piles on the

15  barge, but the big piles still weren't done, so it's

16  not like I had to do it within that day, but I wanted

17  to start loading the barge.

18       Q.   When you say "big piles weren't done," they

19  weren't welded together yet?

20       A.   Weren't 100% fabricated.

21       Q.   Once again, please, can you describe the

22  specific activity on the day of the accident that the

23  RDA employees were doing including yourself?

24       A.   Loading up materials onto the barge.

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11389 REK

************************************************************

| | |
|---|---|
| MARK BOMBARD | * |
| | * |
| v. | * |
| | * |
| SHUSTER CORPORATION, | * |
| RDA CONSTRUCTION CO., INC., and | * |
| SOUTHEAST DEVELOPMENT CO., LLC | * |

************************************************************

**PLAINTIFF'S AMENDED COMPLAINT**

<u>The Parties and Jurisdiction</u>

1.    The plaintiff, Mark Bombard, at all times material hereto, is/was a resident of Exeter, Rhode Island.

2.    The defendant, Shuster Corporation, is a Massachusetts corporation with a usual place of business in New Bedford, Massachusetts.

3.    The defendant, Southeast Development Co., LLC, is a Massachusetts corporation with a usual place of business in New Bedford, Massachusetts.

4.    At all times material hereto defendant, RDA Construction Co., Inc., was the employer of the plaintiff within the meaning of the Jones Act (46 U.S.C. § 688) and employed the plaintiff as a crewmember of a barge to perform work on navigable waters of the United States.

5.      Jurisdiction of the claim against RDA is based upon a federal statute, the Jones

Act. (46 U.S.C. Sec. 688) and the general maritime law; Jurisdiction of the claim against

Shuster is based on diversity of citizenship.

### COUNT II
### Mark Bombard v. RDA Construction Co., Inc.

6.      At all times materials the defendant, RDA, had chartered a barge for the purpose

of using it as a work platform to construct a tower for NOAA.

7.      Plaintiff is a commercial diver who was employed by RDA to perform work in

connection with the mission of said barge and to perform underwater welding once the

piles to support the NOAA tower were driven.

8.      That as a Jones Act employer the defendant, RDA, owed the plaintiff a duty to

provide him with reasonably safe ingress to and egress from the said vessel.

9.      That on or about August 2, 2002 the defendant breached said duty by failing to

provide the Plaintiff with reasonably safe ingress to and egress from the said vessel.

10.      That as a proximate result of said defendant's negligence the Plaintiff was caused

severe pain of body and anguish of mind, incurred substantial expenses for medical

care and attention, was disabled from performing his usual duties as a diver/welder

with a corresponding substantial diminution of earning capacity and was otherwise

injured, as will be shown at the trial of this action.

**WHEREFORE** the plaintiff, Mark Bombard, demands judgment against the

defendant, RDA Construction, in the amount of $500,000.00 plus interest, costs and

attorney's fees.

## COUNT II
### Mark Bombard v. Shuster Corporation

11.     On or about August 2, 2002 the Plaintiff was employed to work aboard a barge that was moored off Shuster's Wharf in New Bedford, MA.

12.     At all times material hereto Defendant owned and was in control of Shuster's Wharf.

13.     That Defendant owed the plaintiff a duty to provide him with reasonably safe ingress to and egress from the said vessel.

14.     That the defendant breached said duty by failing to provide the Plaintiff with reasonably safe ingress to and egress from the said vessel.

15.     That as a proximate result of said defendant's negligence the Plaintiff was caused severe pain of body and anguish of mind, incurred substantial expenses for medical care and attention, was disabled from performing his usual duties as a diver/welder with a corresponding substantial diminution of earning capacity and was otherwise injured, as will be shown at the trial of this action.

**WHEREFORE** the plaintiff, Mark Bombard, demands judgment against the defendant, Shuster Corporation in the amount of $500,000.00 plus interest, costs and attorney's fees.

## COUNT III
### Mark Bombard v. Southeast Development Corporation, Co., LLC

16.     On or about August 2, 2002 the Plaintiff was employed to work aboard a barge that was moored off Shuster's Wharf in New Bedford, MA.

17.     At all times material hereto Defendant owned and was in control of Shuster's Wharf.

18.     That Defendant owed the plaintiff a duty to provide him with reasonably safe ingress to and egress from the said vessel.

19.     That the defendant breached said duty by failing to provide the Plaintiff with reasonably safe ingress to and egress from the said vessel.

20.     That as a proximate result of said defendant's negligence the Plaintiff was caused severe pain of body and anguish of mind, incurred substantial expenses for medical care and attention, was disabled from performing his usual duties as a diver/welder with a corresponding substantial diminution of earning capacity and was otherwise injured, as will be shown at the trial of this action.

     **WHEREFORE** the plaintiff, Mark Bombard, demands judgment against the defendant, Southeast Development Co., LLC, in the amount of $500,000.00 plus interest, costs and attorney's fees.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON EACH AND EVERY ISSUE
RAISED HEREIN.

Dated: January 27, 2005                    The Plaintiff, Mark Bombard,
                                           By his attorney,
                                           JOSEPH G. ABROMOVITZ, P.C.

                                           s/Joseph G. Abromovitz
                                           _____
                                           Joseph G. Abromovitz
                                           BBO NO. 011420
                                           858 Washington Street, 3rd Floor
                                           Dedham, MA 02026
                                           Phone: (781) 329-1080

## CERTIFICATE OF SERVICE

I, Joseph G. Abromovitz, hereby certify that on the 27th day of January, 2006, I

served a copy of this document by first class mail, postage prepaid to the following

counsel of record:

Megan E. Kures
Melick, Porter & Shea, LLP
28 State Street
Boston, MA 02108-1775

Patrick O. McAleer, Esquire
Looney & Grossman, LLP
101 Arch Street
Boston, MA 02110-1112

s/Joseph G. Abromovitz

_____

Joseph G. Abromovitz

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARK BOMBARD | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. NO. 05-11389-REK |
| SHUSTER CORPORATION AND | ) | |
| RDA CONSTRUCTION CO., INC. | ) | |
| Defendants | ) | |
| | ) | |

## ANSWER AND CROSS-CLAIM OF DEFENDANT, RDA CONSTRUCTION CO., INC.

### The Parties and Jurisdiction

1.      Defendant RDA Construction Co., Inc. ("RDA") is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 and therefore denies same.

2.      Defendant RDA is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 and therefore denies same.

3.      Defendant RDA admits only that on occasion it has employed the plaintiff; RDA denies the remaining allegations of paragraph 3.

4.       Paragraph 4 states conclusions of law which require no answer.  To the extent any answer is required, RDA denies the same.

### COUNT II (SIC)
#### Mark Bombard v. RDA Construction Co., Inc.

5.      Defendant RDA admits the allegations contained in paragraph 5.

6.      Defendant RDA admits only that on occasion it has employed the plaintiff; RDA denies the remaining allegations of paragraph 6.

7.      Paragraph 7 states conclusions of law which require no answer.  To the extent any

answer is required, RDA denies the same.

8.      Defendant RDA denies the allegations contained in paragraph 8.

9.      Defendant RDA denies the allegations contained in paragraph 9.

### COUNT II
### Mark Bombard v. Shuster Corporation

10-14.      This Count is not directed at defendant RDA and requires no answer by defendant

RDA to paragraphs 10-14 inclusive.  To the extent any answer is required defendant RDA denies

said allegations.

### FIRST AFFIRMATIVE DEFENSE

And answering further as a first separate and affirmative defense, RDA states that if the

plaintiff were injured as alleged, which is denied, said injuries were caused or contributed to by

the plaintiff's own negligence and, therefore, plaintiff can recover nothing, or, alternatively, any

recovery should be reduced by the degree of the plaintiff's own negligence.

### SECOND AFFIRMATIVE DEFENSE

And answering further as a second separate and affirmative defense, RDA states that that

if the plaintiff were injured as alleged, which is denied, said injuries were caused by an act or

acts of a third person or persons over whom RDA had no knowledge and over which defendant

RDA had no control.

### THIRD AFFIRMATIVE DEFENSE

And answering further as a third separate and affirmative defense, RDA states that

plaintiff's injuries were caused by the willful misconduct of plaintiff for which said defendant is

not responsible.

## FOURTH AFFIRMATIVE DEFENSE

And answering further as a fourth separate and affirmative defense, RDA states that plaintiff's complaint fails to set forth a cause of action against it upon which relief can be granted.

## FIFTH AFFIRMATIVE DEFENSE

And answering further as a fifth separate and affirmative defense, RDA states that plaintiff has failed to mitigate his damages.

## SIXTH AFFIRMATIVE DEFENSE

And answering further as a sixth separate and affirmative defense, RDA states that any injury to the plaintiff was caused by an act of God or force majeure.

## SEVENTH AFFIRMATIVE DEFENSE

And answering further as a seventh separate and affirmative defense, RDA claims the protection of the Limitation of Liability provisions of 46 USC § 181 et seq., and FRCP Rule F Supplemental Rules for Certain Admiralty and Maritime Claims and seeks exoneration from liability or limitation of any judgment against it pursuant to said provisions.

## EIGHTH AFFIRMATIVE DEFENSE

And answering further as an eighth separate and affirmative defense, RDA states that the plaintiff is estopped from bringing an action under the Jones Act (46 U.S.C. Sec. 688) in that he has filed Workers Compensation claim No. 2679202 with the Commonwealth of Massachusetts Department of Industrial Accidents.

## NINTH AFFIRMATIVE DEFENSE

And answering further as a ninth separate and affirmative defense, RDA states that the plaintiff, by his actions, has waived any claim for injuries against RDA.

## CROSS-CLAIM OF DEFENDANT RDA CONSTRUCTION CO., INC. CO-DEFENDANT SHUSTER CORPORATION

1.    Defendant, Cross-Claim Plaintiff RDA Construction Co., Inc. ("RDA") is a Massachusetts corporation with its usual place of business in East Boston, Massachusetts.

2.    Defendant, Cross-Claim Defendant Shuster Corporation ("Shuster") upon information and belief is a Massachusetts corporation with a usual place of business in New Bedford, Massachusetts.

3.    Plaintiff Bombard alleges he was injured on or about August 2, 2002 as a result of RDA's negligence. RDA denies any negligence on its part.

4.    Plaintiff Bombard was injured on a pier owned, controlled, operated and/or maintained by Cross-Claim Defendant Shuster.

5.    If the plaintiff Bombard was injured due to the negligence of any third party, which is denied, it was not the negligence of RDA, but the negligence of Shuster in its ownership, control, operation and/or maintenance of said pier and by its failure to provide the plaintiff with a proper means of ingress and egress between its pier and moored vessels.

6.    If RDA is found to be responsible in whole or in part for any damages sustained by Bombard arising from his fall on August 2, 2002, RDA under the principles of contribution and/or indemnification is entitled to full reimbursement from Shuster,

including costs and reasonable attorney's fees, for any sums it is ordered to pay

Bombard.

WHEREFORE, Defendant, Cross-Claim Plaintiff RDA prays that Defendant, Cross-

Claim Defendant Shuster Corporation be ordered to reimburse it for any sums it must pay

Bombard plus its costs and reasonable attorney's fees.

**DEFENDANT, CROSS-CLAIM PLAINTIFF RDA DEMANDS TRIAL BY JURY AS TO ITS ANSWER AND CROSS-CLAIM.**

RDA CONSTRUCTION CO., INC.

By its attorneys,

/s/ Bertram E. Snyder
Bertram E. Snyder (BBO #471320)
Patrick O. McAleer (BBO #642627)
LOONEY & GROSSMAN, LLP
101 Arch Street
Boston, Massachusetts 02110
(617) 951-2800

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of November 2005, I served the foregoing Motion to Remove Default and Answer by mailing copies thereof, postage prepaid, to Joseph G. Abromovitz, 858 Washington Street, 3rd Floor, Dedham, Massachusetts and Richard J. Shea, MELNICK, PORTER & SHEA, LLP, 28 State Street, Boston, Massachusetts.

_/s/ Bertram E. Snyder_____
Bertram E. Snyder

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK BOMBARD )<br>Plaintiff )<br>v. )<br> )<br>SHUSTER CORPORATION )<br>RDA CONSTRUCTION CO., INC. )<br>AND SOUTHEAST DEVELPOMENT )<br>CO., LLP )<br>Defendants ) | C.A. NO. 05-11389-WGY |

## ANSWER AND CROSS-CLAIM OF DEFENDANT, RDA CONSTRUCTION CO., INC. TO PLAINTIFF'S AMENDED COMPLAINT

### The Parties and Jurisdiction

1. Defendant RDA Construction Co., Inc. ("RDA") is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 and therefore denies same.

2. Defendant RDA is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 and therefore denies same.

3. Defendant RDA is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 and therefore denies same.

4. Defendant RDA admits only that on occasion it has employed the plaintiff; RDA denies the remaining allegations of paragraph 4.

5. Paragraph 5 states conclusions of law which require no answer. To the extent any answer is required, RDA denies the same.

## COUNT II (SIC)
### Mark Bombard v. RDA Construction Co., Inc.

6.       Defendant RDA admits the allegations contained in paragraph 6.

7.       Defendant RDA admits only that on occasion it has employed the plaintiff; RDA
denies the remaining allegations of paragraph 7.

8.       Paragraph 8 states conclusions of law which require no answer.  To the extent any
answer is required, RDA denies the same.

9.       Defendant RDA denies the allegations contained in paragraph 9.

10.      Defendant RDA denies the allegations contained in paragraph 10.

## COUNT II
### Mark Bombard v. Shuster Corporation

11-15.       This Count is not directed at defendant RDA and requires no answer by defendant
RDA to paragraphs 11-15 inclusive.  To the extent any answer is required defendant RDA denies
said allegations.

## COUNT III
### Mark Bombard v. Southeast Development Co., LLP

16-20.       This Count is not directed at defendant RDA and requires no answer by defendant
RDA to paragraphs 16-20 inclusive.  To the extent any answer is required defendant RDA denies
said allegations.

## FIRST AFFIRMATIVE DEFENSE

And answering further as a first separate and affirmative defense, RDA states that if the
plaintiff were injured as alleged, which is denied, said injuries were caused or contributed to by
the plaintiff's own negligence and, therefore, plaintiff can recover nothing, or, alternatively, any
recovery should be reduced by the degree of the plaintiff's own negligence.

## SECOND AFFIRMATIVE DEFENSE

And answering further as a second separate and affirmative defense, RDA states that that if the plaintiff were injured as alleged, which is denied, said injuries were caused by an act or acts of a third person or persons over whom RDA had no knowledge and over which defendant RDA had no control.

## THIRD AFFIRMATIVE DEFENSE

And answering further as a third separate and affirmative defense, RDA states that plaintiff's injuries were caused by the willful misconduct of plaintiff for which said defendant is not responsible.

## FOURTH AFFIRMATIVE DEFENSE

And answering further as a fourth separate and affirmative defense, RDA states that plaintiff's complaint fails to set forth a cause of action against it upon which relief can be granted.

## FIFTH AFFIRMATIVE DEFENSE

And answering further as a fifth separate and affirmative defense, RDA states that plaintiff has failed to mitigate his damages.

## SIXTH AFFIRMATIVE DEFENSE

And answering further as a sixth separate and affirmative defense, RDA states that any injury to the plaintiff was caused by an act of God or force majeure.

## SEVENTH AFFIRMATIVE DEFENSE

And answering further as a seventh separate and affirmative defense, RDA claims the protection of the Limitation of Liability provisions of 46 USC § 181 et seq., and FRCP Rule F

Supplemental Rules for Certain Admiralty and Maritime Claims and seeks exoneration from liability or limitation of any judgment against it pursuant to said provisions.

## EIGHTH AFFIRMATIVE DEFENSE

And answering further as an eighth separate and affirmative defense, RDA states that the plaintiff is estopped from bringing an action under the Jones Act (46 U.S.C. Sec. 688) in that he has filed Workers Compensation claim No. 2679202 with the Commonwealth of Massachusetts Department of Industrial Accidents.

## NINTH AFFIRMATIVE DEFENSE

And answering further as a ninth separate and affirmative defense, RDA states that the plaintiff, by his actions, has waived any claim for injuries against RDA.

## CROSS-CLAIM OF DEFENDANT RDA CONSTRUCTION CO., INC.  VS. CO-DEFENDANT SOUTHEAST DEVELOPMENT CO., LLP

1.    Defendant, Cross-Claim Plaintiff RDA Construction Co., Inc. ("RDA") is a Massachusetts corporation with its usual place of business in East Boston, Massachusetts.

2.    Defendant, Cross-Claim Defendant Southeast Development Co., LLP ("Southeast") upon information and belief is a Massachusetts limited liability partnership with a usual place of business in New Bedford, Massachusetts.

3.    Plaintiff Bombard alleges he was injured on or about August 2, 2002 as a result of RDA's negligence.  RDA denies any negligence on its part.

4.    Plaintiff Bombard was injured on a pier owned, controlled, operated and/or maintained by Cross-Claim Defendant Southeast.

5.    If the plaintiff Bombard was injured due to the negligence of any third party, which is denied, it was not the negligence of RDA, but the negligence of Southeast in its

ownership, control, operation and/or maintenance of said pier and by its failure to

provide the plaintiff with a proper means of ingress and egress between its pier and

moored vessels.

6.    If RDA is found to be responsible in whole or in part for any damages sustained by

Bombard arising from his fall on August 2, 2002, RDA under the principles of

contribution and/or indemnification is entitled to full reimbursement from Southeast,

including costs and reasonable attorney's fees, for any sums it is ordered to pay

Bombard.

WHEREFORE, Defendant, Cross-Claim Plaintiff RDA prays that Defendant, Cross-

Claim Defendant Southeast Development Co., LLP be ordered to reimburse it for any sums it

must pay Bombard plus its costs and reasonable attorney's fees.

**DEFENDANT, CROSS-CLAIM PLAINTIFF RDA DEMANDS TRIAL BY JURY
AS TO ITS ANSWER AND CROSS-CLAIM.**

RDA CONSTRUCTION CO., INC.

By its attorneys,

  /s/Patrick O. McAleer
Bertram E. Snyder (BBO #471320)
Patrick O. McAleer (BBO #642627)
LOONEY & GROSSMAN, LLP
101 Arch Street
Boston, Massachusetts 02110
(617) 951-2800

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non registered participants.

/s/ Patrick O. McAleer
Patrick O. McAleer