UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11389 REK

```
*******************************************************
MARK BOMBARD                         *
                                     *
v.                                   *
                                     *
SHUSTER CORPORATION,                 *
RDA CONSTRUCTION CO., INC., and      *
SOUTHEAST DEVELOPMENT CO., LLC       *
*******************************************************
```

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO
DEFENDANT, SOUTHEAST DEVELOPMENT CO. LLC'S MOTION FOR
SUMMARY JUDGMENT

<u>STATEMENT OF THE FACTS</u>

On or about  August 1, 2000, the plaintiff, Mark Bombard,  who at that time was

employed by the Defendant, RDA Construction Company ("RDA"), was injured while

working on property owned and/or controlled by the Defendant, Southeast

Development Co. ("Southeast"). (Deposition of Mark Bombard, pp. 49-50, Exh. A ;

Deposition of Steven Shuster, pp. 20-24, 45, 56-57, 76, Exh. B).  The subject property,

located in New Bedford, MA., abuts a waterfront/harbor with a bulkhead/headwall to

which vessels are docked.  (Deposition of Steven Shuster, pp. 20-21, 41, 56, Exh. B).

Southeast Development Co., charges vessel owners for use of its property, specifically

for parking space, yard space and dockage of vessels in the harbor.  (<u>Id</u>., at pp. 45-46).

Southeast charges an additional dockage charge when it provides a vessel with dockage

directly alongside the bulkhead. ( <u>Id</u>., at pp. 56-57).  With such direct dockage,

Southeast is "providing the exclusive use of the entire width of the property [thereby closing] any other opportunity for [Southeast] to use that space that's immediately adjacent to [its] property ." (Id., at p. 76).

A few weeks prior to the date of the plaintiff's accident, RDA and Southeast entered into an oral contract for RDA's use of the property and in particular , for dockage of a vessel, to wit, a barge, upon which piles were to be loaded by RDA employees. [1] (Deposition of Eugene Kelly, p. 17, 31, Exh.  C ).  For RDA, the major element of the contract was the provision by Southeast for dockage of the barge directly alongside the bulkhead. (Deposition of Eugene Kelly, pp. 74-78, Exh.  C ; Deposition of James Sousa, pp. 25-26, Exh. D).  Said provision of the contract was significant/important to RDA, not only because its employees would be moving very large steel piles from the wharf onto the barge with use of a crane located on the barge, but also because said direct dockage would enable RDA to utilize a gangway (stored on the barge) for safe ingress and egress from the wharf to the barge.  (Deposition of Eugene Kelly, pp. 26, 41, Exh. C; Deposition of James Sousa, pp. 56-57, Exh. D).

On August 1, 2002, when RDA employees arrived at the wharf to begin loading the piles onto the barge, they discovered that the barge was not docked directly alongside the bulkhead but instead was nested outside two fishing vessels (one in front of the other) which in turn, were docked directly alongside the bulkhead.  (Deposition of Mark Bombard, p. 72, Exh. A).   Had RDA known prior to this date that Southeast

---

[1] RDA required use of the property pursuant to a contract with the National Oceanic and Atmospheric Administration (NOAH) to build a tower behind Martha's Vineyard. (Kelly Deposition, pp. 22-23, Exh. C).

would be unable to meet its obligation for direct dockage of its vessel, because Southeast was permitting two fishing vessels to take up the exclusive direct space alongside the bulkhead, RDA would have made other arrangements "somewhere else." (Deposition of Eugene Kelly, pp. 74, 78, Exh. C).

Because the barge was tied to the fishing vessels and not directly to the bulkhead, RDA was unable to use the gangway it had fully intended for use by its employees for access to and from the barge.  ( Deposition of James Sousa, pp. 44, 56-58, Exh. D; Deposition of Eugene Kelly, pp. 41-45, 71, Exhibit C).  Gangways were utilized by RDA as the customary and safe means of access for its employees to and from a vessel. (Deposition of James Sousa, 42, 58, Exh. D; Deposition of Eugene Kelly, pp. 41-44, 71, Exh. C; Deposition of Mark Bombard, p. 52, Exh. A ).  The gangways used by RDA  had handrails, self adjusted to the rise of the tide, and had sufficient walking space. (Deposition of Mark Bombard, p. 43, Exh.  A; Deposition of James Sousa, p. 58, Exh. D ; Deposition of Eugene Kelly, pp. 43-44, Exh. C ).   Had the vessel been docked directly against the bulkhead thereby enabling the use of a gangway,  Mr. Bombard (as well as the other RDA employees)  would have used the gangway. (Deposition of Mark Bombard, pp. 52-55, Exh. A).   Instead, the men had to resort to various means to board the fishing vessel from the wharf, including, as testified by Mr. Bombard, the use of an unsecured, narrow plank (ten inches wide and eight/ten feet long) lacking handrails (Id. at pp. 76, 82-84, 103).

Mr. Bombard considered the plank to be extremely unsafe.  ( Id., at pp.  78, 103-104, 117).  Because of his tall height (he was taller than all of the other RDA employees),

he  chose to swing his leg over the vessel railing and jump onto the pier when

disembarking from the fishing vessel.  (Deposition of James Sousa, pp. 61-62, Exh. D;

Deposition of Mark Bombard, pp. 103-104, Exh. A).   It was while so doing, that he

sustained a severe injury to his right leg. (Deposition of Mark Bombard, pp. 97-99, Exh.

A).

<u>PROCEDURAL HISTORY</u>

Plaintiff initially filed suit against Shuster Corporation, as the entity that owned

and/or controlled the subject premises, alleging, *inter alia*, breach of its duty to provide

the plaintiff, an employee of the defendant, RDA Construction, Inc., safe ingress/egress

to a vessel.   Plaintiff also named RDA Construction, Inc., as a defendant, alleging that

RDA breached its duty to provide its employee, the plaintiff, safe ingress/egress to and

from a vessel.

Plaintiff's subsequent motion to amend the complaint to add Southeast

Development, Co., Inc. as the entity that owned and/or controlled the subject premises

and as a potential joint tortfeasor, was granted.

<u>ARGUMENT</u>

I.    THE DEFENDANT, SOUTHEAST, IS NOT ENTITLED TO SUMMARY
      JUDGMENT AS A MATTER OF LAW.  THE RECORD EVIDENCE
      DEMONSTRATES GENUINE ISSUES OF MATERIAL FACT AS WELL AS
      SUFFICIENT EVIDENCE OF NEGLIGENCE AND PROXIMATE CAUSE.

<u>Standard Of Review/Summary Judgment</u>

As this Court is aware, a party moving for summary judgment is held to a

stringent standard to demonstrate the absence of a genuine issue as to any material fact

in order to entitle the movant to judgment as a mater of law.  <u>Community Nat'L Bank</u> v. <u>Dawes</u>, 369 Mass. 550, 554 (1976); 10A C.A. Wright, A.R. Miller, & M.K. Kane, Federal Practice and Procedure, Section 2727, at 124-125 (2nd ed. 1983).  The evidence presented is always construed in favor of the party opposing the motion, and said party is given the benefit of all favorable inferences that can be drawn therefrom.  <u>Parent</u> v. <u>Stone & Webster Eng., Corp</u>., 408 Mass. 108, 113 (1990).

While a moving party may satisfy its burden either by submitting affirmative evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial,  a court should not grant a party's motion for summary judgment merely because the facts offered appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial.  <u>Kourouvacillis v. General Motors Corp</u>. 410 Mass. 706, 716 (1991); <u>Attorney Gen</u>. v. <u>Bailey</u>, 386 Mass. 367, 370, <u>cert. den</u>. 459 U.S. 970 (1982).

The plaintiff contends that the record evidence demonstrates the failure of the defendant to sustain its burden of proof for summary judgment as argued herein.

A.     Southeast's Duty Of Care To The Plaintiff Arises From It's Failure To Carry Out a Contractual Obligation To RDA And Its Employees; As Such, The "Open And Obvious Rule" Is Not Applicable To Preclude The Defendant's Duty Of Care To The Plaintiff.

<u>Southeast's Duty Of Care</u>

It is well settled in this jurisdiction that a claim in tort may arise from a contractual relationship and can be available to persons who are not parties to the

contract. [2] Parent v. Stone & Webster Eng. Corp., 408 Mass. 108, 113 (1990)(citations to cases omitted.)  Specifically, the Massachusetts appellate courts have held that a defendant under a contractual obligation is liable to third persons not parties to the contract under circumstances in which it is foreseeable that such persons can be exposed to danger and are injured due to the defendant's negligent failure to carry out said contractual obligation.  See, Id.  Stated somewhat differently, "[i]t is well established in Massachusetts that one who assumes an obligation under a contract has a duty of reasonable care in the performance of the obligation and is liable  to third parties who are foreseeably exposed to danger and injured as a result of any negligent failure to carry out that obligation.  Davis v. Protection One Alarm Monitoring, Inc., 456 F. Supp. 2d 243, 249 (D. Mass. 2006)(citations to cases omitted.).

For RDA, the "major" element of the oral contract entered into by Southeast and RDA, was the provision by Southeast for dockage of a barge directly alongside the bulkhead that abutted Southeast's property.  (Deposition of James Sousa, pp. 25-26, 74-78, Exh. D;  See, also, Deposition of Eugene Kelly, pp. 41, 81, Exh. C).  Said direct dockage was of primary importance to RDA, not only because its employees would be moving very large steel piles from the wharf onto the barge, but also because said direct dockage would enable RDA to utilize a gangway (stored on the barge) for safe ingress and egress from the wharf to the barge for its employees. (Deposition of Kelly pp. 26, 41, Exh.  C; Deposition of Sousa, p. 56, Exh. D).  As testified by James Sousa, RDA's

---

[2] That the plaintiff may not be an intended beneficiary of the contract, with rights to enforce the contract between RDA and Southeast, does not preclude a legal duty owed by Southeast to RDA and the plaintiff, an employee of RDA. See, Lakew v. MBTA, 65 Mass. App. 794, 801, 844 N.E.2d 263, 269 (2006).

supervisor on the date of the accident, "Our main plan was to put a gangway out to [sic]

pier." (Sousa Deposition, at p. 56).   And, as further testified by RDA's Rule 30A(b)(6)

designee, Eugene Kelly:

> I think it was pretty clear that they knew what we were doing.
> We were putting piles...maybe 15 tons...we needed to be close
> to the pier  so we could actually put gangways onto a safe pier...
> (Exh. C, p. 41).  [Being] tied up to the bulkhead, which is the
> deal that we made--we wouldn't have made any other deal.
> (Id., at, p. 81. ).

On the day of the accident, RDA employees went to the pier to begin the

loading work, only to discover that the barge was not docked directly to the bulkhead,

but was nested outside two fishing vessels, which in turn, were tied directly alongside

the bulkhead.  (Deposition of Eugene Kelly, pp. 31-33, Exh. C; Deposition of Mark

Bombard, p. 72, Exh. A).  As testified by both Sousa and Kelly, because the vessel was

not docked directly alongside the bulkhead, the gangway RDA had fully intended its

employees to use for access from the pier to the barge and back could not be used, since

a gangway could not be safely or appropriately utilized with a fishing vessel.

(Deposition of James Sousa, pp. 42, 56-58, Exh. D; Deposition of Eugene Kelly, pp, 41,

78-81, Exh. C). [3]

The gangways used by RDA had handrails, self-adjusted to the rise of the tide,

had sufficient walking space, and were utilized by RDA as their customary and safe

means of access for its employees to and from a vessel.  (Deposition of James Sousa, pp.,

---

[3] Because  the steel piles were already in the parking lot of Southeast's property, ready for loading onto
the barge, and because RDA was under a time constraint, RDA decided to commence with the loading.
(Deposition of Kelly, p. 81, Exh. C ; Deposition of Bombard, p. 78, Exh. A).

42, 58, Exh. D;Deposition of James Kelly, pp. 41-44, Exh. C; Deposition of Mark Bombard, p. 43, Exh. A ).   Pursuant to Southeast's promise/agreement to provide dockage of the vessel directly against the bulkhead, thereby enabling the use of a gangway, Mr. Bombard, as he made clear in his deposition testimony, would have used the gangway had it been available.  (Deposition of Mark Bombard, pp. 54-55, Exh. A). Instead, the plaintiff and the other RDA employees were forced to improvise patently less safe means of access from the wharf to the fishing vessel and back again.  Said means included an unsecured plank, ten inches wide, eight/ten feet long, without handrails, extending from the pier towards the stern of the fishing boat; the use of scupper holes on the side of the vessel; and climbing off the fishing vessel and jumping onto the pier.[4]

As testified by Mr. Bombard, Mr. Sousa, as well as some of the other employees, used the plank (as did Mr. Bombard on occasion), and at times during the earlier part of the day, also climbed off the  fishing vessel onto the wharf.  (Deposition of Mark Bombard, pp. 85-87, Exh. A).  Mr. Bombard consistently testified that he considered the plank dangerous and unsafe since, *inter alia*, it did not have handrails and was not secured. (Id., at pp. 78, 82-83, 91-95, 103-104, 117).  In particular, he was concerned that should he lose is balance or slipped, he could have gotten pinned between the barge and the wharf.  (Id., at p. 117).  Due in part to his height (he was considerably taller than all of the other RDA employees) he often chose to disembark the vessel by climbing

---

[4] There is conflicting testimony as to the specific means of ingress/egress actually available and which were in fact utilized by RDA employees. See, infra., p 12 and n. 8.

over the vessel and jumping onto the pier. (Deposition of Mark Bombard, at pp. 103-104; See, Deposition of James Sousa, pp 61-62, Exh. D). It was while so doing that he injured his leg. (Deposition of Mark Bombard, p. 99, Exh. A). Because they were too short, the other employees were unable to disembark the vessel by jumping onto the pier once the tide rose. (Deposition of James Sousa, pp. 61-62, Exh. D).

Southeast's duty of care to the plaintiff arises from its failure to carry out its obligation to provide dockage of the barge directly alongside the bulkhead, making it liable to the plaintiff for the injuries he sustained as a foreseeable result of said violation. While the precise manner in which the plaintiff's accident/injuries occurred may not have been specifically foreseen by Southeast, such precision is not required. Solimene v. B. Grauel & Co., 399 Mass. 790, 798 (1987). Simply stated, RDA's inability to use a gangway as a safe means of ingress/egress for its employees,[5] was the direct result of Southeast's negligent failure to fulfill its contractual obligation to RDA, and was a substantial contributing factor to the plaintiff's accident and injuries. (See, infra, pp. 11-13).

Southeast does not admit that a provision for direct dockage to the bulkhead was ever part of the contract, despite considerable evidence to the contrary, including an invoice to RDA specifically charging for said dockage. (See, Southeast's Brief p. 3). Moreover, Southeast has denied it had any knowledge that RDA employees would be working upon the barge and/or even that the employees would be requiring access to

---

[5] Pursuant to the Jones Act, RDA, as the plaintiff's employer, had a duty to provide the plaintiff with safe ingress/egress to and from the vessel. See, Florida Fuels Inc., v. Petroleum Corp., 6 F. 3d. 330, 331 (5th Cir. 1993).

and from the barge! (Deposition of Steven Shuster, pp. 34-38, Exh. B). Said denials are material fact issues relative to the terms of the oral contract and the parameters of the agreement between Southeast and RDA. Accordingly, it is for a jury to determine, upon any conflicting evidence, just what the terms of the oral agreement were. Banaghan v. Dewey, 340 Mass. 73, 80 (1995).

The "Open And Obvious Rule" Is Inapplicable

The "Open And Obvious Rule" applies to a landowner's duty to warn of blatant dangerous conditions on his or her property. O'Sullivan v. Shaw, 432 Mass. 201, 204 (2000)(emphasis added). That is, "landowners are relieved of the duty to warn of open and obvious dangers on their premises because it is not reasonably foreseeable that a visitor exercising . . . reasonable care for his own safety would suffer injury from such blatant hazards." Id. Any warning under such circumstances would be "an empty form" and would not reduce the likelihood of resulting harm. O'Sullivan, 432 Mass. at 204, quoting, LeBlanc v. Atlantic Bldg & Supply Co., 323 Mass. 702, 705 (1949).

As shown, the duty to the plaintiff had absolutely nothing to do with a "duty to warn" but arose from the defendant's failure to carry out a contractual obligation; therefore, the open and obvious rule is simply inapplicable to the case at bar. Even assuming arguendo the rule is applicable, the alleged dangerous activity in which the plaintiff engaged, to wit jumping six to eight feet from a vessel onto a pier, simply does not rise to the level of blatant danger found as a matter of law to be "open and dangerous" thereby precluding plaintiff's negligence claim. See, e.g., O'Sullivan, 432 Mass. at 207 (diving head first into shallow end of pool); Maldonado v. Thomson Nat'l

10

Press Co., 16 Mass. App. 911, 912, 449 N.,E. 2d 1229, 1230 (placing hand into a fast-moving press).  The behavior of the plaintiff and the manner in which he chose to depart from the vessel is relevant to the issue of comparative negligence, and as such is one for the jury.[6]  OMalley v. Putnam Safe Deposit Vaults Inc., 17 Mass. App. 332, 343, 458 N.E. 2d 752, 760 (1983).

B.      The Causal Connection To Plaintiff's Accident/Injuries Is Neither
        Remote Nor Attenuated.

        Questions of causation, proximate as well as intervening, ordinarily present issues for the jury to decide.[7]  Solimene v. B. Grauel & Co., 399 Mass. 790, 794 (1987). Not only is there no requirement of law that the plaintiff point out the exact way an accident occurs, the precise manner in which the harm occurs does not have to be foreseen by the Defendant.  Solimene, 399 Mass. at 798.  In deciding on the reasonable foreseeability of harm, all circumstances are to be examined.  Flood v. Southland Corp. 416 Mass. 62, 73 (1993).

        That the plaintiff had alternative means to disembark the vessel onto the wharf does not preclude a causal connection between the plaintiff's accident and Southeast's failure to provide RDA with access directly to the bulkhead, thereby ensuring the use of a gangway.  (Southeast's Brief, p. 9).  For one, there is conflicting evidence/testimony about the existence, viability and actual use by RDA employees of the alternative means to disembark the fishing vessel, to wit, a plank and/or scupper holes on the side of the

---

[6] Notwithstanding the defendant's argument, plaintiff's testimony that his choice was "a stupid thing to do" was said in the context of hindsight and hardly forecloses the plaintiff's negligence claim.  Said testimony is merely relevant to the issue of comparative negligence, which is for a jury to consider.
[7] To the extent Southeast suggests that RDA's negligence was a superceding/intervening cause relieving it of liability to the plaintiff, such a question is one for the jury.  Solimene, 399 Mass. at 795.

vessel and a plank.   That is, and directly contrary to Bombard's testimony, Sousa denies

the existence of a plank, and further denies that on the day of the accident, he or the

other RDA employees ever climbed over the fishing vessel onto the pier. ( Deposition of

James Sousa, pp. 52, 55-56, 60-61, Exh. D).   He claims that they all used the scupper

holes on the vessel. (See, Id.).[8]

   Secondly, there is no question that had the barge been docked directly alongside

the bulkhead, as promised by Southeast, RDA would have employed the  gangway

stored on its barge.  The record evidence indicates that had a gangway been provided,

the plaintiff (as well as the other RDA employees) would have used the gangway and

no other means of access. (See, Statement of Facts, infra, p. ).

The gangway, by definition, would have been the safest means to access and

disembark the barge onto the pier--safer than an unsecured, narrow plank, and safer

than "having to climb up and down vessels." ( Deposition of James Sousa, p. 48, Exh. D).

Due to Southeast's negligence, the gangway simply was not available.

Because of Southeast's negligent failure to carry out its obligation to provide

direct dockage, the RDA employees had to improvise a means of access from the wharf

to the fishing vessel and back onto the pier, rather than using the safest means of all, a

gangway.  Had Southeast carried out its contractual obligation, a gangway would have

been utilized, the plaintiff would have used said gangway, and in all likelihood the

accident never would have happened.  Accordingly, the plaintiff submits that the

---

[8] Kelly claims that a plank was there and was used. (Deposition of Kelly, p. 58, Exh. C). Bombard does not recall and/or is unsure about the existence and use of scupper holes, but is absolutely certain there was a plank, and that he as well as other employees, including Sousa,  also would climb from the vessel onto the pier. (Deposition of Bombard, pp. 75, 85, 87, Exh. A).

defendant's conduct in failing to provide dockage directly to the bulkhead, as it was obligated to do by the contract, is not so "attenuated that as a matter of law said conduct could not have been a substantial factor in bringing about the harm to the plaintiff " Johnson v. Summers, 411 Mass. 82, 89 (1991).

C.     As A "Wharfinger" Southeast Breached Its Duty To RDA To Furnish
       Berth For RDA'S Vessel.

A "wharfinger" is defined as "the owner or occupier of a wharf."  Charles West v. City of St. Paul, 1997 AMC 2103 (Alaska Supreme Court 1997) quoting, Black's Law Dictionary  (6th ed. 1990); See, also, Bangor & A.RR. v. Ship Fernview, 455 F. Supp. 1043, 1062 n. 52 (D. Me. 1978).  Said wharfinger owes a duty to exercise reasonable diligence to furnish a safe berth, including the duty to ascertain the condition of the berth, to make it safe and to provide notice to vessel owners of any hidden hazard, dangerous condition or deficiency known to the wharfinger.  See, Charles West v. City of St. Paul, 1997 AMC 2103; See, also, Florida Fuels, Inc, v. Citgo Petroleum Corp., 6 F. 3d 330, 334 (5th Cir. 1993).

The record demonstrates that Southeast is the owner and/or occupier of the subject wharf. (Deposition of James Shuster, pp 20, 21, 41, 45, 56-57, 76, Exh. B). Contrary to Southeast's suggestion, it is of no import that a five foot strip of land between the bulkhead and the property owned by Southeast at the New Bedford harbor on Wright Street, was owned by the City of New Bedford. (Defendant's Brief, p. 4). Southeast manifested absolute control over access to the subject wharf/harbor area and the bulkhead, charging vessel owners for use of the wharf for parking/staging, and also

charging for vessel dockage, including an extra charge for direct and exclusive dockage alongside the bulkhead.  (Deposition of James Shuster, pp. 56-57, 76, Exh. B).

In the case at bar Southeast, as a wharfinger, provided wharfinger services to RDA  (as previously described herein) and as such had a duty to provide RDA with a safe berth for its vessel/barge.   There is sufficient record evidence to show that Southeast breached its duty by allowing two fishing vessels to impede/prevent  direct and safe access to the barge, thereby proximately causing the plaintiff's injuries. Alternatively, whether or not Southeast breached its duty as described, and whether said breach proximately caused the plaintiff's injuries are for a jury to decide.

## CONCLUSION

For all of the above stated reasons, the Defendant Southeast's Motion For Summary Judgment should be denied.

Dated:  May 16, 2007

The Plaintiff, Mark Bombard,
By his attorney,
JOSEPH G. ABROMOVITZ, P.C.

s/Joseph G. Abromovitz

_____

Joseph G. Abromovitz
BBO NO. 011420
858 Washington Street, 3rd Floor
Dedham, MA 02026
Phone: (781) 329-1080

<u>CERTIFICATE OF SERVICE</u>

I, Joseph G. Abromovitz, hereby certify that on the 16th day of May, 2007, I

served a copy of this document by first class mail, postage prepaid to the following

counsel of record:

Jennifer Hardy, Esquire
Melick, Porter & Shea, LLP
28 State Street
Boston, MA 02108-1775

Patrick O. McAleer, Esquire
Looney & Grossman, LLP
101 Arch Street
Boston, MA 02110-1112

s/Joseph G. Abromovitz

_____

Joseph G. Abromovitz

1

Volume:        I

Pages:     1-189

Exhibits       5

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT   OF   MASSACHUSETTS

- - - - - - - - - - - - - - x

MARK   BOMBARD,

            Plaintiff

    VS.                            Civil Action

SHUSTER   CORPORATION,   RDA            No.   05-11389REK

CONSTRUCTION CO., INC., and

SOUTHEAST DEVELOPMENT CO., LLP,

          Defendants

- - - - - - - - - - - - - - x

        DEPOSITION of MARK BOMBARD, a witness called

by and on behalf of the Defendants, taken pursuant to

the provisions of the Massachusetts Rules of Civil

Procedure, before Arlene R. Boyer, a Professional

Court Reporter and Notary Public, in and for the

Commonwealth of Massachusetts, at the offices of

Melick, Porter & Shea, LLP, 28 State Street, Boston,

Massachusetts, 02109, on Tuesday, October 3, 2006,

commencing at 10:30 a.m.

42

1  Continental, how would you access the sites where
2  your dive would take place?
3 A  We had a tug that would ferry us back and forth.
4 Q  Where would the tug pick you up?
5 A  It would pick us up in any number of locations,
6  whether from a ladder that you would, you know,
7  climb down, or through one of the piers. I can't
8  remember the street that it was on.
9 Q  So you would access the tug by way of a ladder if
10  it was below you, correct?
11 A  Right.
12 Q  You said that you'd also access the tug from a
13  pier, not recalling which one it was?
14 A  Right. Sometimes the tug would pick us up there
15  as well, and we also had a steel skiff that we
16  would take out as a team out there as well.
17 Q  When you were picked up at a pier by the tug, how
18  did you get on board the tug?
19 A  It was pretty much just a walk-on scenario.
20 Q  So you'd just step from the pier onto the tug?
21 A  Yes.
22 Q  Was there a gangway?
23 A  I think it was more of a floating dock, so there
24  may have been some sort of gangway. I don't

43

1  recall.
2 Q  Just for the record, what's a gangway?
3 A  A gangway would be a moveable egress onto, you
4  know, said barge or boat, you know, provided with
5  railings and walking space.
6 Q  Like a ramp?
7 A  Like a ramp.
8 Q  Had you ever accessed the tug from a pier while
9  with Modern Continental by way of any other means
10  other than a gangway?
11 A  I'm sorry, could you repeat that?
12 Q  Sure. While with Modern Continental when you
13  would actually access the tug from the pier, did
14  you ever access it under conditions where a
15  gangway wasn't provided?
16     MS. MORELLO: If you remember.
17 A  I don't recall. I believe there may have been
18  times where, like I said, we were coming down a
19  ladder, and I remember getting picked off or
20  dropped off at a --
21 Q  Forgetting the ladder for a moment, when the tug
22  would pick you up at a pier, was it always the
23  case that a gangway is provided for you to access
24  the tug?

44

1 A  I believe it was more of a floating dock than a
2  pier, I guess. There would be a ramp down to it,
3  to the pier, which would be a ramp.
4 Q  Who provided that ramp?
5 A  I would imagine it was Modern Continental.
6 Q  Did you ever complain to Modern Continental about
7  the way in which access was provided to or from
8  the tug while you were diving?
9 A  Never.
10 Q  Did you ever jump over the railing to get off the
11  tug onto the pier?
12 A  No. There was never that scenario.
13 Q  Prior to working with Modern Continental, other
14  than perhaps some work with Clearwater Solutions,
15  had you ever jumped over a railing to get off a
16  vessel onto a pier?
17 A  No.
18 Q  So I take it that whether you used a ladder to
19  get down to the tug or you used a gangway or a
20  floating dock, you were always provided by Modern
21  Continental with a safe means of egress and
22  access to the tug?
23 A  I assume it was Modern Continental who provided
24  it all.

45

1 Q  And that was a safe way to get on and off the
2  boat?
3 A  Yes.
4 Q  Just tell us briefly what a pile driver does,
5  sir.
6 A  Basically, a pile driver loads and unloads
7  trucks. They have piles that they drive into the
8  ground for building docks, piers, stiffening the
9  ground so you can put tall buildings on, things
10  of that nature.
11 Q  When did you first become trained in pile
12  driving?
13 A  It was on-the-job training. Like I said, I got
14  into the union because I was a certified diver.
15 Q  Did you receive any safety training as a pile
16  driver?
17 A  There were some safety meetings with Cashman, I
18  believe, and just the older, more experienced
19  guys kind of pointing things out what to do and
20  what not to do.
21 Q  Did you ever run a crew when you were working at
22  Modern Continental?
23 A  I never ran a crew on any construction job.
24 Q  Did you ever see any of your fellow workers go

12 (Pages 42 to 45)

46

1    over a rail to exit a vessel onto a dock prior to
2    August 1 of 2002?
3 A    No, not in any kind of work capacity.
4 Q    So for all the years that you worked in the
5    marine industry from 1999 up through the date of
6    your accident, you never saw anyone jump off a
7    vessel to gain access to a wharf or a dock in a
8    commercial environment, right?
9 A    That's correct.
10 Q    So the day of your accident would be the first
11    time that you've ever even done it yourself,
12    right?
13        MS. MORELLO:  Objection.
14 A    In a commercial --
15 Q    Commercial.
16 A    In a work environment, yes, that was probably the
17    first time.
18 Q    You would agree with me the reason is that over
19    the years of maritime work, diving, pile driving,
20    that you've never seen anyone do it is because
21    that's not a safe way of exiting a vessel onto a
22    dock, right?
23        MS. MORELLO:  Objection.
24 A    I would say it's not a safe way, and there was

47

1    always better means.
2 Q    You told us that safety is of paramount concern
3    to you in your work environment, right?
4 A    I would say safety is very important.
5 Q    Now, moving up to Jay Cashman, sir, you,
6    according to your resume, began with them in the
7    year August of 2000, but at least according to
8    your resume, you only worked for them for a week;
9    is that right?
10 A    Yeah.  It was a short job that they needed some
11    help for.
12 Q    You were working as a pile driver, right?
13 A    That's correct.
14 Q    But you said a few moments ago that you did
15    receive some safety training when you were with
16    Cashman, right?
17 A    That's correct.
18 Q    So during that one-week period of time, August
19    24, 2000 to September 1, 2000, what safety
20    training did Cashman give you?
21 A    They would have safety meetings.  I believe
22    earlier on, they had a serious accident on the
23    job site, and Cashman was taking their safety
24    program very seriously.

48

1 Q    Did you have to do any work in the water?
2 A    For Cashman, no.
3 Q    All land-based?
4 A    All land-based.
5 Q    The next employment listed in your resume, sir,
6    is CRC Company, Inc.  What's the business of CRC?
7 A    Again, basically it's the dive wing of Cashman,
8    the way I understood it.
9 Q    According to your resume, sir, you worked with
10    CRC from August of 2000 through February of 2001;
11    is that correct?
12 A    Probably off and on, yeah.
13 Q    As a diver, right?
14 A    Yes.
15 Q    Ron LaCoss was your supervisor?
16 A    Yes.
17 Q    Where were you diving, sir?
18 A    Again, at Fort Point Channel.
19 Q    How did you access the dive site when you were
20    with CRC?
21 A    CRC was actually a land-based dive site, so we
22    would actually enter the water via ladder.
23 Q    No vessels involved during that period of time
24    with CRC?

49

1 A    No vessels involved.
2 Q    Were you ever disciplined by any of your
3    companies for safety violations on or before
4    joining RDA Construction?
5 A    Never.
6 Q    The next employment listed on your resume is RDA
7    Construction; is that correct, sir?
8 A    Yes.
9 Q    According to your resume, you began with them in
10    February of 2001; is that correct, sir?
11 A    I believe so.
12 Q    It says you work with them through the present;
13    is that correct, sir?
14 A    That was at the time of this.  I haven't worked
15    with RDA since the date of the injury.
16 Q    Are you still technically an employee of RDA?
17 A    I honestly don't understand how it works at this
18    point.
19 Q    What's the business of RDA Construction?
20 A    It's a marine construction company.
21 Q    The date of this accident, sir, that brings us
22    here today is August 1 of 2002; is that correct?
23 A    Yes.
24 Q    Between February 26 of 2001 and August 1 of 2002,

13 (Pages 46 to 49)

50

1   what job sites did you work at as an employee of
2   RDA Construction?
3 A   Logan Airport as a pile driver was my first job
4   with them. From there, I went to Conley
5   Terminal, which was a long, long stint with that.
6   There may have been breaks in the jobs where
7   we've gone to -- what's the name of the wharf?
8   It might have been called Tutor Wharf, I'm not
9   sure, where we actually pulled piles, and I used
10   a hydraulic chainsaw in the water to remove some
11   piles from that.
12        We did a little bit at Battery Wharf,
13   which was probably more unloading barges, and
14   another pile-driving stint near Northeastern
15   University. I don't recall the name of that
16   street. And there was also some pier work near
17   Boston Garden. I'm not sure of the name of that
18   job site.
19 Q   What percentage of your time while employed at
20   RDA Construction did you dive versus being a pile
21   driver?
22 A   I would say 80 to 90 percent.
23 Q   Would be diving?
24 A   Yeah.

51

1 Q   Were there other divers on your team, if you
2   will?
3 A   Yes. Jim Souza, our foreman, would act as a
4   diver, and on some of the jobs, Flipper was his
5   nickname -- I can't recall his real name -- but
6   during that time period, I was probably their
7   primary diver.
8 Q   The RDA facility is listed at Summer Street in
9   East Boston; is that correct?
10 A   It was then. I know there were talks of possibly
11   moving it, but at that time period, that's where
12   it was.
13 Q   At the time of your accident, sir, that's where
14   their yard was located; is that right?
15 A   That is correct.
16 Q   At the RDA Construction yard, were there gangways
17   available, sir?
18 A   There were some stored on a barge, yes.
19 Q   How many?
20 A   I don't recall. I believe two, possibly more.
21 Q   Can you describe the gangways that were stored on
22   the barges at RDA's yard in East Boston?
23 A   Basically, they look like your typical gangway,
24   pipe railings, you know, lightweight decking.

52

1 Q   How heavy were these, sir, if you know?
2 A   I have no idea.
3 Q   During the period of time February 2001 up to the
4   date of your accident, had you seen the gangways
5   removed from the barge at the RDA Construction
6   site and transported to other locales that RDA
7   was working at?
8 A   I never spent much time at the yard. No, I did
9   not.
10 Q   Did you ever ask anyone why they were storing
11   gangways on a barge at the RDA yard?
12 A   I had just assumed that's where they put all of
13   the equipment when it wasn't being used.
14 Q   I take it that your understanding was that these
15   gangways would be used for access to and from
16   vessels?
17 A   Yes. I know on Conley Terminal, we actually had
18   a gangway for accessing the barge that we were
19   working off of.
20 Q   Who provided that gangway at Conley Terminal?
21 A   I don't know.
22 Q   Was it similar in appearance and design to the
23   gangways stored on the barges?
24 A   Yes, it was fairly similar.

53

1 Q   Now, let's just go back briefly. When you worked
2   at the Logan Airport location for RDA, you were a
3   pile driver?
4 A   That's correct.
5 Q   Specifically, was that land-based or in the
6   water?
7 A   Land-based.
8 Q   Conley Terminal, you just mentioned that there
9   was work with a barge; is that right?
10 A   Yes. I was a diver.
11 Q   Tell me specifically what the barge was being
12   used for at Conley Terminal.
13 A   It was a dive platform.
14 Q   Where was the barge docked, if you will?
15 A   It all depends on where we were working. When
16   I'm a commercial diver, I'm surface supplied,
17   working surface supplied, so we have a rig which
18   is, you know, supplying air, hot water,
19   communications to the diver. I believe the rigs
20   we have are probably 150 feet to 200, so we'd
21   have to move the barge along, depending on where
22   the work was.
23 Q   How would you access the barge?
24 A   The gangway.

14 (Pages 50 to 53)

54

1 Q   So that at Conley Terminal, there'd be the dock
2       area, if you will, a gangway --
3 A   That's correct.
4 Q   -- and then you'd walk up the gangway and step
5       onto the barge?
6 A   We would go down to the barge, yes.
7 Q   So the gangway would be angled down to the barge?
8 A   Down to the barge, correct.
9 Q   Whose barge was it?
10 A  I don't know.  I believe RDA's, but I don't know.
11 Q  As far as the gangway being provided, you don't
12      know who provided that, right?
13 A  I don't know who provided that.
14 Q  Was it fair to say that during the entire period
15      of time that you worked at the Conley Terminal
16      that there always was a gangway provided by RDA
17      to the workers to get on board the barge?
18           MR. McALEER:  Objection.
19 A  There was always a gangway to access the barge.
20 Q  You had never had any difficulty getting on board
21      or off the barge when there was a gangway
22      present, right?
23 A  No.  I mean, there were times when it was steep,
24      but it was definitely doable.

55

1 Q   Did you ever jump over the side of that barge to
2       get off it?
3 A   Never.
4 Q   Now, you mentioned that there was some work you
5       believed done at Tutor Wharf; is that correct?
6 A   Yes.
7 Q   You said you had pulled some piles; is that
8       right?
9 A   We were pulling piles, and if they weren't
10      getting pulled out, I'd have to go down and cut
11      them at the mud line.
12 Q  Was that land-based?
13 A  That was we were working from a barge on that job
14      as well.
15 Q  Where was the barge docked?
16 A  It was tied off to some of the piles, the
17      existing piles that were there.
18 Q  Where is Tutor Wharf located?
19 A  Near the new bridge, the Constitution.  It was an
20      old wharf that had actually burnt down.  That's
21      as far as I can really tell you, in Boston.
22 Q  How did you access this particular barge, by way
23      of a gangway?
24 A  I believe we had to take a skiff out to it.

56

1 Q   So during the time you worked at Tutor Wharf, was
2       there ever a time that the barge was tied off at
3       the wharf where you accessed it directly rather
4       than by way of a skiff?
5 A   I believe we always had to use a skiff in order
6       to access it.
7 Q   Once the skiff would arrive at the barge, would
8       you just go up a ladder?
9 A   Yes.
10 Q  How did you get onto the skiff?
11 A  We'd just step over the side.
12 Q  At Battery Wharf, you were unloading barges; is
13      that correct, sir?
14 A  That's correct.
15 Q  What were you unloading off the barge?
16 A  Wooden piles.
17 Q  Describe for me the wooden piles that you'd be
18      unloading.
19 A  They were just slippery, encrusted, wooden
20      timbers.
21 Q  What would the size and dimensions of them be?
22 A  They were various.  I mean, too big to move
23      manually.  It was all loaded by cranes, so we
24      were going through hooking up, you know, cables

57

1       to the crane, hoisting them over, and then, you
2       know, drop them on shore.
3 Q   Your job would be to manually wrap the piles, if
4       you will?
5 A   Wrap and unwrap them, that's correct.
6 Q   How long did you work at the Battery Wharf site?
7 A   I don't recall exactly; a couple of days at a
8       time.  I believe they might have been the piles
9       from Tutor Wharf, but I'm not exactly sure.
10 Q  This particular barge was actually docked at
11      Battery Wharf, right?
12 A  I believe so.
13 Q  How did you gain access to and exit from that
14      particular barge?
15 A  It was a gangway.
16 Q  When you first arrived at Battery Wharf, was the
17      setup in place; in other words, was the barge
18      already there and the gangway already in place?
19 A  I believe so.
20 Q  As your position as a laborer with RDA
21      Construction, was it ever part of your
22      responsibility to move a gangway from one
23      location to another?
24 A  No.

15 (Pages 54 to 57)

70

1    ready they said, you know, be there for then.
2 Q    How did you get there?
3 A    I drove.
4 Q    When you arrived at the Shuster Wharf on August 1
5    of 2002, what time of the day did you arrive?
6 A    Early morning.
7 Q    Who was in charge of the crew?
8 A    Jim Souza.
9 Q    You told us that Mr. Souza also was a diver; is
10    that right, sir?
11 A    Yes, he's a diver as well.
12 Q    How many RDA employees were present at the yard
13    that morning in New Bedford?
14 A    I know there were the two Jim Souzas. One is a
15    crane operator, and one is a pile driver
16    superintendent. There was another pile driver.
17    I believe his name is Jay Huron, myself. There
18    were two guys with the tug. Whether they're
19    actually RDA employees, I don't know. And there
20    was also one other guy who I believe was a non-
21    union worker. I'm not sure what his name was.
22 Q    Just so I understand it, there were the two Jim
23    Souzas, yourself, Jay Huron, and one other guy
24    who was non-union?

71

1 A    As far as I can remember.
2 Q    Other than the two guys that were on the tug?
3 A    Yes.
4 Q    So there was a crew of five who would be
5    responsible for loading the piles on board the
6    barge; is that right?
7 A    Well, there would be the operator of the --
8    basically, we were short pile drivers. The
9    operator isn't considered a pile driver.
10 Q    So one of the Jim Souzas would not be considered
11    a pile driver?
12 A    Right, that's correct.
13 Q    How many pile drivers were required for loading
14    the piles that were in the yard onto the barge to
15    take over to Martha's Vineyard?
16 A    How many were responsible for that?
17 Q    You just said you were short pile drivers.
18 A    Yes. I believe by union standards -- I'm not
19    positive, but I believe it's five for any kind of
20    hoisting operation.
21 Q    So five pile drivers for any hoisting operation?
22 A    Yes.
23 Q    What standard are you referring to?
24 A    Using a crane too large, you know, to move any --

72

1 Q    Have you reviewed any written union standards,
2    sir?
3 A    No, I have not.
4 Q    Are you guessing that five is the number, or did
5    someone tell you that?
6 A    On a job at Modern Continental, we were moving
7    something at one time, and there was something I
8    couldn't handle, and I went to grab a guy from
9    another crew, and he's like of course you can't
10    handle this, and I believe that's where I heard
11    the number five.
12 Q    Now, when you arrived at the Shuster Wharf on
13    August 1 of 2002, did Jim Souza, the supervisor,
14    convene a meeting to explain what the job
15    functions of each of you would be?
16 A    Basically, we had a little briefing. We were
17    going to be loading the barges. It wasn't very
18    formal, I should say.
19 Q    How many barges were there?
20 A    One, that I recall.
21 Q    Where is the barge docked?
22 A    The barge was nested between two fishing boats,
23    and then there was the wharf.
24 Q    Describe for us, if you will, what you mean when

73

1    you said "the barge was nested between two
2    fishing boats, and then there was the wharf."
3 A    Okay. Basically, we had Shuster's Wharf. Tied
4    up to the wharf, there were two fishing boats
5    under various stages of construction. Tied to
6    those two fishing boats on the outside was the
7    barge that we were loading the piles onto.
8 Q    Are you capable of drawing a rough sketch for us
9    as to the wharf location, the two fishing
10    vessels, and the barge?
11 A    I can give that an attempt.
12 Q    Why don't you take this piece of paper, sir, and
13    just outline for us, if you will, Shuster's
14    Wharf, the two fishing vessels, and the location
15    of the barge, and label each thing, if you don't
16    mind, please.
17 A    (Witness complies.)
18 Q    Would you mind just signing and dating that for
19    us, Mr. Bombard? Today is October 3.
20 A    Sure.
21    (Witness complies.)
22        MR. SHEA: Can we mark this as Exhibit
23    Number 2, please.
24

19 (Pages 70 to 73)

74

1          (Exhibit Number 2, Diagram by Mr.
2     Bombard, was Marked for
3     Identification.)
4
5 Q    I'm going to show you, Mr. Bombard, what has been
6     marked as Exhibit 2 which you were kind enough to
7     prepare a rough sketch of the general
8     configuration of the area where your accident
9     occurred; is that correct, sir?
10 A    Yes.
11 Q    You begin with the driveway, and there's a gate;
12     is that correct, sir?
13 A    That's correct.
14 Q    You have marked something house?
15 A    That was some sort of warehouse.
16 Q    Warehouse, okay.  I take it between the warehouse
17     and the waterfront, this is a parking lot area,
18     sir?
19 A    Parking lot yard, yeah.
20 Q    Then you mark "waterfront," and there are two
21     boats depicted?
22 A    Right.
23 Q    Are those the two fishing boats that you
24     described?

75

1 A    That's correct.
2 Q    You've marked "point of disembarkment"?
3 A    That's where I threw my legs over the railing and
4     sustained the injury.
5 Q    Beyond the two boats is the barge with the crane;
6     is that correct, sir?
7 A    That's correct.
8 Q    I take it that the goal was to take piles that
9     were located on the ground in the parking lot
10     between the warehouse and the waterfront and load
11     them onto the barge; is that right?
12 A    That's correct, yes.
13 Q    When you arrived at the location depicted in your
14     Exhibit 2 on August 1 of 2002, where was the pile
15     of piles, if you will, located?  You can add that
16     to Exhibit 2, please.
17     (Witness complies.)
18 A    These aren't to scale or size.
19 Q    Could you just label them "piles," sir, just so
20     we know what they are?
21 A    (Witness complies.)
22 Q    Granted that they're not to size or scale, but
23     can you just tell us from your best memory
24     approximately how large the piles were that were

76

1     being moved from the ground onto the barge?
2 A    I believe they were 180 feet.
3 Q    Each?
4 A    Yes.
5 Q    Again, sir, the crane that was being used to
6     hoist them was located on the barge; is that
7     correct, sir?
8 A    That is correct.
9 Q    What was the role that you and your fellow pile
10     drivers would be playing?  Would it be simply to
11     wrap the piles both on land and then unwrap them
12     once they were placed on the barge?
13 A    And guide them over during the process.
14 Q    Now, before beginning any work that morning, did
15     you have any conversation with anyone from RDA
16     about the means of access to and from the barge?
17 A    Yes.
18 Q    What conversation did you have?
19 A    When we got there, the other pile driver, Jay,
20     was kind of talking about the access point.  He
21     made comment to, you know, look at the ramp that
22     we have to -- or look at the -- basically, it was
23     just look at the plank we have to get at, you
24     know, to go on the barges, like typical RDA.

77

1 Q    When you say that there was a plank, sir, where
2     was the plank that you described to access the
3     barge?  Use the pen, if you will, and label it
4     "plank."
5     (Witness complies.)
6 Q    You've marked the plank towards the stern of the
7     front boat?
8 A    That's correct.
9 Q    Can you describe that plank for us in dimensions,
10     sir?
11 A    Roughly it was like a two-by-ten, probably eight
12     to ten feet long.
13 Q    You mentioned that Jay made comment about look at
14     the plank; is that right, sir?
15 A    Yes.
16 Q    What conversation, if any, did you have relative
17     to the plank before ever setting foot on it?
18 A    We were just commenting on how unsafe it looks.
19     At that point, there was boat traffic going by,
20     so the fishing boats are rocking up and down.
21     The plank looked rickety.
22 Q    Who provided that plank?
23 A    I don't know.
24 Q    What conversation, if any, did you have with your

20 (Pages 74 to 77)

78

1  supervisor, Jim Souza, about the means of egress
2  and access to the barge?
3 A  I mentioned to Jim at one point that we had those
4  gangways at the yard, and they'd be great for
5  this.
6 Q  What did he say?
7 A  He basically responded like yeah, that would be a
8  good idea, but we're only going to be here for
9  one day, and we've got to get out.  The weather's
10  getting bad, and time was of the essence with
11  this job.
12 Q  So is it fair to say that you recognized that, at
13  least from your perspective, that there was not a
14  safe means of access to and from the barge before
15  you even began your work that day?
16       MS. MORELLO:  Objection.
17 A  Yes.
18 Q  You told us before that you would never encounter
19  an unsafe condition on a job yourself.  If you
20  felt it was unsafe, you wouldn't do the job,
21  right?
22       MS. MORELLO:  Objection.  Go ahead.
23 A  If I felt it was extremely unsafe, I would not do
24  it.

79

1 Q  So you make a distinction between something
2  that's unsafe and something that's extremely
3  unsafe as to whether or not you'll do a job?
4 A  Yes.
5 Q  So that you felt that this was unsafe, but still
6  you're going to go for it, right?
7 A  Yes.
8 Q  Prior to first going on board the first fishing
9  boat to access over to the barge, did anyone make
10  any inquiry as to whether or not you would ask
11  Shuster Corporation or Southeast Development if
12  they had a gangway?
13 A  I have no knowledge of that.
14 Q  You brought up the fact that there was gangways
15  back at the RDA East Boston facility, right?
16 A  Yes.
17 Q  And you knew that RDA owned gangways that could
18  be used in this type of environment, right?
19 A  I assumed they owned them because they were on
20  their barges.  I don't know whether --
21 Q  Mr. Souza didn't refute that when you brought it
22  up?
23 A  Okay.
24 Q  Is that correct?

80

1 A  I don't know.
2 Q  Well, did he say --
3 A  He said he recognized there were gangways there.
4  He thought it would be a good idea, but it would
5  take a day to get them down there, and time was
6  of the essence.  He said we just had to do it
7  this once, and we would be done.
8 Q  So that the decision not to use a gangway in
9  order to get the job done under the RDA time
10  constraint was made by RDA?
11       MR. McALEER:  Objection.
12 Q  Is that your understanding?
13 A  I'm sorry, could you repeat that?
14 Q  Sure.  The decision not to use a gangway was a
15  decision that RDA made because they were under
16  time constraints?
17       MR. McALEER:  Objection.
18 A  I'm unclear as to who would have provided the
19  gangway or whose conscious decision anyone made
20  on that.
21 Q  Well, you said you had a conversation with Jim
22  Souza --
23 A  Right.
24 Q  -- who said that, in essence, you didn't have

81

1  time because this is a one-day job, right?
2 A  Right.
3 Q  Did Mr. Souza tell you it's not our
4  responsibility, RDA, to provide you with a
5  gangway?
6 A  He did not say that.
7 Q  Were you looking to Jim Souza to provide you with
8  a gangway?
9       MR. McALEER:  Objection.
10 A  I brought that up figuring that would be a better
11  alternative.
12 Q  Once he said no, we have to get the job done, did
13  you have any conversation with your fellow
14  workers to say guys, let's take a vote under the
15  union standard of unsafe work environment and not
16  do this?
17 A  No, we did not.
18 Q  Because you felt that you could safely get from
19  the wharf on board the fishing boat and then onto
20  the barge, right?
21       MS. MORELLO:  Objection.
22 A  I wouldn't say safely.  I figured it could be
23  done.
24 Q  Now, how did you get from the boat onto the

21 (Pages 78 to 81)

82

1  barge?

2 A  How did we get from the boat. Basically, it was
3     just right over the railing. It was -- the
4     levels were similar enough where it wasn't a big
5     deal.

6 Q  So that you would access the fishing boat marked
7     in Exhibit 2 by way of a plank and then simply go
8     over the rail of the fishing boat and then over
9     the rail onto the barge?

10 A  Yes.

11 Q  As the boat and the barge were bobbing in the
12     water, how did you accomplish that, just grab it
13     and jump?

14 A  It wasn't that much of an issue. The heights
15     were similar enough where it wasn't too big of an
16     issue getting back and forth.

17 Q  What was the distance between the side of the
18     barge and the side of the boat?

19 A  I don't know. It was close.

20 Q  Now, with respect to the plank, sir, you said
21     that it was a two-by-ten-foot plank?

22 A  I'm guessing, yeah.

23 Q  Two inches thick, ten feet long?

24 A  Ten inches wide.

83

1 Q  Oh, ten inches wide, I'm sorry.

2 A  Two-by-ten, and roughly eight to ten feet long.

3 Q  Now, when you first began accessing the fishing
4     boat by way of the plank, sir, did you have any
5     problems getting on board the fishing boat?

6 A  I was just careful, and I didn't have any problem
7     getting on.

8 Q  What was the condition of the tide when you first
9     started accessing the boat?

10 A  The tide was low, so we probably first started
11     accessing around, say, 7:00 a.m.

12 Q  Was the plank already in place when you started,
13     or --

14 A  Yes.

15 Q  -- did someone from your crew put it in place?

16 A  The plank was already in place.

17 Q  Who put it in place?

18 A  I don't know.

19 Q  Did you ever ask anyone?

20 A  No.

21 Q  How was the plank secured to the fishing boat?

22 A  To my knowledge, it wasn't.

23 Q  Was it resting on a rail, was it under a rail?

24 A  I don't exactly recall.

84

1 Q  Well, you went up and down it how many times that
2     day, sir?

3 A  I don't know, a few.

4 Q  And you made no observation at all as to how that
5     plank was positioned between the wharf and the
6     boat?

7 A  I believe it was resting on it, but at this
8     junction in time, I don't recall.

9 Q  Now, describe for me, if you will, how high the
10     plank went from the ground level to the boat when
11     you first accessed it.

12 A  Initially?

13 Q  Yes.

14 A  I'd say that it was probably a difference of two
15     to three feet.

16 Q  So it would ramp up two to three feet; is that
17     correct?

18 A  Yes.

19 Q  You said that there was boat traffic causing the
20     fishing boats to rock; is that correct?

21 A  From time to time, yeah.

22 Q  Is it your testimony that when the fishing boats
23     would rock from time to time that the plank would
24     remain stationary?

85

1 A  No. The boat -- the plank would kind of rock
2     around a little bit as well.

3 Q  Then who would move the plank in a position to
4     make sure it was secure?

5 A  I don't know.

6 Q  What did you do, if anything, to make sure the
7     plank was secure before you set foot on it?

8 A  I would make sure that it wasn't rocking too much
9     and, you know, kind of grab it and move quickly.

10 Q  Did you grab the plank with your hands to
11     position it back and forth to make sure it was
12     secure before you stepped on it?

13 A  I don't recall.

14 Q  Would that be a safe practice for you to
15     insure --

16 A  I would make sure it was fairly stable.

17 Q  Now, yourself, Jim Souza, the pile driver, Jay
18     Huron, and the other non-union worker would be
19     accessing the boat via the plank that day, right?

20 A  Yes.

21 Q  On how many occasions prior to your accident did
22     you go up and down that plank to get on and off
23     the boat?

24 A  I don't know exactly.

22 (Pages 82 to 85)

86

1 Q    Again, what time did you first step on the plank
2      in the morning?
3 A    It was early morning, I would say between 6:00
4      and 7:00.
5 Q    Your accident occurred at what time?
6 A    In the evening. I'm not exactly sure. I believe
7      it was like around 3:00 or so.
8 Q    So roughly eight hours later, in rough terms?
9 A    Yes, rough terms.
10 Q   And during that eight-hour period of time, your
11     sole function was to wrap and unwrap the piles,
12     right?
13 A   Pretty much preparing the barge, loading the
14     piles and preparing the barge for sea travel.
15 Q   How many times, sir, did you come off the boat
16     back onto the wharf prior to your accident?
17 A   I know there's at least three piles. I would say
18     anywhere between five to ten times.
19 Q   Now, during those five to ten times between 6:00
20     or 7:00 in the morning and 3:00 in the afternoon
21     that you exited the fishing boat back onto the
22     waterfront, how many times had you jumped over
23     the railing?
24 A   I would say four to eight times.

87

1 Q    Did you see any of your fellow workers jumping
2      over the railing?
3 A    I believe so early on.
4 Q    Who?
5 A    I believe Jay and Jim Souza.
6 Q    So you're confident that you saw Jay go over the
7      railing, and you're confident that you saw Jim go
8      over the railing; is that your testimony?
9 A    I'm pretty sure I saw them both, you know, step
10     over it when it was fairly low early in the
11     morning.
12 Q   So you saw them both step over the railing when
13     it was fairly low early in the morning, meaning
14     that the railing height, the difference between
15     the railing height and the wharf, was minimal?
16 A   Yes.
17 Q   And as the tide rose that day, the height between
18     the railing height of the fishing boat and the
19     wharf increased, correct?
20 A   Correct.
21 Q   And you didn't see Jay Huron go over the railing
22     when the height increased from a minimal level,
23     did you?
24 A   No.

88

1 Q    And you didn't see Jim Souza go over the railing
2      when the height increased from a minimal level,
3      did you?
4 A    No.
5 Q    And the reason you didn't see them do that is
6      because they would access the wharf by going back
7      down the plank, right?
8 A    Possibly. I didn't see them go on and off all
9      the time. It depends on where we were. I might
10     be on one end of the barge, they might be on the
11     other, and if they got to their end first, I
12     wouldn't actually see them.
13 Q   So was it coincidence that you saw them early on
14     in the day when they were going off the minimal
15     height?
16 A   No, because that was earlier before we actually
17     started loading the barges, per se, so it was
18     kind of -- we might have gone back and forth
19     there a couple of times, you know, coffee truck
20     or whatever.
21 Q   Sure. Had you seen the non-union fellow go over
22     the rail?
23 A   No.
24 Q   That fellow would go up and down the plank,

89

1      right?
2 A    I don't recall him -- I'm trying to remember if
3      he actually went on the barges or not.
4 Q    Is it your testimony, sir, that you never saw Jim
5      Souza go down the plank from the fishing boat to
6      the wharf, yes or no?
7 A    No, I've seen Jim Souza go down the plank, yes.
8 Q    He went down the plank after the tide rose,
9      right?
10 A   Yes.
11 Q   And you saw Jay Huron go down the plank after the
12     tide rose?
13 A   Yes.
14 Q   And you're the only one who made the decision to
15     go over the rail and jump off the fishing boat
16     onto the wharf after the tide rose, right?
17         MS. MORELLO: Objection.
18 A   I was the one that went over the railing after
19     the tide rose.
20 Q   You're the only one?
21         MS. MORELLO: Objection.
22 A   I don't know that.
23 Q   Well, let me ask you this. Did you see anyone
24     other than yourself go over the railing and jump

23 (Pages 86 to 89)

90

1    from the fishing boat onto the wharf after the
2    tide rose?
3 A   No.
4 Q   Now, you told us, sir, that you jumped
5    approximately four to eight times coming off the
6    boat onto the wharf that day prior to your
7    accident, right?
8 A   Yes.
9 Q   What were the various heights that you jumped
10   during that four to eight time period?
11 A   I would say anywhere between two to, you know,
12   six, possibly even eight feet at the point of the
13   injury.
14 Q   During each of the times that you made the
15   decision to jump off the fishing boat onto the
16   wharf, the plank was still in place, right?
17 A   As far as I know.
18 Q   Well, did you look for it, or did you just decide
19   to go over the railing and jump off?
20 A   I've seen it there.
21 Q   Did you have any conversation with anyone from
22   RDA Construction or any of the crew that day when
23   you were making the decision to jump over the
24   side that hey, fellows, I'm not going down that

91

1    plank because it looks unsafe?
2         MS. MORELLO:  Objection.
3 A   I don't recall.  I remember going back and forth
4    whether it looked unsafe or not, but --
5 Q   Really?  More than the initial conversation that
6    you told us about today that you said to Jim what
7    about the gangway, and he said we'd love to have
8    it, but time's a wasting?
9 A   No, but I think more to the fact that we were
10   probably commenting sometimes as the height
11   increased that the angle of the board was
12   looking, you know, more and more dangerous and,
13   you know, especially with the rocking at such
14   angle.
15 Q   So tell me specifically.  I want to hear from
16   you, Mr. Bombard, who it was that you spoke to on
17   board the barge or the fishing boat where you
18   commented that the angle and steepness of that
19   plank had gotten to a point where it looked more
20   dangerous?  Who did you have that conversation
21   with?
22 A   Probably between Jay and Jim, and it wasn't while
23   we were on the barge.  It was actually we were
24   probably having like coffee or something and, you

92

1    know, later in the afternoon, you could actually
2    notice the height of the -- you know, the angle
3    getting steeper and steeper on that plank.
4 Q   Just so I'm clear, you're not sure, you don't
5    have a specific memory of --
6 A   I don't have -- I mean, I --
7 Q   Let me finish.  You're not sure whether it was
8    specifically Jay or Jim that you commented to
9    about the alleged sharp angle of the plank in the
10   afternoon when you were having coffee?
11 A   I know I mentioned it to Jay.  I don't know if
12   Jim was there or not.
13 Q   So you have a conversation with Jay, and what
14   does Jay say to you in response to your comment
15   that the angle looked steep?
16 A   It was one of those offhanded like yeah, look at
17   that, and that was about it.
18 Q   Now, you were on the ground, on the wharf at that
19   point, right?
20 A   Right.
21 Q   And you had to get back on board the boat and the
22   barge before your accident?
23 A   Right.
24 Q   So how did you get back on board the boat?

93

1 A   The plank.
2 Q   So you walked up the allegedly dangerous steep
3    plank that you commented about, right?
4         MS. MORELLO:  Objection.
5 A   Yeah.
6 Q   And you didn't make the decision not to go up
7    there because you felt you could still negotiate
8    going up the plank, right?
9         MS. MORELLO:  Objection.
10 A   Yeah.
11 Q   And before you commented to Jay during a coffee
12   break that it looked steep, you had already been
13   jumping over the side of the railing and not
14   using the plank, right?
15 A   Yes.
16 Q   So that was a personal decision that you made,
17   regardless of the height and angle of the plank,
18   right?
19         MS. MORELLO:  Objection.
20 A   Yes.
21 Q   So when the plank was at an angle and height that
22   wasn't very steep, you still were going over the
23   railing because it was quicker and easier for
24   you, right?

24 (Pages 90 to 93)

94

1              MS. MORELLO: Objection.
2 A   It would depend on the location, but yeah.
3 Q   What do you mean it depends on the location?
4 A   If I had actually egressed -- can I see the
5     drawing?
6 Q   Sure.
7 A   If I had actually come off -- you know, say we
8     were working on this part of the barge, there
9     were times where I actually did go on that plank.
10    Where you came over this area, it actually just
11    made sense to go down the plank at that time.
12 Q   So if you're working on the barge area near the
13    plank or the stern end of that fishing boat, you
14    used the plank.  If you're working at the barge
15    at the bow end of the fishing boat, you'd jump
16    over the railing?
17 A   Until it started getting high, in which case I
18    would walk to the railing.
19 Q   So when it started getting high, you made a
20    personal decision to use the railing rather than
21    the plank?
22 A   Yes.
23 Q   Was that based on any observation that you made
24    from the fishing boat looking down the plank

95

1     thinking I can't get down there?
2 A   It just seemed like this was a better route for
3     me.
4 Q   I'm asking a different question.  Did you go over
5     to the plank and look down and say I consciously
6     am making a decision not to go down this plank
7     because I don't think I can safely walk down that
8     plank?
9 A   No, I never made that.
10 Q   In fact, your fellow workers used that plank to
11    get off the vessel when the tide had come in?
12 A   Yes.
13 Q   So that the plank actually did provide a safe
14    means of egress for your fellow workers, right?
15             MS. MORELLO: Objection.
16 A   They managed to go down the plank without getting
17    injured.
18 Q   Well, does that conclude to you, sir, that it
19    provided a safe means of egress for everyone else
20    on board that boat but you?
21             MS. MORELLO: Objection.
22 A   No.
23 Q   So they got lucky?
24 A   It all depends on how you look at it.

96

1 Q   How many times did they go down the plank after
2     the tide was high?
3 A   I would imagine a similar amount as I, four to
4     eight times.
5 Q   So after the tide was high, each of the three
6     fellow workers on board the boat and the barge
7     would have gone down four to eight times apiece,
8     so that would be four times three, or 12 safe
9     exits by them, or eight times three, or 24 safe
10    exits by them; is that right?
11 A   Yes.
12 Q   So that at least at a low of 12 times and at a
13    high of 24 times, your fellow workers were able
14    to come down that allegedly steep plank without a
15    problem?
16 A   Yes.
17 Q   And you made a decision not to follow their safe
18    path, but to go over the rail?
19             MS. MORELLO: Objection.
20 A   Yes.
21             MR. SHEA:  Let's go off the record for
22    a minute.
23
24        (Whereupon, a discussion was held off

97

1     the record.)
2
3 Q   Mr. Bombard, during the time that you would be
4     jumping over the railing, sir, from the boat to
5     the wharf, was it always at the point of
6     disembarkment where your accident occurred?
7 A   Yes.
8 Q   Why did you choose that point, sir?
9 A   I don't exactly recall.  It seemed like the best
10    spot at the time as far as landing.  I'm trying
11    to recall if there was actually steps built into
12    the side of the boat actually to climb up there
13    or not, because like I said early on, I know we
14    went up there as well.  I don't recall that, but
15    it seemed like the lowest point.  It looks like
16    there possibly -- I don't know, it seemed like a
17    good point.
18             MR. SHEA:  Will you mark this as the
19    next exhibit.
20
21             (Exhibit Number 3, Copy of
22             Photograph, was Marked for
23             Identification.)
24

25 (Pages 94 to 97)

98

1 Q   I'm going to show you, sir, what has been marked
2      as Exhibit 3 and ask you if you can identify that
3      for us?
4 A    Specifically, no. It's obviously boats.
5 Q   Does that look, sir, at all familiar to you as a
6      fair and accurate depiction of the area where
7      your accident occurred back in August of 2002?
8 A    I honestly can't tell from this angle.
9 Q   Do you know what a bulkhead is?
10 A   Specifically, is that the front of the wharf
11     right before the water?
12 Q   I'm just asking what your definition would be.
13 A   That would be my definition.
14 Q   Just taking a look at Exhibit 3, sir, you see
15     that there's some timber here at what I'll call
16     the edge of the wharf; is that correct, sir?
17 A   Yes.
18 Q   When you were jumping off the fishing vessel,
19     were you jumping over the timber onto what I'll
20     loosely say is the concrete or pavement?
21 A   Yes, definitely over the wood.
22 Q   Do you know what the horizontal distance, if you
23     will, between the wharf ground and the side of
24     the boat was that you were jumping off?

99

1 A    The actual landing point?
2 Q   Yes, sir.
3 A    I would say roughly two to three feet.
4 Q   So you were jumping six to eight feet in height
5      and over two to three feet to land on the ground?
6 A    That's correct.
7 Q   And certainly you were landing on the surface of
8      the wharf, which was what, concrete or asphalt?
9 A    Yes. It looked like it was more asphalt.
10 Q   And the decision to jump was made by you?
11 A   Yes. I consciously looked over the side. I
12     figured it wasn't out of my bounds. I put my
13     hands on the railing, swung my legs out over the
14     railing to try to, you know, minimize the drop
15     time, and as I was in the air, my body spun a
16     little bit, planted with my right leg first
17     before my left leg came down, my knee blew out,
18     and I was on the ground.
19 Q   What were you going to do at the time of your
20     accident? Why were you exiting the vessel at
21     that time that you recall?
22 A   We had just unloaded a -- just landed a pile, and
23     we were going back to shore.
24 Q   When you say "we were going back to shore," that

100

1      means the whole crew was coming off to go back to
2      shore, right?
3 A    I believe so, yes.
4 Q   Now, do you recall what the order of exit was; in
5      other words, were you the first one over? Were
6      the other guys already off, and then you were
7      catching up to them?
8 A    The other guys were already off.
9 Q   Were you running behind for any reason?
10 A   I wasn't running behind, no.
11 Q   And each of the three other fellows came down the
12     plank and safely exited right under the same tide
13     and wharf conditions that you jumped and were
14     injured, right?
15 A   That's correct.
16 Q   When you said that you looked over the side and
17     you felt that it was within your range, is it
18     your testimony that jumping from a height of six
19     to eight feet through the air another two to
20     three feet to land on a concrete or asphalt
21     surface was something that you felt was a safe
22     means of exiting this fishing vessel?
23         MS. MORELLO: Objection.
24 A   I had been doing -- like I said, I'd been going

101

1      on and off all day and, you know, I made a
2      conscious choice. I thought I could do it.
3 Q   When was the last time you had jumped before the
4      time of your accident in hours or minutes?
5 A    I don't know, must have been I'd say 30 to 40
6      minutes, depending how long it took to load and
7      land that pile.
8 Q   During each of the four to eight times that you
9      had jumped earlier, you'd always get back on
10     board by going back up the plank, right?
11 A   Once the tide starting getting higher, yeah.
12 Q   So that within 30 or 40 minutes before your
13     accident, you actually made it safely up the
14     plank onto the boat, right?
15 A   Yes.
16 Q   Had the conditions changed at all by way of tide
17     and height between your last jump 30 to 40
18     minutes before, your earlier jump, if you will,
19     and the accident jump?
20 A   It seemed like it was a little bit higher, but
21     like I said, it seemed within my ability.
22 Q   What was the limit of your ability? How high
23     would it have gone?
24 A   I wouldn't have gone much higher. I mean, it was

26 (Pages 98 to 101)

102

1    one of those moment of truth, and it's like yeah,
2    you know, I can do it and, you know, it's the
3    last time.
4 Q   Well, when you say "last time," you weren't done
5    for the day, right, because you were still
6    loading up piles?
7 A   I wasn't sure if that was the last pile or not.
8    Once my knee broke, I kind of lost track of
9    everything else.
10 Q   Sure, but you knew that the job hadn't been
11    finished at that point, right?  You weren't
12    wrapping it up for the day; you knew that?
13 A   I'm not sure.  I'm not sure.
14 Q   Well, you knew that whatever the height was --
15    you just said it was a moment of truth -- you
16    looked down and said well, I can do it, and this
17    is the last one of the day, right?
18 A   Um-hmm.
19 Q   You have to answer yes or no.
20 A   Yes.
21 Q   And that meant that the next time that you had to
22    come off the vessel was too high for you to jump,
23    you're going to go down the plank, right?
24 A   I would have to evaluate that at that time, but

103

1    at that point in looking at it, if it had gone
2    any higher, I probably would have, you know, I
3    would have said that was not safe, and the plank
4    probably would have been a safer option.
5 Q   Just so I understand your testimony, then, as the
6    tide would continue to rise, if you had to come
7    off that vessel one more time, you actually would
8    have gone down the plank rather than over the
9    side?
10 A   Likely, yes.
11 Q   So the plank would have presented a safer
12    alternative even against the higher pitch angle
13    and a higher boat height than jumping over the
14    railing, right?
15    MS. MORELLO:  Objection.
16 A   Possibly.
17 Q   Therefore, when the tide was lower and the plank
18    was at a less steep angle, it would have provided
19    you a safe alternative means of egress from the
20    fishing boat rather than jump at the time that
21    you did, right?
22    MS. MORELLO:  Objection.
23 A   You never knew what was going to happen with that
24    plank, if it was going to, you know, shift or

104

1    tip, angle, there's no railings.  So for me, you
2    know, being as tall as I was, hopping over the
3    side didn't make that big of a deal.
4 Q   So jumping off a fishing boat six to eight feet
5    onto a concrete surface you thought was safer
6    than following your fellow workers down a plank?
7    MS. MORELLO:  Objection.
8 A   Possibly.
9 Q   Now, when you were injured, sir, you described
10    how you went over the side, your body rotated,
11    and you felt your leg snap; is that correct, sir?
12 A   Yes.
13 Q   It's your right leg we're talking about; is that
14    correct?
15 A   Yes.
16 Q   Now, did you have any conversation with any of
17    your fellow RDA employees while you were on the
18    ground?
19 A   I'm sure they asked what happened.
20 Q   What did you say?
21 A   I told them I hopped off the boat and, you know,
22    my leg was gone.  There was obvious deformities.
23    They were obviously worried.  I asked for, you
24    know, an ambulance.  Jim Souza asked if, you know

105

1    -- said the hospital was close, can we drive you,
2    and I said okay, and they carried me to the jeep
3    and took me to the hospital.
4 Q   What were the weather conditions like?
5 A   It was sunny.
6 Q   Had you consumed any alcohol?
7 A   No.
8 Q   Were you on any medication?
9 A   No.
10 Q   Do you know if any of your fellow workers
11    witnessed the accident?
12 A   Whether they actually saw the jump, I don't know.
13    I think as soon as I hit the ground, I'm sure
14    they saw that.
15 Q   When you say you're sure that they saw that, have
16    you had any conversation with any of the people
17    who were present at the wharf that day wherein
18    they indicated to you that they actually saw you
19    hit the ground?
20 A   I have not.
21 Q   Let me ask you this.  Since the date of your
22    accident, what conversations, if any, have you
23    had with James Souza, the superintendent pile
24    driver, about the happening of your accident?

27 (Pages 102 to 105)

114

1    that would depict the positioning of the two
2    fishing boats and the barge as they existed on
3    August 1?
4 A    Only myself, only my own.
5 Q    Aside from the diagram you prepared today, have
6    you prepared a diagram for anyone else, sir?
7 A    Yes.
8 Q    Who would that be for?
9 A    That would be for my lawyer, and the business
10    agent has a copy of that.
11 Q    When you sent the stuff to the business agent
12    that you referenced earlier, your notes and the
13    diagram, sir, did you have any follow-up
14    conversation with the business agent after his
15    receipt and review of those documents?
16 A    No.
17 Q    Did you discuss the fact that you'd be filing a
18    lawsuit against RDA, Southeast Development, and
19    Shuster Corporation with the business agent?
20 A    No.
21 Q    Now, you filed a complaint, sir, against my
22    clients, Southeast Development and Shuster
23    Corporation, alleging that they were negligent.
24    You're aware of that, right?

116

1    what in coordinating that, I don't know.
2 Q    You don't even know who they are.
3 A    I don't.
4 Q    Now, you say also that you're alleging that
5    someone needed to provide safe means of access
6    and egress to the barge, right?
7 A    That's correct.
8 Q    What duty, if any, do you say that Shuster
9    Corporation had to you to provide safe access --
10        MS. MORELLO:  Objection.
11 Q    -- or egress from the barge?
12 A    Basically, like I said, I know this is stuff that
13    should have been provided.  Who's responsible for
14    it, I don't know.
15 Q    Has any person, any expert witness, to your
16    knowledge, been retained to look at the access to
17    and from the barge on your behalf?
18 A    Not to my knowledge.
19 Q    Have you talked to anyone who's been designated
20    as a maritime or engineering expert?
21 A    No.
22 Q    When you say that a safe means of access to and
23    from the barge needed to be given, you're making
24    a distinction between the plank and something

115

1 A    Yes.
2 Q    Can you tell us, sir, your understanding as to
3    what facts there are that you allege that my
4    client allegedly did wrong in this instance?
5 A    At this time, I believe there should have been
6    safe access to the boat, and we shouldn't have
7    been working shorthanded.
8 Q    When you say that you "shouldn't have been
9    working shorthanded," what role, if any, did
10    Shuster Corporation or Southeast Development have
11    with that?
12 A    See, that's where I'm unclear as to who had
13    responsibility to oversee the operation.
14 Q    So that the operation of moving the piles from
15    the wharf onto the barge was being conducted by
16    what entity?
17 A    RDA.
18 Q    Is it your understanding that Southeast
19    Development or Shuster Corporation had anything
20    to do with that moving operation of the piles
21    onto the barge?
22 A    I know they had no physical grounds, but again,
23    I'm not -- I mean, basically I'm, you know, the
24    hired help.  As far as who was responsible for

117

1    else, right?
2        MS. MORELLO:  Objection.
3 A    Yes.
4 Q    And despite the fact that none of your fellow
5    workers had any problem using the plank, you deem
6    it unsafe?
7        MS. MORELLO:  Objection.
8 A    Yes.
9 Q    Is it your testimony, sir, that if you had used
10    the plank at the time when you made the decision
11    to jump that you somehow would have been injured?
12        MS. MORELLO:  Objection.
13 A    It's unknown.  Basically, I thought it was an
14    unsafe point of access.  If it slipped or I lost
15    balance, I could have gotten pinned between, you
16    know, said barge or wharf, so I made a conscious
17    decision at the time.  I didn't think it was out
18    of my abilities, so I made the jump.
19 Q    Well, did you have any conversation with James
20    Souza, the superintendent, at any point that day
21    after going up and down the plank that this is
22    just an unsafe way of getting off this boat?
23 A    Beyond the initial conversation, no.
24 Q    Being around construction industry and maritime

30 (Pages 114 to 117)

166

1 A   Yeah, kind of like a Timberland. I don't believe
2     they were steel-toed, but, you know, something of
3     that nature.
4 Q   Were they tied?
5 A   Yeah, they were tied.
6 Q   Were they three-quarter-length boots, or were
7     they boots that went up -- how high up on your
8     calf would they go?
9 A   They were probably like, I'd say, three-quarter-
10    length.
11 Q  You said before you couldn't recall the names of
12    these two fishing boats that were tied up here?
13 A  Um-hmm.
14 Q  I know it's been a long time, but sometimes, some
15    of these fishing boats have sort of interesting
16    paint, you know, the deckhouse might be one color
17    and the hull another color. Do you recall
18    anything like that?
19 A  I don't recall. I really don't.
20 Q  When you showed up at the yard on the morning of
21    the offload, the morning of the incident, did you
22    see anyone there other than the people involved
23    that you've already spoken about with the on-load
24    of these pilings? Was there anybody from Shuster

167

1     or another company that was there?
2 A   No.
3 Q   No one met you that morning?
4 A   No.
5 Q   You note here on your diagram as well, there's a
6     warehouse?
7 A   Um-hmm.
8 Q   Was there any kind of an office or anything there
9     that there might have been some people present?
10       MR. SHEA: Objection to form.
11 A  I don't know.
12 Q  There's a gate here that you note as well next to
13    the warehouse. Was the gate open, or was it
14    locked?
15 A  I believe at that point it was open.
16 Q  Where did you park your vehicle?
17 A  I typically parked up here (indicating).
18 Q  You're saying you parked just across from the
19    warehouse but before the gate?
20 A  Yes.
21 Q  Before the entrance to the yard?
22 A  Yes.
23 Q  Could you have brought a vehicle into the yard if
24    you needed to?

168

1 A   I don't know if we could have or not. I know
2     they brought my jeep in when they picked me up.
3 Q   So the gate was big enough to bring a vehicle in?
4 A   Oh, it was certainly big enough to bring in
5     vehicles.
6 Q   Could you just explain for me, you mentioned some
7     built-in steps on the fishing boat; is that
8     correct?
9 A   Yeah. I'm not sure if there was built-in steps
10    or like early on, I know you could actually climb
11    on there. I don't know whether maybe it was just
12    a point where like the decking came out beyond
13    the rail, but I remember you could actually kind
14    of like step up and into it when the tide was
15    low. Whether there was actually built-in steps,
16    I don't recall.
17 Q  When you say built-in, do you mean if you're on
18    the deck of the fishing boat, these steps would
19    be on the interior side of the gunwale or the
20    interior of the side of the boat?
21 A  I don't know whether -- it would be on the
22    outside of the railing. Like I said, I don't
23    recall if it was actually a step or maybe a point
24    where the decking went in and the railing was

169

1     like set back a little, but there was something
2     to actually plant your feet on there.
3 Q   I guess my question is when you say there were
4     built-in steps, would you have to be inside the
5     boat or outside the boat to use them?
6 A   Outside.
7 Q   Was there anything inside on the deck of the boat
8     like a step stool or anything like that that you
9     were using to go up over the side?
10 A  I don't recall.
11 Q  This area where you marked this point of
12    disembarkment, how high was the side of the boat?
13    The gunwale is the top edge of the rail?
14 A  Yeah. I'd say the decking and the gunwale, I
15    don't know, maybe two, two and a half feet.
16 Q  That came up to where? Did it come up to your
17    waist or your thighs?
18 A  I don't recall exactly, below my waist.
19 Q  The barge, the crane barge that was tied
20    alongside, was the barge perfectly flat, or did
21    the barge also have a railing around it on the
22    perimeter?
23 A  I don't recall exactly.
24 Q  You said before, and correct me if I'm wrong, but

43 (Pages 166 to 169)

## Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Docket No.  05-11389-REK

- - - - - - - - - - - - - - - - - - - - - - - x

MARK BOMBARD,

                              Plaintiff,

vs.

SHUSTER CORPORATION,

RDA CONSTRUCTION, INC., and

SOUTHEAST DEVELOPMENT CO., LLC,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

VOLUME I                    Pages 1 - 85

        DEPOSITION OF JAMES SOUZA, a witness called

by counsel for the Plaintiff, taken before Suzanne M.

Hebert, Professional Shorthand Reporter and Notary

Public in and for the Commonwealth of Massachusetts,

at the Law Office of Joseph G. Abromovits, P.C., 858

Washington Street, Floor 3, Dedham, MA, on Thursday,

March 22, 2007, commencing at 2:05 p.m.

## Page 2

1  APPEARANCES:

2

3    Law Office of Joseph G. Abromovits, P.C.

4    By:  Marsha A. Morello, Esq.

5    858 Washington Street, Floor 3

6    Dedham, MA 02026

7        for the Plaintiff;

8

9    Melick, Porter & Shea, LLP

10   By:  Jennifer B. Hardy, Esq.

11   28 State Street

12   Boston, MA 02109

13       for the Defendants Shuster Corporation

14       and Southeast Development;

15

16   Looney & Grossman, LLP

17   By:  Patrick Owens McAleer

18   101 Arch Street

19   Boston, MA 02110

20       for the Defendant RDA Construction.

21

22

23

24

## Page 3

1                    I N D E X

2

3    WITNESS: James Souza

4

5    EXAMINATION:                        Page

6      By Ms. Morello                     4

7      By Ms. Hardy                       69

8

9

10

11

12                  E X H I B I T S

13   No.                       Page

14   1    Diagram                  51

15

16

17

18

19

20

21

22

23

24

## Page 4

1         P R O C E E D I N G S

2        MS. MORELLO:  Agreed by between and among

3   the parties that the Witness will sign the transcript

4   within 30 days and signing before a notary is waived.

5   All objections, except as to the form, and motions to

6   strike are reserved until the time of trial.

7        JAMES SOUZA,

8      having been first duly sworn by the court

9      reporter, testified as follows:

10            EXAMINATION

11   BY MS. MORELLO:

12     Q.  My name is Marsha Morello along with

13   Attorney Joseph Abromovits representing the Plaintiff

14   in this action, Mark Bombard, in an action against

15   the Shuster Corporation, Southeast Development, and

16   RDA Construction, the Defendants, relative to the

17   injuries that Mr. Bombard sustained on August 2,

18   2002, while he was working for RDA on the premises

19   located at 4 Wright Street, New Bedford,

20   Massachusetts, also known as Shuster.

21        Today I'm going to be asking you a

22   series of questions, mostly concerning the date of

23   the accident, Mr. Bombard's accident, the intended

24   circumstances, and the arrangement and contract that

## Page 17

1  Q. Were the pilings going to be dug into the
2  earth on Martha's Vineyard or in the ocean?
3  A. Off the ocean, off the backside of Martha's
4  Vineyard.
5  Q. So through the water -- this might sound a
6  little stupid, but through the water to the bottom --
7  A. Into the dirt.
8  Q. This was going to be right off Martha's
9  Vineyard?
10  A. Yes.
11  Q. So you told him that that was the
12  project --
13  A. Yes.
14  Q. -- that RDA was engaged in, correct?
15  A. Yes.
16  Q. What else did you tell him?
17  A. How much space I needed.
18  Q. Space for what?
19  A. For the pilings and the barge.
20  Q. Where did RDA intend to put the pilings?
21  A. The pilings, as soon as you go through the
22  gate on the right-hand side, because the left-hand
23  side had vessels and a lot of stuff stored there.
24  Q. So you discussed with him would you say

## Page 18

1  storing pilings there before you put them in the
2  barge?
3  A. Building them there.
4  Q. So I take it that you were going to bring
5  materials to what you knew as Shuster's Wharf and
6  build pilings from these materials?
7  A. Correct.
8  Q. And then were you going to load them onto a
9  barge?
10  A. Onto the crane barge, correct.
11  Q. When you say a "crane barge," does that
12  simply mean it's a barge with a crane on it?
13  A. Correct.
14  Q. So you told him you needed space for the
15  pilings to make the pilings, and did you tell him the
16  pilings were going to go onto a barge, crane barge?
17  A. Yes.
18  Q. Did you tell him that you wanted to dock
19  the barge?
20  MS. HARDY: Objection.
21  A. Yes. I told him I needed the head wall.
22  Q. When you say you told him you "needed the
23  head wall," what is a head wall?
24  A. The head wall is where you have a perfectly

## Page 19

1  clean drop into the water so you can lay a vessel up
2  against it without any problems of it hitting
3  anything.
4  Q. Is another name for head wall bulkhead?
5  A. Yes.
6  Q. Is it your testimony you told Mr. Shuster
7  RDA wanted to dock the barge flush against the head
8  wall?
9  A. Yes.
10  Q. What did he say?
11  A. There was a couple of vessels in there.
12  One guy was redoing an engine. By time the barge
13  came from Boston, it should be available.
14  Q. Did he say what kind of vessels?
15  A. Two fishing vessels.
16  Q. Were they there at the time you were
17  speaking with him?
18  A. Yes.
19  Q. He said by the time the barge was there the
20  vessels wouldn't be there?
21  MS. HARDY: Objection.
22  A. It shouldn't be. No guarantees, but it
23  shouldn't be.
24  Q. When you say "no guarantees," he wasn't

## Page 20

1  assuring you that the two vessels would be gone by
2  the time the barge needed to be docked against the
3  bulkhead?
4  MR. McALEER: Objection.
5  A. He never said "yes" or "no." "They should
6  be out of here," because when I was looking for the
7  head wall, he said, "They should be out of here by
8  the time you come here with your crane barge."
9  Q. How long was the barge supposed to be
10  docked at the wharf?
11  A. As long as it took to get the pilings on
12  board, built, and equip up for the job.
13  Q. Well, did you give him any time period?
14  A. No, I did not.
15  Q. Was it open-ended?
16  A. I did not make the contract. I did not
17  look to go that far into it. I left it that, "Okay,
18  looks like I have a spot. Here you go." Do you know
19  what I mean?
20  Q. No, I don't. Are you saying you didn't
21  enter into an oral contract with Mr. Shuster?
22  A. I did not enter into the contract.
23  Q. Who entered into the contract, then?
24  A. RDA Construction.

6 (Pages 21 to 24)

Page 21

1    Q.  You agree you're a representative of RDA?
2    A.  Yes.
3    Q.  When you're talking to Mr. Shuster, you're
4  speaking on behalf of RDA, are you not?
5    A.  Correct, but I didn't mention money, didn't
6  know if it was going to be too much, so contract
7  itself wasn't through me.
8    Q.  Are you saying, obviously, you expected RDA
9  was going to have to pay for these services?
10    A.  Correct.
11    Q.  But you certainly have nothing to do with
12  setting the price or agreeing to the price; is that
13  correct?
14    A.  Correct.
15    Q.  Whose responsibility was it to do that?
16    A.  That would be Gene Kelly.
17    Q.  Do you know if Mr. Kelly spoke to
18  Mr. Shuster relative to how much was going to be
19  charged after the conversation you had with
20  Mr. Shuster?
21    A.  I do not know if it was Gene that did talk
22  to him.  I have no idea how the contract was
23  finalized.
24    Q.  So you just went in and asked Mr. Shuster,

Page 22

1  this is what you wanted, could it be done, and it was
2  your understanding that he agreed?
3    MS. HARDY:  Objection.
4    A.  Yes.  I agreed to know as much as I was
5  asking for.
6    Q.  As far as the time as to how long the barge
7  would be there, how it would arrive, was it your
8  understanding Mr. Kelly was going to work this out
9  with Mr. Shuster?
10    A.  Yes.
11    Q.  Now, again, this was an oral conversation
12  and agreement you had with Mr. Shuster.  Was any of
13  what you spoke about written, put on a document at
14  all?
15    MS. HARDY:  Objection.
16    A.  No.
17    Q.  After you spoke with Mr. Shuster, I take
18  it, as you testified, you then spoke with Mr. Kelly,
19  correct?
20    A.  Yes.
21    Q.  Did you speak with Mr. Kelly on the same
22  day you spoke with Mr. Shuster?
23    A.  Yes.
24    Q.  Did you talk to him in person or did you

Page 23

1  call him on the phone?
2    A.  Phone.
3    Q.  What did you say to him?
4    A.  I said, "It looks like I found a spot for
5  us to work out of to do the job."
6    Q.  What did he say?
7    A.  He said, "Great.".
8    Q.  What else did you say to him?
9    A.  Shuster's Corporation, gave him the number.
10    Q.  So you gave him the number of Mr. Shuster?
11    A.  Of Shuster's, yes.
12    Q.  How did you get the number?
13    A.  From his card.
14    Q.  So Steven Shuster gave you a card?
15    A.  Yes.
16    Q.  And on it was a number?
17    A.  Yes.
18    Q.  Do you know what the card said?
19    A.  No, I do not.
20    Q.  Did you ever hear of the company Southeast
21  Development Company?
22    A.  Yes, I have.
23    Q.  What do you know about that company?
24    A.  All I know is Steve's way of getting paid

Page 24

1  for by the pier.  I believe in the beginning the
2  first check was made out to Shuster's and then it was
3  the wrong way to make it out.
4    Q.  How do you know it was the wrong way to
5  make it out?
6    A.  Well, I just heard that it was through
7  another company.
8    Q.  When you say a "check was made out," you
9  mean RDA made out a check to Shuster Corporation to
10  pay for these services that you described and at some
11  point you were told RDA shouldn't be making out the
12  check to Shuster's Corporation?
13    A.  I don't think the first check made it there
14  with Shuster on it, but I know it was cut and then I
15  believe it was notified to me it was the wrong word,
16  they wanted some other company, and I had the office
17  take care of it, Joe Catrufo, I believe.
18    Q.  As part of your job, did you have a role in
19  issuing checks?
20    A.  No.
21    Q.  How did you get involved with it?
22    A.  If Gene is behind on a check, say it's New
23  Bedford Welding Supply, I still order equipment.
24  They might call me and say, "I haven't received a

Page 25

1  check in awhile." I get on the phone to the office,
2  say, "Someone has to look into this." That's kind of
3  what it was.
4      Q.  After that check, I take it incorrectly
5  made out to Shuster's Corporation, were the checks
6  then made out to Southeast Development Company?
7      A.  I believe so.
8      Q.  And there wasn't anyone present when you
9  and Mr. Shuster had this discussion?
10     A.  No.  We left his office and walked out in
11  the yard so I could show him exactly how much room I
12  needed.
13     Q.  So you went out into the yard; what did you
14  do, illustrate where you wanted to put the barge?
15     A.  The pilings and the barge, yes.
16     Q.  And at that time, did you tell him you
17  wanted the barge to be docked directly against the
18  head wall?
19     A.  Yes.
20     Q.  Is it fair to say you walked away from that
21  conversation with the understanding the barge would
22  be docked directly against the bulkhead?
23     MS. HARDY:  Objection.
24     A.  Yes.

Page 26

1      Q.  Did you consider that a major part of the
2  contract?
3      MS. HARDY:  Objection.
4      A.  Yes.
5      Q.  Just going back now, when you spoke to Gene
6  Kelly, you said you called him after you spoke to
7  Steven Shuster?
8      A.  Yes.
9      Q.  You said, "Looks like we have got a good
10  spot," and what did he say?
11     A.  "Great."
12     Q.  Then what did he do or say?
13     A.  I gave him the number and I didn't
14  follow-up it up much further until he told me we had
15  it.
16     Q.  So you gave him the number, and is it your
17  understanding then at some point he obviously called
18  Mr. Shuster?
19     A.  Yes.
20     Q.  And is it your understanding, then, he
21  finalized the deal?
22     A.  Yes.
23     Q.  And he told you at some point, "It's a done
24  deal"?

Page 27

1      A.  Yes, because I started shipping equipment
2  there.
3      Q.  When did he start to ship equipment?
4      A.  Maybe two weeks after that, right around
5  there.
6      Q.  Do you have any idea what month that was?
7  This was in 2002, certainly, was it not?
8      A.  I know it was hot, so, July.
9      Q.  The accident was August 2, 2002, so is it
10  safe to say you were shipping materials --
11     A.  Three weeks prior to that.
12     Q.  When saying "shipping materials," what were
13  you shipping, the pilings?
14     A.  The pilings are 142 feet long.  You can't
15  truck them that long, so we started receiving them in
16  pieces.  That's why we're building them in Shuster's
17  yard.
18     Q.  So the pieces of the pilings were being
19  shipped to Shuster's yard?
20     A.  Yes.
21     Q.  That started three weeks before the date of
22  the accident?
23     A.  Not exactly sure.
24     Q.  Approximately?

Page 28

1      A.  Yes.
2      Q.  Now, do you know, you mentioned a barge, do
3  you know how RDA was arranging for the barge to be
4  taken to the wharf?
5      A.  Yes.
6      Q.  How?
7      A.  By tugboat.
8      Q.  Who owned the tugboat?
9      A.  RDA Construction.
10     Q.  I don't think I asked you this:  Do you
11  know when the barge first appeared at the wharf?
12     A.  Exact date, no.
13     Q.  Well, it was before the date of the
14  accident, correct?
15     A.  Yes.
16     Q.  Do you know how soon before the date of the
17  accident?
18     A.  Week and a half, maybe.
19     Q.  So it was being taken by tugboat; was an
20  RDA employee running the tugboat?
21     A.  Yes.
22     Q.  Do you know what his name was?
23     A.  Gary Bushy.
24     Q.  And when Gary Bushy first took the barge to

8 (Pages 29 to 32)

Page 29

1  the wharf, and this you said was perhaps a week and a
2  half before the accident, did he tell anybody how it
3  was docked when he got there, how the barge was
4  docked?
5      A.  I was there when it came in.
6      Q.  So you were on the scene before the date of
7  the accident?
8      A.  Yes.
9      Q.  Certainly, to speak with Mr. Shuster,
10  correct?
11      A.  I was there the day the barge pulled on and
12  started working on that job every single day.
13      Q.  I want to know the times you were there.
14  The time you spoke to Mr. Shuster, was that the first
15  time you were ever at that wharf?
16      A.  Yes.
17      Q.  Was the second time you were at that wharf,
18  when was the second time you were at the wharf, after
19  that first time talking with Mr. Shuster?
20      A.  About a week, maybe, when we started
21  bringing in materials.  Exact dates, I'm not sure.
22      Q.  So there was a week you were bringing in
23  materials, and at that time, the barge was there,
24  correct?

Page 30

1      A.  When we first started bringing in the
2  materials, there was no barge.  I was using just the
3  land.
4      Q.  Did you see the barge for the first time on
5  the day of the accident?
6      A.  No.
7      Q.  When is the first time you saw the barge at
8  Shuster's Wharf?
9      A.  The barge was there a week or so before
10  Mark was on the job.
11      Q.  Did you see it at Shuster's at that time?
12      A.  Yes.
13      Q.  Where was it docked?
14      A.  Two vessels out on the bulkhead, actually,
15  only one vessel out, but two vessels were there.
16      Q.  Were two vessels nesting together and then
17  the barge was tied to one of the fishing vessels?
18      A.  Two vessels were about astern and the barge
19  was on the outside of that.
20      Q.  When you saw that, were you surprised?
21      A.  Yes.
22      Q.  Were you surprised because that isn't what
23  your understanding of how it was supposed to be
24  docked?

Page 31

1      MS. HARDY:  Objection.
2      A.  I was more surprised because I couldn't
3  pick up the pilings from that far out.
4      Q.  Well, you go there and you see the barge
5  docked the way it is, it's not directly against the
6  bulkhead, correct?
7      A.  Yes.
8      Q.  And you're surprised to see it that way?
9      A.  Yes.
10      Q.  So what do you do about it; did you do
11  anything about it, did you talk to Mr. Shuster, did
12  you call Mr. Kelly?
13      MS. HARDY:  Objection.
14      A.  I talked with Gene.
15      Q.  Did you call him up?
16      A.  Yes, on the cell phone.
17      Q.  What did you tell him?
18      A.  That from where the barge is I won't be
19  able to reach the pilings.
20      Q.  What did he say?
21      A.  "The pilings finished being built yet,
22  we'll worry about that when they're done."
23      Q.  So then what did you continue to do on that
24  particular day, which was about a week, you said, and

Page 32

1  a half before the accident?
2      A.  Continued bringing in materials.
3      Q.  Was anyone with you?
4      A.  Yes.
5      Q.  Who was with you?
6      A.  Danny DeOlivera.
7      Q.  Could you spell the last name?
8      A.  Capital "D," small "e," then the capital
9  "O," Olivera.
10      Q.  You don't know how to spell the last name?
11      A.  Not really.
12      Q.  He was and employee of RDA?
13      A.  He was at that time.
14      Q.  He is no longer an employee?
15      A.  No.
16      Q.  Do you know where he is working now?
17      A.  No.
18      Q.  Do you know his residential address?
19      A.  No.
20      Q.  What else was with you?
21      A.  Peter Casendras (phonetic), not sure of his
22  last name, a gentleman out of Maine.
23      Q.  Was he an employee of RDA at that time?
24      A.  He was hired for the project.

DUNN & GOUDREAU

Page 37

1   vessels moved, is that your understanding; did
2   someone try and get the vessels moved?
3       A.  That's the first route we went.
4       Q.  When you say, "That's the first route we
5   went," what did you do, take to get the vessels
6   moved?
7       A.  Talked with Gene, never got the vessels
8   moved.  That's when we started to see if we could get
9   them around the pier.
10      Q.  But in order to get the vessels moved, you
11  would have to, I would think, talk to the vessels'
12  owners and/or Mr. Shuster?
13      A.  Correct.
14      Q.  Do you know if anybody spoke to either
15  Mr. Shuster or vessel owners in an effort to get
16  those vessels moved?
17      A.  I don't know.
18      Q.  Did you ever know who owned the vessels?
19      A.  I met one of the owners on the vessels.  I
20  broke his antenna.
21      Q.  When did you first meet one of the owners?
22      A.  Day after I broke his antenna.
23      Q.  Relative to the day of the accident, was it
24  prior to the date of the accident you met with one of

Page 38

1   the fishing vessel owners?
2       A.  Yes.
3       Q.  When prior to the accident; do you know
4   approximately?
5       A.  Two days.
6       Q.  So that was the first time you ever met an
7   owner of any of the fishing vessels?
8       A.  Yes.
9       Q.  So you met him because you broke one of his
10  antennas?
11      A.  Yes.
12      Q.  How did you break one of the antennas?
13      A.  Trying to load my barge swinging everything
14  over the vessels.
15      Q.  What did you say to him?
16      A.  He says, "My antenna got broken.  I heard
17  that got broken."  I said, "It was me.  Give me a
18  bill.  I would be glad to pay it.  It was an
19  accident.  What do you want from me?"
20      Q.  Did you know his name?
21      A.  No.  I don't even remember his name.
22      Q.  Now, there were two fishing vessels,
23  correct?
24      A.  Yes.

Page 39

1       Q.  Did you ever meet the other owner?
2       A.  No.  It was abandoned all the time.  It was
3   apart and abandoned.
4       Q.  So one of the vessels appeared to be
5   abandoned?
6       A.  I worked there every day for a while and
7   never saw anyone go on board.
8       Q.  But you saw somebody go on board the other
9   vessel?
10      A.  A couple of workers, yes.
11      Q.  Appeared people were working on that
12  vessel?
13      A.  Yes.
14      Q.  Did you ever speak to any of the workers?
15      A.  They didn't speak English, so, no.
16      Q.  But you did speak to the owner of that
17  particular vessel but merely because you broke his
18  antenna?
19      A.  Correct.
20      Q.  You didn't ask if he could move his vessel,
21  did you?
22      A.  No.
23      Q.  Now, it's true, isn't it, the RDA employees
24  relative to this project were going to need -- let me

Page 40

1   back up a little.
2           Every day to the site prior to the
3   day of the accident, did Mr. Bombard ever accompany
4   you on any of those days prior to the day of the
5   accident?
6       A.  I believe he was there the day before the
7   accident is when he started.  I'm really not sure.
8       Q.  What was going on the day before the
9   accident?
10      A.  Loading the barge with materials.
11      Q.  Now, did you have a time period of time in
12  which you understood that RDA, the barge should be
13  loaded with all the materials; was there a time
14  constraint involved?
15      A.  All I know is we had to get the job done by
16  a certain date.  We had a weather window, the piles
17  being built.  We had a lot of things trying to get us
18  out of there to get onto the site to build the tower.
19      Q.  When you say the job getting done by a
20  certain date, talking about the job done, erecting
21  the tower?
22      A.  Being completed, yes.
23      Q.  You knew there was some sort of schedule
24  date when they should be completed?

Page 41

1      A.  Yes.
2      Q.  Did you know what the date was?
3      A.  I don't remember the date, but I did know
4  it, though.
5      Q.  So, therefore, all the pre-work, getting
6  the piles onto the barge, taking the barge out to the
7  Vineyard, had to be done within a certain amount of
8  time relative to the ultimate time when the tower had
9  to be built?
10      A.  Yes.
11      Q.  But there wasn't a schedule, like, "On this
12  day, we have to do this, next day we have to do
13  that," was there?
14      A.  No, but, yes.  I don't know.  When I set up
15  a job, I say, "We have to try to get the piles done
16  by this date so we can get them loaded by this date.
17  We have to try to get to the Vineyard by this date."
18      Q.  So it's an informal schedule you have in
19  your head?
20      A.  Yes.
21      Q.  Do you convey that to the employees?
22      A.  Yes.
23      Q.  I take it you conveyed that to the
24  employees including Mr. Bombard during that ten-day

Page 42

1  period up until the day of the accident?
2      A.  Yes.
3      Q.  Up to and including the day of the
4  accident?
5      A.  Yes.
6      Q.  Now, the barge, I take it that the barge
7  itself was a major part of this project, correct?
8      MS. HARDY:  Objection.
9      A.  Yes.
10      Q.  It's true, is it not, RDA employees would
11  need access to the barge, correct?
12      A.  Yes.
13      Q.  Was it RDA's responsibility to provide that
14  access to the barge?
15      MR. McALEER:  Objection.
16      Q.  By that I mean, a gangway of some sort, an
17  actual physical means of getting on and off the
18  barge?
19      MR. McALEER:  Objection.
20      A.  99% of the time we use a gangway to go from
21  the barge to shore.
22      Q.  So are you saying 99% of the time whenever
23  RDA employees need access to a vessel RDA supplies
24  that access?

Page 43

1      MR. McALEER:  Objection.
2      A.  Yes.
3      Q.  Now, when you say 99% of the time you use
4  gangways, can you describe to me what a gangway is?
5      A.  Aluminum plank approximately 26 inches
6  wide.  It can be any length from 20 to 35 feet,
7  whatever you need.
8      Q.  Does it have handrails?
9      A.  Sometimes.
10      Q.  When you say 99% of the time you use
11  gangways for the access of your employees, I take it
12  RDA owns gangways?
13      A.  We rent them more than we own them.
14      Q.  Some of them have handrails, some of them
15  do not?
16      A.  When you rent them, they become a bare
17  gangway and the handrails and everything are on the
18  side.  You attach them yourself.
19      Q.  And how is a gangway secured from a wharf
20  to a vessel?
21      A.  You tie it tight to your barge and you let
22  it float on land so when the barge goes up to the
23  tide the gangway rides.  When the tide comes out, the
24  gangway goes back out.

Page 44

1      Q.  Would you agree that RDA 99% of the time
2  provides access for its employees, would you agree
3  it's RDA's responsibility to employees to provide a
4  safe way for the access of the vessel for its
5  employees?
6      MR. McALEER:  Objection.
7      A.  Depends what you consider safe.
8      Q.  Well, I'm sure RDA wouldn't provide access
9  saying, "This isn't safe, we're going to use it any
10  way"?
11      A.  No, definitely not.
12      Q.  So you certainly would try and do something
13  that appears safe to you?
14      A.  Correct.
15      Q.  Now, do you know what RDA planned to use
16  for this particular project as access to the barge?
17      A.  Going to the head wall I would put a
18  gangway out like I normally do.  There was two
19  gangways on the barge.
20      Q.  So this barge had two gangways on it?
21      A.  Correct.
22      Q.  The barge that was at Shuster's Wharf?
23      A.  Correct.
24      Q.  I think you just said, is your testimony,

12 (Pages 45 to 48)

Page 45

1  had the barge been docked against the bulkhead,
2  that's the means of access you would have used, those
3  gangways?
4      A.  Yes.
5      Q.  You would have gotten it from the barge?
6      A.  Correct.
7      Q.  Let's go to the day of the accident.  On
8  the day of the accident, what time did you arrive at
9  the wharf?
10     A.  6:30.
11     Q.  Did you come by yourself?
12     A.  Yes.
13     Q.  When you got there, were any other RDA
14  employees there?
15     A.  No.
16     Q.  What time did they start to arrive?
17     A.  Between 7:00, quarter of.
18     Q.  Who on that particular day was working for
19  RDA?
20     A.  Danny DeOlivera, Pete Casendras, whatever
21  his last name is, Mark Bombard, and myself.
22     Q.  Was Gary Bushy there that day?
23     A.  I believe he was there later in the
24  afternoon, late -- later in the morning.  They

Page 46

1  traveled from far north.  I believe he lives in
2  Beverly, and if I wasn't using the tugboat, I didn't
3  mind if he didn't show up until 7:30, 8:00, 9:00.
4  Every day he showed up a little different.  I didn't
5  mind.
6      Q.  Were you using the tugboat during this
7  period of time?
8      A.  No.
9      Q.  Now, on the day of the accident, other than
10  the RDA employees in the morning, did you observe
11  anyone else at the wharf?
12     A.  Yes.
13     Q.  Who?
14     A.  The people from the welding company we
15  hired to help weld these piles together.
16     Q.  How many were there?
17     A.  Two guys there.
18     Q.  They don't work for RDA?
19     A.  No.
20     Q.  They were helping you with putting together
21  the piles?
22     A.  They had the contract of welding the piles
23  together.
24     Q.  At the time, the day of the accident, did

Page 47

1  you before starting for work meet with the employees
2  informally and say, "This is what we're going to do
3  today"?
4      A.  I do that every morning.
5      Q.  You did that the day of the accident?
6      A.  Give them a lowdown what the plan is to
7  start the day out.
8      Q.  What was the plan that day?
9      A.  We had some smaller steel on board, stuff I
10  wanted to start landing on the barge.
11     Q.  Did you tell them you wanted to accomplish
12  a certain amount of work by the end of the day?
13         MR. McALEER:  Objection.
14     A.  No.  I wanted to get the piles on the
15  barge, but the big piles still weren't done, so it's
16  not like I had to do it within that day, but I wanted
17  to start loading the barge.
18     Q.  When you say "big piles weren't done," they
19  weren't welded together yet?
20     A.  Weren't 100% fabricated.
21     Q.  Once again, please, can you describe the
22  specific activity on the day of the accident that the
23  RDA employees were doing including yourself?
24     A.  Loading up materials onto the barge.

Page 48

1      Q.  So they would go to where the pilings were?
2      A.  To the materials were, correct.
3      Q.  Would they be attached to the crane?
4      A.  We attach them to the crane.
5      Q.  Then they're swung over into the barge?
6      A.  Correct.
7      Q.  Does this require, I take it, the employees
8  getting to the barge?
9      A.  Yes.
10     Q.  So to get to the barge, they had to go from
11  the wharf to the fishing vessel and then onto the
12  barge?
13     A.  Yes.
14     Q.  Did you ever comment on the day of the
15  accident to any of the other RDA employees that the
16  barge wasn't where it was supposed to be?
17     A.  No.
18     Q.  Did you ever comment prior to the day of
19  the accident --
20     A.  Yes.
21     Q.  What did you say and to whom?
22     A.  Just the men saying that, "This sucks
23  climbing up and down vessels."
24     Q.  Just to the RDA employees?

Page 49

1    A.  Yeah, the men.
2    Q.  You said you thought Mark Bombard was there
3  a day before the accident; did you tell him that,
4  "This sucks"?
5        MR. McALEER:  Objection.
6    A.  I don't know.
7    Q.  But you recall telling --
8    A.  I don't know whether Danny was alongside
9  me.  Peter was alongside me when I said that.  I'm
10  not sure who was alongside.
11    Q.  Did any of the employees ever complain
12  about the barge not being docked directly against the
13  bulkhead?
14    A.  No.
15    Q.  Did any agree with you it, quote, unquote,
16  "sucked"?
17        MR. McALEER:  Objection.
18        MS. HARDY:  Objection.
19    A.  Yes.
20    Q.  Who agreed with you?
21    A.  Timmy Nash.
22    Q.  Did he say anything else of the situation?
23    A.  No.
24    Q.  Do you recall Mark Bombard on the day of

Page 50

1  the accident complaining to you about the access to
2  the fishing vessel?
3    A.  No.
4    Q.  Do you recall him ever saying to you,
5  "Let's go use a gangway"?
6    A.  No.
7    Q.  Did you have the authority to say on the
8  day of the accident that, "We're not going to work
9  that day unless and until the barge is docked the way
10  it was supposed to be docked"?
11        MR. McALEER:  Objection.
12        MS. HARDY:  Objection.
13    A.  I don't know if I had that much authority.
14    Q.  But you never did stop work because the
15  barge was docked tied to a fishing vessel and not to
16  the bulkhead, correct?
17    A.  Correct.
18        MS. MORELLO:  I'm going to mark as an
19  exhibit a previous exhibit that had been marked at
20  Mr. Bombard's deposition, and it's a diagram of the
21  wharf and the barge and the tug and the fishing vessels, the tug,
22  as of the date of the accident.  It's not to scale.
23  It's a rough drawing, but I want to mark it here as
24  an exhibit.

Page 51

1        (Exhibit 1 marked for identification)
2    Q.  I would like you to look at that.  That's
3  Mr. Bombard's drawing.  It's rough and it's obviously
4  not to scale, but is there anything in that drawing
5  that looks incorrect to you?
6    A.  Tug wasn't tied up and push gear was on the
7  other side.  The crane was on the other side of the
8  barge.  The tugboat, he has the tug on the end of the
9  barge.  It wasn't on the end of the barge.  It was on
10  the hip.
11    Q.  I see.  Anything else?
12    A.  The crane was on this end (indicating) at
13  the time of the accident.
14    Q.  The opposite end shown in that picture?
15    A.  Yes, but the crane has the ability to walk
16  up and down the whole thing.
17    Q.  Now, you'll see he has indicated there are
18  two boats, correct?
19    A.  Correct.
20    Q.  Were these fishing vessels?
21    A.  Yes.
22    Q.  One of them you had said was abandoned or
23  appeared to be abandoned; is that correct?
24    A.  Yes.

Page 52

1    Q.  Now, Mr. Bombard drew a plank or he drew
2  and then identified this rectangle as a plank as the
3  means of access for the RDA employees to get onto the
4  boat, and then from the boat, they would go onto the
5  barge; do you see that?
6    A.  Yes.
7    Q.  Was there such a plank?
8    A.  I don't recall a plank there.
9    Q.  You don't recall the plank?
10    A.  Nope.
11    Q.  How did the employees then on the date of
12  the accident in particular get from the waterfront to
13  the boat, fishing boat?
14    A.  I took and climbed through the scuppers on
15  the vessels.  It's got notched out scuppers like a
16  ladder.
17    Q.  You're talking about the fishing vessel?
18    A.  Yes.
19    Q.  Where are the scuppers located?
20    A.  On the side wall.
21    Q.  Of the fishing vessel?
22    A.  Yes.
23    Q.  So you didn't use this plank to get onto
24  the boat?

Page 53

1    A.  No.
2    Q.  Did you ever use the plank during the day
3  of the accident?
4    A.  No.
5    Q.  Was this plank in place the previous times
6  you came to the wharf?
7    A.  I don't recall a plank there.
8    Q.  Ever?
9    A.  Ever.
10    Q.  Well, previous to the day of the accident,
11  did you need access to this boat?
12    A.  Through the scupper holes I climbed back
13  and forth.
14    Q.  That's not the question.  Previous to the
15  date of the accident, you said there were ten days
16  you went virtually every single day to work?
17    A.  Yes.
18    Q.  Only one of the days you think Mr. Bombard
19  came, you think, the day before?
20    A.  Yes.
21    Q.  On those dates, did you and/or your
22  employees need access to this boat ever?
23    A.  We needed access to our barge, not to that
24  vessel.

Page 54

1    Q.  Strike that.  That's the question.  Sorry.
2      On those days, did you ever require
3  access to the barge?
4    A.  Yes.
5    Q.  The barge was tied to the fishing boat,
6  correct?
7    A.  Yes.
8    Q.  And the fishing boat was tied up directly
9  to the bulkhead, correct?
10    A.  Yes.
11    Q.  So you required, I would take it then,
12  access to the fishing vessel in order to get onto the
13  barge?
14    A.  Yes.
15    Q.  How in the days prior to the day of the
16  accident did you get onto the fishing vessel in order
17  to get onto the barge?
18    A.  Depending on the tide, 99% of the time I
19  used scupper holes.
20    Q.  What about the 1% time?
21    A.  If the tide was low and the rail -- on the
22  backside of the vessel, the rail dropped, and where
23  the rail dropped, sometimes that curb of the head
24  wall would be the same height as the big wall.

Page 55

1    Q.  That depended on the tides?
2    A.  Correct.  I would climb over the big wall
3  and get right onto the deck of the vessel.  If the
4  tide wasn't at the right tide, I would use the
5  climbing scupper holes that are in it.
6    Q.  The scupper holes are located where?
7    A.  Right about where Mark got hurt.  In front
8  of that there are notch outs to climb out over the
9  wall, climb back down to the vessel's deck.
10    Q.  Did the other employees use the same means
11  as you did, talking about prior to the day of the
12  accident?
13    A.  Yes.
14    Q.  Prior to the day of the accident, was that
15  ramp there -- strike that -- was that plank there
16  that he drew?
17      MR. McALEER:  Objection.
18    A.  I don't ever recall the plank.
19    Q.  Do you recall the plank being there on the
20  day of the accident?
21    A.  Nope.  I didn't use it.  I never saw it or
22  I just don't recall it.
23    Q.  So it's your testimony you don't recall
24  ever from the first time you started to go to work at

Page 56

1  Shuster's Wharf and the times prior to the day of the
2  accident you would need to work on the barge -- I
3  realize you didn't always work on the barge -- there
4  was never a plank from the waterfront to the fishing
5  vessel?
6    A.  Not that I recall.
7    Q.  Also, on the day of the accident, you don't
8  recall this plank?
9    A.  I do not recall a plank.  All the times
10  that I loaded in and out of that boat was everything
11  off the bow.
12    Q.  So is it fair to say that that was the
13  access that RDA was supplying, the access that RDA
14  intended for its employees was to literally climb
15  from the wharf to the fishing boat and then go to the
16  barge?
17    A.  Our main plan was to put a gangway out to
18  the pier.  I didn't have that ability.
19    Q.  Why didn't RDA have that ability?
20    A.  Two fishing vessels were there.
21    Q.  Why can't you attach a gangway to a fishing
22  vessel?
23    A.  Okay.  The deck of a fishing vessel drops
24  down and you have a big wall, so now your deck -- and

Page 57

1  you have a wall in front of you.  If I put a gangway
2  on top of that wall, I don't know how to get from the
3  deck of the vessel up to the top of the gangway to
4  try and make it work with the tides moving and
5  everything, so that's that 1% that I can't use a
6  gangway, because it ain't going to work.
7      Q.  Is it your testimony a gangway was never
8  even attempted to be used as access to the boat, to
9  the fishing boat?
10     MR. McALEER:  Objection.
11     A.  Correct.
12     Q.  That because, under the circumstances of a
13 fishing boat, it would be unsafe?
14     A.  Yes.
15     Q.  So also your testimony is, on the day of
16 the accident, even prior to the accident, you don't
17 remember any plank providing access to a fishing
18 vessel?
19     A.  No.
20     Q.  Is it your testimony you thought it was
21 safe for the RDA employees, then, just to climb onto
22 the boat, then climb over to the barge, and then
23 climb back to the boat and then back to the
24 waterfront?

Page 58

1      MR. McALEER:  Objection.
2      A.  Yes.
3      Q.  Would you consider that the safest means of
4  access to the vessel?
5      A.  Yes.
6      Q.  The safest means of exiting the vessel?
7      A.  Yes.
8      Q.  And that was because it was a fishing
9  vessel and because you couldn't use the gangway?
10     A.  Yes.
11     Q.  Was there more than one gangway on the
12 barge?
13     A.  Yes.
14     Q.  How many were there?
15     A.  Two.
16     Q.  Did they have the handles that you could
17 put up?
18     A.  Yes.
19     Q.  Again, and I apologize if I had said this,
20 fair to say that, had the barge been docked directly
21 against the bulkhead, the means of the access would
22 have been the gangway?
23     MS. HARDY:  Objection.
24     A.  Yes.

Page 59

1      Q.  You consider that a safe means of access
2  and egress?
3      MS. HARDY:  Objection.
4      A.  The gangways, yes.
5      Q.  Did anyone, any employee, mention to you
6  anything about this plank Mr. Bombard has drawn on
7  this?
8      A.  No.
9      Q.  So you never saw it?
10     A.  No, I do not recall.
11     Q.  Now, in order to access the barge from the
12 fishing vessel, once you were on the fishing vessel,
13 was the top of the railing of the boat flush with the
14 barge, was it easy to get from the boat to the barge?
15     A.  Yes.
16     Q.  Was that easier than getting, say, from the
17 wharf onto the boat, the fishing vessel?
18     A.  Same way, scupper holes, use the scuppers
19 to get onto the barge just like you do to get off.
20     Q.  At some point, you said you were also
21 jumping off the rail; were you not?
22     MR. McALEER:  Objection.
23     A.  If the vessel was the same height as the
24 curb, I would go from the curb to the rail, step down

Page 60

1  onto the deck on the low side of the vessel.
2      Q.  And was that because the tide conditions
3  made that practical to do so early in the morning --
4  what happened when the tide rose?
5      A.  Now it was too high, so you had to try and
6  climb up and then jump down on the vessel.  That's
7  the way it was the day Mark got hurt.  The tide was
8  up.
9      Q.  In the morning, what was the tide?  When
10 you first started to work, what time did you guys
11 first start work that day?
12     A.  7:00 a.m.
13     Q.  7:00 a.m., what was the condition of the
14 tide?
15     A.  I don't remember if it was coming or going,
16 but the fishing vessel was up.
17     Q.  At the beginning of the day, how were the
18 RDA employees getting onto the vessel and then onto
19 the barge then back to the vessel and back to the
20 waterfront?
21     A.  I don't recall exactly.  I know that we
22 climb over the fishing vessel, walk across its deck
23 up onto our barge.
24     Q.  When you had to go back to the wharf, what

Page 61

1   did you do?
2       A.  Same way, just reverse.
3       Q.  And you saw Mark Bombard do that,
4   certainly?
5       A.  Mark Bombard and I were right together when
6   it happened. I even joked with him saying, "Look at
7   you. You're long-legged." He's very tall. I would
8   use the scupper holes. He would swing his leg over
9   the railing. Instead of climbing, he would swing his
10  leg over.
11      Q.  Did anyone else swing their leg over?
12      A.  No.
13      Q.  Did you ever swing your leg over?
14      A.  No.
15      Q.  So mostly they use the scupper holes?
16      A.  Yes. Everyone is pretty short-legged, so
17  you can't swing your leg over the rail and meet the
18  other side.
19      Q.  Because he was long-legged and taller than
20  the rest of you, this was the way did he it?
21      A.  Yes.
22      Q.  Did you tell him ever not to do it that
23  way?
24      A.  No.

Page 62

1       Q.  Did you think the means he chose to exit
2   the fishing vessel was a reasonable way of doing so
3   given his long-leggedness?
4       A.  As soon as it happened, I was joking with
5   him about him being long-legged and being able to do
6   that.
7       Q.  Prior to the accident, you didn't have any
8   problem with him exiting the vessel that way?
9           MR. McALEER: Objection.
10      A.  I don't recall how every man got on and off
11  the fishing vessel. I know how I did, used scupper
12  holes.
13      Q.  Did you ever observe Mr. Bombard prior to
14  the accident leave the fishing vessel by swinging
15  over and jumping down into the wharf?
16      A.  I really don't know.
17      Q.  Do you recall the approximate time of the
18  accident?
19      A.  A.m.
20      Q.  I'm going to represent to you it was in the
21  afternoon.
22      A.  Okay.
23      Q.  Just so I have this straight, is he the
24  only RDA employee who swung his legs over the fishing

Page 63

1   vessel and jumped to the wharf because he was so
2   long-legged?
3           MR. McALEER: Objection.
4       A.  I don't know if he was the only one.
5       Q.  You didn't see anyone else do it?
6       A.  No.
7       Q.  But they could have?
8       A.  Possible.
9       Q.  But you never did?
10      A.  No.
11      Q.  Can you estimate how tall Mr. Bombard is?
12      A.  Almost six foot.
13      Q.  Now, did you personally witness
14  Mr. Bombard's accident?
15      A.  Yes.
16      Q.  What did you see and how did you see it
17  come about?
18      A.  Mark and I both climbed off the barge
19  together. We were walking across the deck of the
20  fishing vessel to go ashore to hook the crane up to
21  some materials. I started climbing over the
22  scuppers, and Mark went to pass me, swing his leg
23  over the rail. When I got on top of the scuppers, I
24  swung around. I started climbing down the scuppers.

Page 64

1   That's when mark just went down, grabbed his leg.
2       Q.  So how close were you to him when the
3   accident occurred?
4       A.  Within three feet.
5       Q.  Then what happened when you saw him grab
6   his leg, what happened then?
7       A.  I asked him if he was okay. He said his
8   leg really hurt. I said, "Do you want to go to the
9   hospital?" He said, "Yes." I had Danny DeOlivera
10  take him to the hospital.
11      Q.  Do you know of any other RDA employee on
12  the scene that day who saw the accident happen?
13      A.  I don't know if Timmy Nash saw it. I don't
14  know if anyone did see it.
15      Q.  Did you notify Mr. Kelly or anyone from RDA
16  about the accident?
17      A.  Yes.
18      Q.  When did you do that?
19      A.  Right after got him into the Jeep and
20  headed him over to the hospital.
21      Q.  What did you tell Mr. Kelly?
22      A.  I don't think it was Mr. Kelly that I
23  talked with.
24      Q.  Who did you talk with?

Page 65

1    A. I'm not sure if it was Sara was her name.
2    She worked in the office. I believe I told her I
3    just had a guy hurt, took him to St. Luke's Hospital.
4    I believe that was all I said.
5    Q. Just to go back, had you worked with
6    Mr. Bombard previous to this?
7    A. Yes.
8    Q. Had you been in instances where a vessel of
9    some sort, perhaps a barge, something else, where a
10   gangway was provided by RDA, had you seen Mr. Bombard
11   use that gangway?
12   A. Yes.
13   Q. Did you ever see Mr. Shuster any time after
14   the accident?
15   A. I don't recall.
16   Q. Do you ever recall seeing him any other
17   time other than you had that oral discussion with
18   him?
19   A. Yes.
20   Q. When was that?
21   A. I wanted to buy some parts from him and
22   open an account.
23   Q. When was that?
24   A. I'm not sure if that was before or after

Page 66

1    the accident.
2    Q. Did you ever talk to him about the
3    accident?
4    A. No.
5    Q. Did you ever after the accident talk to him
6    or anybody from Shuster or Southeast Development
7    about the accident?
8    A. No.
9    Q. Do you know who Richard Shuster is?
10   A. No.
11   Q. When was the last time you talked with
12   Mr. Bombard?
13   A. Probably the following summer.
14   Q. What did you talk about?
15   A. See how he was doing.
16   Q. Did you talk about the accident itself?
17   A. No.
18   Q. Did you consider Mr. Bombard to be a
19   competent employee?
20   A. Yes.
21   Q. Did you consider him to be a careful
22   employee?
23   A. Yes.
24   Q. Are you aware of any RDA written safety

Page 67

1    policies or procedures related to accessing a vessel?
2    A. No.
3    Q. Did RDA conduct any training sessions you
4    know of for their employees about safety in general,
5    and in particular, safe access, egress, and ingress
6    to a vessel?
7    A. We have a safety sheet, that's all, a
8    sign-up sheet.
9    Q. What's that?
10   A. Just goes over our safety policies
11   regarding hard hats, eyeglasses, slip, trips, and
12   falls, life preservers, work boots.
13   Q. So is there a written safety policy?
14   A. RDA has a written safety policy.
15   Q. Is it distributed to the employees?
16   A. Yes.
17   Q. When is that distributed to the employees?
18   A. During filling out tax papers.
19   Q. Filling out tax papers?
20   A. We don't have applications, but you have to
21   fill out tax forms so you can get your paycheck.
22   It's not like a regular job application. It's just
23   strictly, basically -- what is that, the 1099 thing
24   there. I don't know what the tax paper is called

Page 68

1    there.
2    Q. On the diagram that you have that
3    Mr. Bombard gave us, can you just indicate where it
4    was that -- I think we can use this, or should we do
5    another one? Why don't we just use this.
6            On this, can you just mark where it
7    was that you would use the scupper holes to get on
8    and off this vessel.
9        MS. HARDY: I have a red pen. Maybe color
10   copy it.
11       MS. MORELLO: Right.
12   A. It's actually right where Mark says he got
13   hurt. I believe right there (indicating) and Mark
14   was here. Just before this bow starts turning in,
15   this is a straight wall (indicating). It's just
16   before the wall starts bending in.
17   Q. But where he indicated the accident
18   occurred?
19   A. Correct. I was here (indicating) and I
20   believe Mark was right here (indicating), because the
21   scupper holes are right at the turning point of the
22   bow, which comes up to a point.
23       MR. McALEER: Marsha, can we have him --
24       Draw an arrow where you move Mark to.

18 (Pages 69 to 72)

Page 69

1     A. (Witness complies).
2     Q. And write your initials in underneath it?
3     A. (Witness complies).
4     Q. Same thing over here, draw an arrow,
5   scuppers?
6     A. (Witness complies).
7     Q. Initial that, too?
8     A. (Witness complies).
9     Q. Okay. So then you were very close to him
10   at the time of the accident?
11     A. Within three feet, yes.
12     MS. MORELLO: I don't think I have any
13   further questions. Give me a minute, though. Let's
14   take a break.
15     (Off the record)
16     Q. Do you know what a wharfinger is?
17     A. No.
18     Q. Have you ever heard that phrase before?
19     A. No.
20     MS. MORELLO: I have no further questions.
21     (Off the record)
22           EXAMINATION
23   BY MS. HARDY:
24     Q. Good afternoon, Mr. Souza. We met earlier.

Page 70

1   My name is Jennifer Hardy, and I represent Shuster
2   and Southeast in this case.
3           After you had the conversation with
4   Mr. Shuster in his office, was it your understanding
5   that Mr. Kelly would firm up the details of RDA's
6   agreement with Southeast?
7     A. RDA Construction.
8     Q. Sure.
9     A. Yes.
10     Q. And after that conversation, did you have
11   any conversations with Mr. Kelly about the agreement
12   that was reached between RDA Construction and
13   Southeast?
14     A. No.
15     Q. So you had no knowledge with respect to the
16   particulars about the agreement between RDA
17   Construction and Southeast Development?
18     A. No.
19     MR. McALEER: I want to mention, to refresh
20   his --
21     A. I have seen this document (indicating). I
22   have seen no affidavits or anything.
23     THE WITNESS: When you asked me if I had
24   seen documents earlier, I said, "No," but actually, I

Page 71

1   saw the map.
2     MS. MORELLO: When did you see that?
3     THE WITNESS: Yesterday.
4     MS. MORELLO: So you saw it in your
5   lawyer's office?
6     THE WITNESS: Yes. This is the only thing
7   I saw.
8     Q. You testified three weeks prior to
9   Mr. Bombard's accident you started receiving
10   materials at the Wright Avenue location; is that
11   correct?
12     A. Give or take, yes.
13     Q. How did those materials arrive to Wright
14   Avenue?
15     A. Flatbed trailers.
16     Q. And were those materials loaded into the
17   yard that's at Wright Avenue?
18     A. Yes, on the right-hand side.
19     Q. And that yard is adjacent to the
20   waterfront; is that correct?
21     A. Yes.
22     Q. And do you know who actually owns the
23   bulkhead or you called it a head wall?
24     A. Yes, no, I don't.

Page 72

1     Q. During the approximate week and a half that
2   the barge was tied up to the fishing vessels at
3   Wright Avenue, did RDA's employees have access to the
4   barge?
5     A. Over the fishing vessel across the deck up
6   onto the crane barge.
7     Q. Was that using the scupper holes on the
8   fishing vessel?
9     A. I used scupper holes.
10     Q. What did the other RDA employees do to
11   access the barge, and I'm talking in the week and a
12   half prior to Mr. Bombard's accident?
13     MR. McALEER: Objection.
14     A. Pretty much the scupper holes.
15     Q. And on a daily basis, and this is prior to
16   Mr. Bombard's accident, how often would RDA employees
17   have to access the barge by using the scupper holes
18   crossing the fishing vessel onto the barge?
19     A. Some days not at all. If we were doing all
20   the welding on shore, some days a few times. It all
21   depends what part of the job we were at.
22     Q. What was the purpose in having RDA
23   employees access the barge on a daily basis, why
24   would they go onto the barge?

DUNN & GOUDREAU

## Page 73

1    A.  To receive the material, get the crane
2  started, get access to our tugboat.
3    Q.  Who was the crane operator?
4    A.  James Souza and not me.
5    Q.  That's S-o-u-z-a?
6    A.  Yes.
7    Q.  Same spelling as your last name?
8    A.  Yes.  I don't know if he was there
9  full-time at that point or if he showed up after Mark
10  Bombard.  A lot of times I run the crane, if we're at
11  a place just loading.  Jim Souza was the operator on
12  that job, though, I don't know if he came in before
13  or after Mark got hurt.
14    Q.  Is there an RDA employee named James Soza,
15  S-o-z-a?
16    A.  No, S-o-u-z-a.  There is two of us.
17    Q.  At any point, after your first conversation
18  with Mr. Shuster in his office, up until and
19  including the time of Mr. Bombard's accident, did you
20  ever go back to Mr. Shuster's office to complain
21  about that the barge, didn't have exclusive use of
22  the head wall or bulkhead?
23    A.  I don't believe so, no.
24    Q.  Do you know if Mr. Kelly had any

## Page 74

1  conversation with Mr. Shuster in which he complained
2  that RDA Construction did not have exclusive use of
3  the bulkhead?
4      MR. McALEER:  Objection.
5    A.  I don't know.
6    Q.  On the date of the accident, was the
7  tugboat being used?
8    A.  No.
9    Q.  Why would Mr. Bushy report to the Wright
10  Avenue location if the tugboat was not going to be
11  used?
12    A.  That's his vessel.  I mean "his vessel" as
13  being a captain.
14    Q.  Was he required to report to the Wright
15  Avenue location every day whether or not the tugboat
16  was being used?
17    A.  Yes.
18    Q.  Who was the welding company that was
19  welding the piles together?
20    A.  I don't remember.  It's not far from
21  Shuster's.  I just don't remember.  It had a weird
22  name.
23    Q.  I believe you testified you had never been
24  to the Wright Avenue location prior to talking to Mr.

## Page 75

1  Shuster?
2    A.  When I was a child, yes, with my dad.
3    Q.  Other than that, you had never done work
4  there on behalf of RDA Construction?
5    A.  No.
6    Q.  I believe you testified Mr. Bombard may
7  have worked on the day prior to his accident?
8    A.  Yes.
9    Q.  On that day, do you recall what his duties
10  and responsibilities were, and this would be the day
11  prior to his accident?
12    A.  Getting materials on the barge.  Actually,
13  I think he was looking into dive equipment.
14    Q.  What do you mean by "looking into dive
15  equipment"?
16    A.  Checking filters, that kind of stuff,
17  making sure we were prepared.
18    Q.  Where would these materials be located?
19    A.  They were on the barge.
20    Q.  He would be doing both categories of things
21  that you just testified to, getting materials onto
22  the barge and looking at the dive equipment on the
23  day prior?
24    A.  Yes.

## Page 76

1    Q.  How would he go about getting the materials
2  onto the barge?
3    A.  Crane.
4    Q.  Where would Mr. Bombard be located in
5  getting the materials onto the barge with the crane?
6    A.  Mark was on shore with me when we were
7  sending the materials over.
8    Q.  How would the crane take the materials from
9  the yard to the barge?
10    A.  I would put two guys on shore, two guys on
11  land, on the barge, swing the crane over.  We would
12  rig it, send it to a couple of guys that were on the
13  barge.
14    Q.  So it's your understanding the day prior to
15  Mr. Bombard's accident he was on shore with you
16  assisting with rigging the crane?
17    A.  Yes, not all day but, yes.
18    Q.  Do you recall if Mr. Bombard ever had an
19  occasion to access the barge on the day prior to his
20  accident?
21    A.  Yes.
22    Q.  Did you ever observe Mr. Bombard accessing
23  the barge on the day prior to his accident?
24    A.  Not like where I would remember it.  Did I

20 (Pages 77 to 80)

Page 77

1  see him go back and forth, yes.
2      Q.  Did Mr. Bombard have any issues accessing
3  the barge prior to the day of his accident?
4          MS. MORELLO:  Objection.
5      A.  No.
6      Q.  He never got hurt on the day prior to his
7  accident accessing the barge; is that correct?
8      A.  Correct.
9      Q.  The day prior to his accident, did
10 Mr. Bombard ever make any complaints to you about
11 having any problems with accessing the barge from the
12 bulkhead or the head wall?
13     A.  No.
14     Q.  Other than the day prior to his accident,
15 had Mr. Bombard ever worked with you at the Wright
16 Avenue location at any point during that approximate
17 week or so you said prior to his accident?
18     A.  I'm not exactly sure what day Mark got
19 there.  I believe it was the day before the accident.
20 That was his first time at that Shuster location.
21     Q.  Before he started his shift, his first
22 shift ever at Wright Avenue, what instructions did
23 you give to him regarding accessing the barge?
24     A.  I did not give him.

Page 78

1      Q.  Did any of the RDA Construction employees
2  present give him any instructions regarding how to
3  access the barge?
4      A.  No.
5      Q.  How did he know how to access the barge
6  from the head wall?
7      A.  How do you know how to get into your car
8  every day?  You work it out.  If your car is in a
9  puddle, are you going to walk through the puddle to
10 get to it?  Same thing, you look at it and you take
11 your safest route.
12     Q.  Did Mr. Bombard ever observe you accessing
13 the barge?
14     A.  Yes.
15     Q.  Is it fair to say that he knew how to
16 access the barge by observing what you did?
17     A.  Yes.
18     Q.  And you testified earlier that your
19 practice was to access the barge by using the scupper
20 holes; is that correct?
21     A.  Yes.
22     Q.  Did you, yourself, ever have any issues
23 accessing the barge by using the scupper holes
24 walking across the fishing vessel and getting onto

Page 79

1  the barge?
2      A.  No.
3      Q.  Did you feel that that was a safe way to
4  access the barge from the bulkhead or head wall?
5      A.  Yes.
6      Q.  It's fair to say that, at the time of
7  Mr. Bombard's accident, he could have used the
8  scupper holes like you did in getting off of the
9  fishing vessel; is that correct?
10     A.  Yes.
11     Q.  Instead, he chose actually to swing his leg
12 around and landed on the bulkhead; is that correct?
13     A.  Yes.  The way I went over, and I was using
14 the scupper holes, I went like this (indicating).  I
15 came over the wall and I looked and then Mark was
16 down.
17     Q.  Just for the record, you swung your left
18 leg around; is that correct?
19     A.  Left leg around, put it into the top
20 scupper hole, then I swung my right into the second
21 scupper hole down.
22     Q.  Had Mr. Bombard kind of waited for you to
23 actually get off of the scupper holes, instead he
24 passed you; is that correct?

Page 80

1      A.  Yes.
2      Q.  At any point after he was injured, did he
3  ever tell you that was an incredibly stupid thing to
4  do?
5          MS. MORELLO:  Objection.
6      A.  No.
7      Q.  Did he ever tell you that he made a
8  mistake?
9      A.  No.
10     Q.  I believe earlier Attorney Morello
11 suggested the accident occurred in the afternoon; do
12 you have any memory of when the accident occurred?
13     A.  I thought it was a.m.
14     Q.  Do you know based on what you recall how
15 often Mr. Bombard would have accessed the barge prior
16 to his fall and being injured?
17     A.  That day?
18     Q.  Yes.
19     A.  A few times.
20     Q.  When you spoke with Mr. Shuster during that
21 first conversation in his office, I believe you
22 testified earlier you told him how much space you
23 needed for the pilings, and what did you say to him
24 in that regard?

Page 81

1    A. 150 feet by the width of that right-hand
2  side. I don't exactly know how wide it is, whatever
3  the width was. There was even some vessels and some
4  stuff he moved for us to get that access.
5    Q. And at some point after your discussions
6  with Mr. Shuster, aside from when you purchased some
7  items at Shuster's, did you ever see him at the yard
8  or in the area of the bulkhead; is that correct?
9    A. Correct.
10    Q. When you spoke with Mr. Shuster in his
11  office, did you give him an exact time frame as to
12  when the barge would be there?
13    A. No.
14    Q. I believe you testified to, that at some
15  point, you were notified that the checks were made
16  out to the wrong entity; is that correct?
17    A. Correct.
18    Q. Who did you speak with about that; do you
19  recall?
20    A. Someone from my office called up and said,
21  "Is there a problem?" I just said, "I don't know."
22  They were saying, "Well, it ain't Shuster's" --
23  because I gave them Shuster's. They said they didn't
24  want it Shuster's, some other company. I said, "I

Page 82

1  don't know."
2    Q. During the approximate week and a half that
3  you were at the Wright Avenue location prior to
4  Mr. Bombard's accident, did any RDA employees ever
5  get injured by accessing the scupper holes crossing
6  the fishing vessel onto the barge?
7    A. No.
8    Q. And I believe you testified that no RDA
9  employees complained to you about that method; is
10  that correct?
11    A. Yes.
12    Q. It's fair to say you didn't stop doing any
13  of the work that you were doing on behalf of RDA
14  Construction because of the configuration of the
15  barge being tied up to the fishing vessel; is that
16  correct?
17    A. Changed the game plan, but, no.
18    Q. Were you able to load all of the materials
19  that you had from the yard onto the barge although
20  the configuration and the barge was tied onto the
21  fishing vessel?
22    A. No. I couldn't load the big pilings tied
23  to the fishing vessels.
24    Q. Did you eventually load those onto the

Page 83

1  barge?
2    A. Yes. I had to bring the barge up the other
3  side at a high tide.
4    Q. And you testified you never asked the
5  fishing vessel owners to move their vessels; is that
6  correct?
7    A. I only seen one owner.
8    Q. And you didn't ask that person?
9    A. No.
10    Q. And you didn't ask Mr. Shuster or anyone at
11  Southeast to arrange to have the vessel moved?
12    A. No.
13    Q. With respect to the plank Mr. Bombard has
14  indicated in his drawings, it's your testimony you
15  never recall seeing any plank there?
16    A. I don't recall a plank.
17    Q. And you never instructed any RDA employees
18  to use a plank, correct?
19    A. No, I didn't.
20    MS. HARDY: That's all I have. Thank you.
21    MS. MORELLO: That's it.
22    (Whereupon, the deposition
23      was concluded at 3:37 p.m.)
24

Page 84

1  PLEASE ATTACH TO THE DEPOSITION OF JAMES SOUZA
2  CASE: MARK BOMBARD vs. SHUSTER CORPORATION, et al.
3  DATE TAKEN: March 22, 2007
4
5    ERRATA SHEET
6  PAGE LINE    CHANGE    REASON
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16    I have read the foregoing transcript of my
17  deposition and except for any corrections or changes
18  noted above, I hereby subscribe to the transcript as
19  an accurate record of the statements made by me.
20    Executed this _____ day of _____, 2007.
21
22    _____
23      JAMES SOUZA
24

## Page 1

VOLUME: I
PAGES: 1 - 85
EXHIBITS: 1 - 6

UNITED STATED DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

MARK BOMBARD,

        Plaintiff,

vs.                    Docket No.
                     05-11389-REK

SHUSTER CORPORATION,

RDA CONSTRUCTION CO., INC., AND

SOUTHEAST DEVELOPMENT

CO., LLC,

        Defendants.

- - - - - - - - - - - - - - - - - - x

DEPOSITION of EUGENE KELLEY, a witness
called on behalf of the Plaintiff, taken pursuant to
notice before Deborah L. Maren, Registered Professional
Reporter and Notary Public in and for the Commonwealth of
Massachusetts, at the Law Office of Joseph G. Abromovitz,
P.C., 858 Washington Street, Third Floor, Dedham,
Massachusetts, on Thursday, January 18, 2007, commencing at
2:02 p.m.

DUNN & GOUDREAU

COURT REPORTING SERVICE, INC.

ONE STATE STREET

BOSTON, MASSACHUSETTS 02109

TEL: 617-742-6900/FAX: 617-973-9500

## Page 2

1  APPEARANCES:
2
    LAW OFFICE OF JOSEPH G. ABROMOVITZ, P.C.
3    By Marsha A. Morello, Esq.
    858 Washington Street, Third Floor
4    Dedham, Massachusetts 02026
    Attorney for the Plaintiff
5
6  MELICK, PORTER & SHEA, LLP
    By Jennifer B. Hardy, Esq.
7    28 State Street
    Boston, Massachusetts 02109
8    Attorney for the Defendants Shuster Corporation and
    Southeast Development Co., LLC
9
10 LOONEY & GROSSMAN, LLP
    By Patrick Owens McAleer, Esq.
11   101 Arch Street
    Boston, Massachusetts 02110
12 Attorney for the Defendant RDA Construction Co., Inc.
13
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1             INDEX

2  WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
3  EUGENE KELLEY
4    By Ms. Morello    4       77
5    By Ms. Hardy      50      82
6    By Mr. McAleer        82
7
8
9
10           EXHIBITS
11
12 Number    Description         Page
13 1  Notice of taking deposition    4
14 2  RDA Construction Company's answers to
   Shuster Corporation's first set of interrogatories  15
15
   3  RDA Construction Company's answers to plaintiff's
16   first set of interrogatories      15
17 4  Invoices           24
18 5  Diagram           36
19 6  First report of accident     66
20
21
22
23
24

## Page 4

1      PROCEEDINGS
2      MS. MORELLO: It was agreed by and among parties
3  for the respective -- for the plaintiff and the defendants
4  that the deponent will have 30 days to sign the deposition
5  transcript. Signing before a notary is waived.
6      All objections except as to the form of the
7  question and motions to strike are reserved until the time
8  of trial.
9
10     EUGENE KELLEY, a witness called for examination by
11 counsel on behalf of the plaintiff, first having been duly
12 identified and sworn, was examined and testified as follows:
13
14 DIRECT EXAMINATION BY MS. MORELLO:
15 Q.  My name is Marsha Morello. And I, along with Joseph
16 Abromovitz, represent the plaintiff in this action marked
17 Bombard against the defendants Shuster Corporation, RDA
18 Construction Company, and Southeast Development Company,
19 relative to injuries that Mr. Bombard sustained on August
20 2nd, 2002, on the premises located at 4 Wright Street in New
21 Bedford, Massachusetts.
22     MS. MORELLO: I'd like to mark as Exhibit 1 the
23 30(b) notice of the taking of the deposition of RDA
24 Construction.

Page 17

1  of all parties to said agreement and set forth the terms of
2  said agreement.
3       Did I read that correctly?
4  A.  Yes.
5  Q.  And your answer in number 14 was:  Upon information
6  and belief, James Soza of RDA Construction Corp entered a
7  verbal agreement for wharfage at Shuster Wharf.  Southeast
8  Development Company, LLC, and or its sister company, Shuster
9  Corporation, as wharfinger, was obligated to provide RDA
10 with a safe berth and wharf for its vessels and employees,
11 including a proper means of ingress and egress.
12      Additionally, see invoices for wharfage from
13 Southeast Development Company previously provided in Exhibit
14 C of RDA's Rule 26 automatic disclosure.
15      Did I read that correctly?
16 A.  Yes.
17 Q.  Could you please identify for me James Soza's current
18 position with RDA?
19 A.  Yes.
20 Q.  And that is?
21 A.  Pile driver/foreman.
22 Q.  And what was his position on the date of the accident?
23 A.  Pile driver/foreman.
24 Q.  As a pile driver/foreman, what were his

Page 18

1  responsibilities and duties?
2  A.  He was overseeing the daily operations at that time
3  for the crew, which responsibility encompassed making sure
4  that the barge at that point in time was properly mobilized
5  and demobilized.  And he was in charge of the crew.
6  Q.  Okay.  When you say the crew and the barge, are you
7  specifically talking about the incident on the date of the
8  plaintiff's accident?
9  A.  Yes.
10 Q.  Okay.  But what I want to know is his general
11 responsibilities and duties.  I'm not -- I'll get to the
12 specific day of the accident.  But I wanted to know, in
13 general, what were his -- I know he's a pile
14 driver/foreman.  Can you just -- and you said overseeing
15 daily operations for the crew.  But I take it for crews --
16 A.  The pile driver crew that was there.
17 Q.  Right -- on the day of the accident.  But did he
18 typically do that separate and apart from the date of the
19 accident?
20 A.  Yes.  That's typically his position.  That's what he
21 did.
22 Q.  Okay.  How long has Mr. Soza been working for RDA?
23 A.  As of today?  Or as of the time of the accident?
24 Q.  As of the time of the incident.  Strike that.

Page 19

1       When did he start working for RDA?
2  A.  I believe around 1990.
3  Q.  Now, in this answer number 14, you started by saying,
4  Upon information and belief.  Who provided you with the
5  information that you stated in your answer?
6  A.  Jimmy Soza, in my recollection of events.
7  Q.  Did anyone else provide you with information for this
8  answer, separate and apart from any discussion you might
9  have had with your attorney?
10 A.  No.
11 Q.  And by Shuster, what particular property are you
12 referring to in this answer?
13 A.  Shuster Wharf.
14 Q.  Did you know that as a property located at 4 Wright
15 Street in New Bedford, Mass.?
16 A.  I don't know.  I don't know the physical street
17 address.
18 Q.  Do you understand that Shuster Corporation and/or
19 Shuster Development Company, LLC, owned, quote, unquote,
20 Shuster Wharf?
21      MS. HARDY:  Objection.
22 A.  I don't know.
23 Q.  Did you know -- do you have any idea who owns Shuster
24 Wharf?

Page 20

1  A.  No.
2  Q.  But it's commonly referred to as Shuster Wharf where
3  the accident took place?
4       MS. HARDY:  Objection.
5  A.  Yes.
6  Q.  And that's known among your employees?
7  A.  Yes.
8  Q.  Well, you answered here that upon information and
9  belief, James Soza entered a verbal agreement for wharfage
10 at Shuster Wharf.  Do you know who he spoke to when he
11 entered into this verbal agreement?
12 A.  I don't recall.
13 Q.  You don't know with whom he discussed the agreement?
14 A.  No.
15 Q.  It was an oral agreement, however; correct?
16 A.  Yes.
17 Q.  Did he tell you who he talked with?
18 A.  Yes.
19 Q.  Who was that?
20 A.  I don't remember the names.
21 Q.  Do you remember if the last name was Shuster?
22 A.  No.
23 Q.  Well, you would assume, wouldn't you, if James Soza,
24 on behalf of RDA Construction Corp, entered a verbal

6 (Pages 21 to 24)

Page 21

1  agreement for wharfage at Shuster Wharf, that he was
2  speaking to the owner and/or owners of the wharf, wouldn't
3  you?
4        MR. MCALEER: Objection.
5        MS. HARDY: Objection.
6  A.  No, not necessarily.
7  Q.  Who would he -- possibly could he have entered the
8  verbal agreement into other than the owners?
9  A.  Somebody that the owner gave, you know, the ability to
10  make the deal.
11  Q.  An agent for the owner?
12  A.  Yes.
13  Q.  Has RDA, previous to the date of the accident, ever
14  utilized Shuster Wharf before?
15  A.  Not that I recall.
16  Q.  So this would be the first time that RDA Corporation
17  utilized Shuster Wharf?
18  A.  I don't recall.
19  Q.  Have you ever been to Shuster Wharf?
20  A.  Yes.
21  Q.  When?
22  A.  Around the time of that project.
23  Q.  Can you be a little more specific?
24  A.  No.

Page 22

1  Q.  Were you there prior to the defendant's accident?
2  A.  I was there after the accident. I may have been there
3  before the accident. I was there several times.
4  Q.  And was that during the time period of July 17th,
5  2002, to August 19th, 2003?
6  A.  Yes.
7  Q.  And why were you there?
8  A.  We had a project going on.
9  Q.  The project that included the date of the plaintiff's
10  accident?
11  A.  Yes.
12  Q.  And why were you specifically there? I know you said
13  it was because of the project. But did you go for a
14  specific reason?
15  A.  I would visit the job site from there by boat at
16  times.
17  Q.  By boat from where?
18  A.  From the Barge yard, C.
19  Q.  I'm sorry?
20  A.  The barge, after we mobilized the job out in the
21  ocean -- it was probably 30 miles from there -- we would
22  come back to that dock.
23  Q.  Okay. What was the project that RDA was involved in
24  requiring utilizing Shuster Wharf?

Page 23

1  A.  We were contracted to build a tower behind Martha's
2  Vineyard that monitored for NOAA. It was under contract
3  with the government to provide some sort of fog information
4  and track fog. And we built them a tower and put some
5  instrumentation on it for them.
6  Q.  Okay. So NOAA contracted with you to build this
7  tower?
8  A.  Yes.
9  Q.  Is there a written contract?
10  A.  Yes.
11  Q.  Do you know where that's located?
12  A.  Yes.
13  Q.  Can you tell me where?
14  A.  216 Ricciuti Drive.
15  Q.  So in RDA's files?
16  A.  Yes.
17  Q.  Do you know who signed the NOAA written contract on
18  behalf of NOAA?
19  A.  No.
20  Q.  Did you sign the contract --
21  A.  Yes.
22  Q.  -- as the president of RDA?
23  A.  Yes.
24  Q.  Okay. How long was this -- let me go back. How long

Page 24

1  was the project to take?
2  A.  Three to four months.
3  Q.  And did you complete that project?
4  A.  Yes.
5  Q.  Do you know the date it was completed?
6  A.  No. The month of October that year, late October.
7  Q.  October 2002?
8  A.  Yes.
9  Q.  Was it to be -- was this project to be completed by a
10  certain date? Or were you given a period in which to work?
11  A.  I don't recall.
12  Q.  Would that information be in the contract?
13  A.  Yes.
14        MS. MORELLO: Let's mark as Exhibit -- let's mark
15  as Exhibit -- this would be 4, I guess, various invoices
16  from Southeast Development to RDA Construction. They
17  consist of Invoice No. 13831, 13833, 13837, and 13844.
18        (Exhibit No. 4 invoices marked.)
19  Q.  Look at that and --
20        MS. MORELLO: I'm sorry.
21        MS. HARDY: That's all right.
22        (Discussion off the record.)
23  Q.  Now, if you could just look through these invoices.
24  Have you seen them before?

## Page 25

1  A.  I've seen some of them before.

2  Q.  Is there one you haven't seen?

3  A.  I don't think I've seen the parking lot charge one.

4  Q.  Which invoice number are you referring to?

5  A.  13831.

6  Q.  The first one?

7  A.  Yes.

8  Q.  Well, in looking over these invoices, does this

9  indicate to you that pursuant to the agreement RDA had

10  relative to Shuster Wharf that the time period for the

11  services that were provided to RDA were to cover 7/17/02 to

12  8/19/02?  That is July 17th, 2002, to August 19th, 2002?

13  A.  For these invoices, yes, some form of use.

14  Q.  But these invoices do seem to indicate that that was

15  the time period of the agreement for the usage of Shuster

16  Wharf?

17      MS. HARDY: Objection.

18  A.  Yes.

19  Q.  The project itself --

20  A.  Yes.

21  Q.  -- took much longer and didn't involve Shuster Wharf?

22  A.  Correct.

23  Q.  In any event, Shuster Wharf charged you for those

24  periods, certainly?

## Page 26

1  A.  Yes.

2  Q.  Thank you.  Now, I understand you described the

3  overall project that you were -- that RDA was involved in.

4  Can you describe to me specifically why you needed Shuster

5  Wharf and what was to be done there during that time period?

6  A.  We had -- part of this project, we had some very large

7  pipe piles to drive, which we had placed down in New

8  Bedford.

9      In addition, we had some metal fabrication work

10  purchased down in New Bedford that was too big to truck over

11  the road.  So we took our barge down there in New Bedford

12  and had to lay up and get the materials onto the barge.  And

13  the dockage that we utilized down in New Bedford was Shuster

14  Wharf while we waited to get the material and prepare the

15  barge a little further.

16      We had to tie -- we had to tie -- once we loaded

17  them on the barge, we had to take a few days down in New

18  Bedford and tie everything down before it went out.  It was

19  a pretty rough place where we were.

20  Q.  When you say rough place, what do you mean?

21  A.  The water.  It was a low tow out.  And we had to

22  secure the barge.  After we towed down from Boston, we came

23  there.  We had to put the materials on, secure the

24  materials -- not secure, we had to weld them down to the

## Page 27

1  back of the barge before we went out to the job site,

2  specific location.

3  Q.  Okay.  So were, at some point, piles stacked on

4  Shuster's wharf in their yard area?

5  A.  No, I think -- yes, I believe they were.  And then we

6  put them from that pier onto our barge.  And then we welded

7  them down.

8  Q.  And you say the barge was towed from -- where was it

9  towed from to Shuster's wharf?

10  A.  We loaded up on Nay Street in East Boston, not at --

11  that's where we took -- we were utilizing another yard in

12  East Boston at the time.  It wasn't our yard.  We were just

13  in there.  We walked the crane on.

14      There was a crane that we got from another yard,

15  from another company.  And we crawled up onto the barge at

16  another yard.  We left that yard, which was on Nay Street in

17  East Boston, and towed down to New Bedford.

18  Q.  And so I take it you towed the barge, and there were

19  cranes on the barge?

20  A.  Yes.

21  Q.  And the tugboat, who owned the tugboat?

22  A.  We did.  I'm not sure.  We owned the tugboat that

23  towed down.

24  Q.  And RDA owned the barge?

## Page 28

1  A.  No.

2  Q.  Well, who owned the barge?

3  A.  Sterling Equipment.

4  Q.  Did you rent the barge?

5  A.  Yes.

6  Q.  For how long did you rent the barge, if you know?

7  A.  I don't recall.

8  Q.  Was it specifically for this project?

9  A.  Yes.  Yes.

10  Q.  Do you know the specific activity that RDA's employees

11  were engaged in on the day of the accident?

12  A.  No, not specifically.

13  Q.  I'm going to represent to you that the plaintiff has

14  testified that on the day of the accident, they were to load

15  these piles onto the barge.

16  A.  Yes.

17  Q.  Do you know what was scheduled for that day to occur

18  on August 2nd, 2002?

19  A.  Specifically, they were loading the piles.

20  Q.  Right.  Were they expected to finish loading the piles

21  on that day?

22  A.  I don't recall.

23  Q.  Well, once the piles were loaded onto the barge,

24  whether or not it was intended that they be finished that

8 (Pages 29 to 32)

Page 29

1  day or not, then what was going to happen?
2  A.   They'd be secured, and then we'd go out to the job
3  site.
4  Q.   Okay.  So do you mean the piles would be secured to
5  the barge?
6  A.   Yes.
7  Q.   And then the barge would be taken to the job site?
8  A.   Yes.
9  Q.   And then what would happen?
10  A.   We were under a -- it was a time constraint.  We had
11  to get the job done.  And weather was a big factor here.  So
12  whenever there was good weather, we had to go.  And if it
13  was good weather, there was probably -- and I don't recall
14  the weather at the time.  But it was urgent to get going.
15  Q.   Why was it urgent to get going, other than the -- why
16  was there a time constraint?
17  A.   Contractually we had a time constraint.  Plus the
18  budget for the job was a time constraint.
19  Q.   What do you mean the budget was a time constraint?
20  A.   We were a fixed-priced contract.
21  Q.   Okay.  So, presumably, this contract that you had with
22  NOAA would spell this out, the time constraint --
23  A.   Yes.
24  Q.   -- more specifically?

Page 30

1  A.   Yes.
2       MR. MCALEER:  Object to the form of that
3  question.
4  Q.   Well, you had testified that you were under a time
5  constraint.  I take it that the time constraint was imposed
6  by the terms that NOAA wanted; correct?
7  A.   And our own schedule that we built.
8  Q.   Well, your own schedule was -- also you were cognizant
9  of your budget in that you had --
10  A.   Yes.
11  Q.   -- allotted a fixed price to do the project; correct?
12  A.   Correct.
13  Q.   So that if RDA's employees could finish putting the
14  piles on the barge that day, it's possible that they were
15  also expected to take it out to the job site on the same
16  day; correct?
17       MR. MCALEER:  Objection.
18  A.   No.
19  Q.   And why not?
20  A.   Because it was considerably a lot more work after you
21  load the piles to secure them.  You wouldn't be able to do
22  it in the same day.
23  Q.   So it sounds as if the intention was to, at a minimum,
24  load the piles onto the barge and then perhaps come back the

Page 31

1  next day, tie them up, and maybe take them out to the job
2  site on that day?
3       MR. MCALEER:  Objection.
4  A.   I couldn't tell you the specifics of that schedule.
5  But generally you would tie them down and go.
6  Q.   I'm sorry?
7  A.   You would tie them down, secure the equipment, and
8  then go.
9  Q.   But, as you testified, you couldn't do that in one
10  day?
11  A.   Probably not, no.
12  Q.   Take a look at the invoices again.  Is it fair to
13  say -- certainly looking at Invoice No. 13837 and 13844 --
14  that the agreement relative to use of the wharf included,
15  obviously, dockage of your barge?
16  A.   Yes.
17  Q.   And, again, if you look at the invoices -- and in
18  particular if you're looking at Invoice No. 13833 of Exhibit 4 --
19  that you were also charged for five days' bulkhead; correct?
20  A.   Correct.
21  Q.   Do you know what that involved?
22  A.   I wouldn't be involved.  You have to tie up next to
23  the bulkhead.  That's commonly known.
24  Q.   So there's -- they are charging you a separate charge

Page 32

1  for dockage and then another charge for tying it up to the
2  bulkhead, as you understand the bulkhead charge?
3  A.   Yes.
4  Q.   Did you know that on the date of the accident the
5  barge was not docked or tied directly to the bulkhead on the
6  wharf?
7  A.   Yes.
8  Q.   When did you find that out?
9  A.   Probably the day of the incident or the day after.
10  Q.   And how did you find out?
11  A.   By explanation of how the accident happened.
12  Q.   Who gave you that explanation?
13  A.   Jimmy Soza.
14  Q.   And as part of that explanation, he informed you that
15  the barge was not docked directly to the bulkhead on the
16  wharf?
17  A.   Yes.
18  Q.   Did he tell you it was tied to two fishing vessels
19  which, in turn, were docked directly to the bulkhead?
20  A.   Yes.
21  Q.   Were you surprised about that?
22  A.   Yes.
23  Q.   Why were you surprised?
24  A.   Because in the normal course of business, we would

10 (Pages 37 to 40)

Page 37

1   A.   No.
2   Q.   -- two vessels?  Do you know if Mr. Soza knows?
3   A.   No.
4   Q.   Do you know who tied the barge to the boats?
5   A.   No.
6        MR. MCALEER:  Objection.
7   Q.   Do you know if Mr. Soza would know?
8   A.   I believe he would know.
9   Q.   Now, what about the tug?  The tug -- by his diagram
10  and his representation, the tug was tied to the barge.  Who
11  would have done that?
12  A.   The tug mate.
13  Q.   Did the tug mate work for RDA?
14  A.   Yes.
15  Q.   I may have asked you this so I apologize if I did.
16  But did you ever personally see how the barge was docketed
17  during the time period of -- during this time period of July
18  17th, 2002, until 8/18, 2002?
19  A.   No.
20  Q.   Okay.  But you said you did go to the wharf.  I
21  believe your testimony was that you did go to Shuster's
22  wharf during this project.  And at that time, you didn't see
23  the barge docked that way against two boats?
24  A.   I don't believe I did, no.

Page 38

1   Q.   What did you see?
2   A.   I think I met the tug there several times.
3   Q.   I beg your pardon?
4   A.   I met the tugboat there several times to go out.
5   Q.   Okay.  In other words, I think you're saying that when
6   you went, the barge was no longer tied up to the wharf in
7   any fashion; it was out to its location?
8   A.   Yes.
9   Q.   Thank you.  Okay.  Now, I believe you testified that
10  Mr. Soza was upset when he got there on the day of the
11  accident to see that the barge was not tied directly to the
12  bulkhead; correct?
13  A.   Yes.
14       MS. HARDY:  Objection.
15  Q.   And that he complained about it; correct?
16  A.   Yes.
17  Q.   On the diagram in front of you, Mr. Bombard drew a
18  small rectangle on, I guess, the stern of the boat to the
19  left and identified it as the plank.  Do you see that?
20  A.   Yes.
21  Q.   Do you know who put that plank there?
22  A.   No.
23  Q.   Would Mr. Soza know?
24       MR. MCALEER:  Objection.

Page 39

1   A.   I expect he would know.
2   Q.   Now, let's go to -- back to, I think it's -- I have it
3   mixed up in my mind -- Exhibit No. 2, RDA's answers to
4   Shuster's interrogatories at No. 7.  And I'll read
5   Interrogatory No. 7 and the answer.  Do you see it?
6   A.   Yes.
7   Q.   Excuse me.  Interrogatory No. 7 -- and this is Exhibit
8   2, RDA's answers to Shuster Corporation's first set of
9   interrogatories.
10       Please state fully and in complete detail each and
11  every thing the defendant Shuster Corporation did or did not
12  do which RDA alleges was negligent and state how such
13  negligence caused or contributed to the damages alleged in
14  the plaintiff's complaint.
15       Answer No. 7:  I am informed and believe that
16  Southeast Development Company, LLC, and/or its sister
17  company, Shuster Corporation, as wharfinger, was obligated
18  to provide RDA with a safe berth and wharf for its vessels
19  and employees, including a proper means of ingress and
20  egress.
21       Did I read that correctly?
22  A.   Yes.
23  Q.   What do you mean by, more specifically, a proper means
24  of ingress and egress?

Page 40

1   A.   RDA -- Shuster knew our operation, knew we needed the
2   bulkhead, knew that rafting up against these boats was bad
3   for -- wasn't what we had asked for but what we got when we
4   got there, beyond our control.  We showed up.  Boats were
5   there.
6        As you can see from Mark's drawing there, we had
7   to hoist the piles that weighed probably -- a significant
8   amount of weight, lifting them over the boats, which was
9   not -- we had no choice.  We're there.  They wouldn't move
10  the boats.  What are we going to do?
11       So do I believe -- the question back -- I believe
12  that we made a deal to be up alongside that bulkhead, and we
13  didn't get it.
14  Q.   Okay.  But can you be a little more specific about the
15  proper means -- when you say -- is your answer to my
16  question what you mean by providing a proper means of
17  ingress and egress solely that that barge should have been
18  tied up against the bulkhead and not where it was?
19  A.   So that -- so that a proper means of --
20       MR. MCALEER:  Objection.  You can answer.
21  A.   Can you restate that again?
22  Q.   Right.  I asked you to describe what you mean by their
23  obligation, Southeast Development and/or Shuster, to provide
24  a proper means of ingress and egress.

DUNN & GOUDREAU

Page 41

1    Let me ask you this: Identify what you mean by
2  ingress and egress. To what? From what to what
3  specifically?
4  A.   They had to provide for the work that we had asked
5  for, the deal that we had assumed that we were getting when
6  we spoke with them.
7    I think it was pretty clear that they knew what we
8  were doing. We were putting piles that way, maybe 15 tons.
9  We had to -- we needed to be close to the pier so we could
10 actually put gangways onto a safe pier, not climb over boats
11 to get there, I guess.
12   It was just not -- I don't know how to be more
13 specific.
14 Q.   Okay. Well, when you say we needed to put gangways --
15 a gangway close to the pier, if, in fact, the barge was tied
16 directly to the bulkhead, would RDA have provided the
17 gangway?
18 A.   Yes.
19 Q.   In this situation where it isn't, would RDA still
20 provide a gangway?
21   MR. MCALEER: Objection.
22 A.   I don't believe in this situation that we could have
23 provided the gangway that we assumed we would need based on
24 the deal we made.

Page 42

1  Q.   Well, did anyone on the day of the accident -- did any
2  employee from RDA bring a gangway with them?
3  A.   They might have. Yes.
4  Q.   Who was that? Who brought the gangway?
5  A.   That would be -- the company had gangways on board.
6  Q.   What company?
7  A.   RDA.
8  Q.   All right. RDA had gangways on board what?
9  A.   The barge.
10 Q.   And one of these gangways was going to be used to
11 access the barge?
12 A.   Correct.
13 Q.   Okay. But what happened was -- you understood
14 that the barge would be tied to the bulkhead --
15 A.   Correct.
16 Q.   -- and the gangway that you had on the barge would be
17 used for access to the barge by RDA employees?
18 A.   Correct.
19 Q.   But what happened when Mr. Soza got there and the
20 other RDA employees was that the barge was not directly
21 attached to the bulkhead; it was tied to these two vessels.
22 Correct?
23   MS. HARDY: Objection.
24 A.   Correct.

Page 43

1  Q.   Well, then the RDA employees, under that circumstance,
2  would need a gangway or some sort of mechanism to get on the
3  boat and then go onto the barge; correct?
4  A.   Correct.
5  Q.   Would RDA, under those circumstances, still be
6  responsible to supply a gangway?
7    MR. MCALEER: Objection.
8  A.   We would be -- we would be responsible to get the
9  employees on and off the boats or to and from the barge
10 either by means of a gangway or another means of safe
11 access.
12 Q.   Well, Mr. Bombard has identified the access of --
13 means of ingress and egress on the day of his accident to
14 have been a plank. And I believe -- and I'll represent this
15 to you -- he distinguished it from a gangway.
16   Do you know -- and, again, I could have -- strike
17 that. I didn't ask you this. In addition to gangways, do
18 you have anything that you would call a plank to get on and
19 off a vessel?
20 A.   Well, we would use ladders. We might -- there are
21 many different ways. We would also use steel beams that had
22 railings on them. There's many ways that you could get on
23 and off safely.
24 Q.   Did the gang -- do the gangways that you have, do they

Page 44

1  have rails, handrails on them?
2  A.   Yes.
3  Q.   Well, Mr. Bombard, I'll represent to you again, did
4  not testify that this particular plank had any handrails on
5  it. He said it was 10 feet wide and about -- 10 feet long
6  and two inches thick. Is that something you would have --
7  is that something RDA would utilize?
8  A.   No.
9  Q.   Now, at the time of the accident, I believe you
10 testified that there was a facility in East Boston; correct?
11 A.   Yes.
12 Q.   And I think your testimony was that at that facility
13 it would be likely that you would store gangways; correct?
14 A.   Yes.
15 Q.   How many miles, do you know, was the East Boston
16 facility to the wharf in New Bedford?
17   MR. MCALEER: Is that by water? Or by road?
18   MS. MORELLO: Both.
19 A.   Both?
20 Q.   Yes.
21 A.   Let's see --
22 Q.   Strike that. By road.
23 A.   50 miles.
24 Q.   By road?

## Page 57

1  A.  I don't recall.

2  Q.  Did Mr. Soza at any point after he told you about

3  Mr. Bombard's accident tell you that he had asked anyone at

4  Shuster Wharf to move the fishing boats?

5  A.  I believe we had that conversation, Jimmy and I. And

6  my recollection is that, They can't move the boats. Here we

7  are. We've got to deal with it.

8  Q.  Did Mr. Soza tell you who he spoke with?

9  A.  He may have at the time, but I don't remember at this

10  time.

11  Q.  And did Mr. Soza tell you why they could not move the

12  boats?

13  A.  I'm sure that he did, but I don't remember.

14  Q.  Did Mr. Soza tell you how long the boats had been

15  there?

16  A.  No.

17  Q.  What type of boats were located immediately adjacent

18  to the wharf?

19  A.  I believe they were fishing boats, commercial fishing

20  boats.

21  Q.  Did Mr. Soza tell you that he had any conversations

22  with any of the individuals who were operating the fishing

23  boats about whether they would -- whether or not they would

24  move them?

## Page 58

1  A.  Yes.

2  Q.  And what did he tell you in that respect? The G-rated

3  version, maybe.

4  A.  I don't believe that they were going to move them. I

5  think they were having work done on them. We broke one of

6  the antennas so I know that was one of the hazards of -- we

7  didn't want to be in that situation.

8  Q.  Did you have any conversations at any time after

9  Mr. Bombard's accident, hearing about it, about a plank?

10  A.  Yes.

11  Q.  What did you discuss about a plank?

12  A.  I had heard that -- just through conversation that

13  there was -- the means of access from the boat to the pier

14  was a plank. I don't know who set it up, though.

15  Q.  Did Mr. Soza tell you anything about how it was --

16  came to be that there was a plank from the boat to the pier?

17  A.  Yes.

18  Q.  What did he say?

19  A.  We couldn't put the gangway there so they were walking

20  from the barge to the boat to the bulkhead.

21  Q.  And who put the plank in place?

22  A.  I don't remember.

23  Q.  Did you yourself contact anyone at Southeast or

24  Shuster at any point prior to Mr. Bombard's accident about

## Page 59

1  not having exclusive use to the bulkhead?

2  A.  No.

3  Q.  Do you know what time Mr. Bombard's accident happened?

4  A.  I believe it was the very end of the day. They were

5  leaving the barge. I believe it was 3:00-ish, 3:00 --

6  between 3:00 and 3:30.

7  Q.  Prior to the happening of Mr. Bombard's accident, do

8  you know how RDA employees would get on and off the barge?

9  A.  Gangways. What we call gangways.

10  Q.  Okay. Was a gangway in place at the time of

11  Mr. Bombard's accident?

12       MR. MCALEER:  Objection.

13  A.  We couldn't put it in place.

14  Q.  Okay. But prior --

15  A.  No. No, it was not.

16  Q.  And do you know how RDA's employees, prior to

17  Mr. Bombard's accident on that day itself, how they would

18  get on and off the barge?

19  A.  No, I don't know.

20  Q.  Did Mr. Soza ever tell you how RDA employees got on

21  and off the barge on the date of Mr. Bombard's accident?

22  A.  Yes.

23  Q.  And what did he tell you?

24  A.  That they would climb from the barge to the gunnel to

## Page 60

1  the deck, back up to step on the gunnel and onto the

2  bulkhead.

3  Q.  And prior to Mr. Bombard's accident, did any RDA

4  employees have any problems with doing that?

5       MS. MORELLO:  Objection.

6  A.  No, not that -- not that they notified me of, anyway.

7  Q.  Did any RDA employees make any complaints to Mr. Soza

8  about the methodology or the way that you just described

9  about getting on and off the barge?

10  A.  He has conveyed to me that nobody complained about

11  that.

12  Q.  And did Mr. Soza instruct RDA employees how to get on

13  and off the barge?

14  A.  I don't know.

15  Q.  What was Mr. Bombard's position at the time of the

16  accident?

17  A.  Pile driver.

18  Q.  And is he still employed by RDA?

19  A.  No.

20  Q.  When did he stop working for RDA?

21  A.  The date of this incident, although I did keep him on

22  the payroll for several months.

23  Q.  Did you ever evaluate Mr. Bombard's performance?

24  A.  Not written officially, no.

18 (Pages 69 to 72)

**Page 69**

1    MS. HARDY: In general.

2    Q.  Who would be responsible for training its employees

3    regarding getting on and off of vessels?

4    A.  It would be the -- we would train the

5    superintendents.  Andre would train them or I would actually

6    train them.  They're pretty well-trained.  Most of these

7    guys are all trained in proper means to get on and off --

8    through the industry itself and through our training, they

9    have an orientation that -- or in some form or another they

10    were involved with and signed.  And we'd go over access and

11    egress and on and off of not just barges but any surface.

12    Q.  And would Mr. Soza also be involved in the training?

13    A.  Yes.

14    Q.  And in order to be employed by RDA, would Mr. Bombard

15    have to go through and complete this orientation?

16    A.  Yes.

17    Q.  And do you know, in fact, that Mr. Bombard did

18    complete the orientation?

19    A.  I do not know.

20    Q.  And by completing the orientation, you testified

21    earlier that would cover the subject matters of access and

22    egress to and from vessels; is that correct?

23    A.  Yes.

24    MR. MCALEER: Objection.  Who exactly?  RDA

**Page 70**

1    vessels?  Or privately-owned vessels or entities?

2    MS. HARDY: Well, he testified that RDA uses their

3    own vessels and private vessels.  So I can clarify it.

4    A.  I don't think that --

5    MR. MCALEER: I just want to clarify that a vessel

6    under charter, these are vessels that RDA is the under care,

7    custody and control of as opposed to vessels that RDA is not

8    under the care, custody, or control of.

9    MS. HARDY: Sure.  I'll clarify it.

10    Q.  When you testified to earlier that the orientation

11    includes such subject matter as access to and egress from,

12    what were -- what type of vessel would that include?

13    A.  Specifically, in this incident would be getting on and

14    off the barge.

15    Q.  And the barge that was involved in this project and

16    specifically at the Shuster Wharf on the date of the

17    accident, that was something that was leased by RDA; is that

18    correct?

19    A.  Yes.

20    Q.  And would the procedures regarding access and egress

21    that you would expect RDA's employees to follow be any

22    different on the date of Mr. Bombard's accident --

23    MR. MCALEER: Objection.

24    Q.  -- regarding access to and egress from?

**Page 71**

1    A.  Could you say that again?

2    Q.  Sure.  Since RDA was leasing the barge on the date of

3    Mr. Bombard's accident, would the access and egress policy

4    and -- policies and procedures be any different with respect

5    to RDA's employees having access to and egress from the

6    vessel?

7    MR. MCALEER: Objection.

8    A.  No.  I believe the case here is that the barge pulled

9    up the day this accident happened.  And we were unable to

10    utilize our gangway because of the boats that we didn't know

11    were going to be there were there.

12    Q.  Did Mr. Soza or anyone from RDA instruct any of its

13    employees to do anything different?

14    A.  I don't know.

15    MR. MCALEER: Objection.

16    Q.  Did Mr. Bombard ever tell you how he was getting on

17    and off the barge prior to his accident?

18    A.  Before the accident?

19    Q.  Yes.

20    A.  I think when the barge pulled up, that was the

21    accident, more or less, that day.  So I don't think there

22    was a before.  There was only an after.

23    Q.  Okay.  So your understanding --

24    A.  The plan was to go down there and pull up the

**Page 72**

1    bulkheads and the gangway.  That's always the plan.

2    If the boats were known to be there, there would

3    have been another plan.  I think the barge showed up and the

4    boats were there.

5    Q.  Okay.  Is it your understanding that RDA employees

6    were going on and off the barge in some way prior to

7    Mr. Bombard's accident?

8    A.  I assume they must have been, but I'm not really

9    sure.  I really -- I wasn't really aware of the -- until the

10    date of the accident, I don't think I was aware that the

11    boats were there.

12    Q.  And do you know what time the barge pulled up --

13    A.  No.

14    Q.  -- on the date of the accident?

15    And I believe you testified that you had been to

16    the Shuster Wharf prior on several occasions; is that

17    correct?

18    A.  Correct.

19    Q.  Do you recall if any of those occasions were prior to

20    Mr. Bombard's accident?

21    A.  No, I don't recall.

22    Q.  And you testified that on those occasions you would

23    meet the tugboat there, and the tugboat would take you --

24    A.  That would be after the accident.

Page 73

1   Q.   Okay.
2   A.   I think what actually happened was I was on the barge,
3   and the tugboat went to Shuster during the project. And
4   then we went back with the boat, no barge alongside. That's
5   how -- that's the first time I think I was at Shuster. I
6   was there again. I don't remember when, though.
7   Q.   When you were at the Shuster wharf, did you have an
8   occasion to get off or onto the tug?
9   A.   Yes.
10  Q.   And how did you do that?
11  A.   I don't remember.
12  Q.   And the tugboat was owned by RDA Construction; is that
13  correct?
14  A.   Yes.
15  Q.   And did the tugboat have a gangway on board?
16  A.   Ladders.
17  Q.   Ladders. Did you ever speak with anyone from OSHA
18  about Mr. Bombard's accident?
19  A.   No.
20  Q.   Do you know if OSHA ever investigated the happening of
21  Mr. Bombard's accident?
22  A.   Yes. They didn't.
23  Q.   I'm sorry?
24  A.   Yes. I know that they didn't investigate it.

Page 74

1   Q.   And I take it it's not your position that Southeast
2   and/or Shuster should have provided a gangway from the RDA
3   barge to the bulkhead?
4        MR. MCALEER:  Objection.
5        MS. MORELLO:  Objection.
6   A.   I do not think they should have provided the
7   gangway. They could have, if they wanted to.
8   Q.   That's not something you had contracted with --
9   A.   Correct.
10  Q.   -- either Southeast or Shuster Corp; is that right?
11       MR. MCALEER:  Just so we are clear, if the barge
12  was against the bulkhead and there was no fishing boats in
13  between the two?
14       MS. HARDY:  No. In general.
15       MR. MCALEER:  Do you understand the question?
16  A.   Originally, the bulkhead -- we wouldn't expect them to
17  give us a gangway. If they had told me that there were
18  going to be two boats there when I showed up, we would have
19  made some arrangement.
20  Q.   Do you know, was there -- at any point when you were
21  at Shuster Wharf, did you ever see any employee of Southeast
22  and/or Shuster?
23  A.   I don't recall.
24  Q.   Did you at any point have any conversations with

Page 75

1   anyone at Shuster or Southeast about the bulkhead?
2   A.   I don't believe I had any conversations with anybody
3   about the bulkhead.
4   Q.   Do you know if Mr. Soza had any conversations with
5   anyone at Southeast and/or Shuster about the exclusive use
6   of the bulkhead?
7   A.   Yes. That was the deal that was made originally.
8   Q.   Okay. And the deal that was made originally, was that
9   conveyed through Mr. Soza to you?
10  A.   Yes.
11  Q.   And you had no direct agreement with either Southeast
12  and/or Shuster?
13  A.   Well, I had --
14  Q.   Strike that. Let me --
15  A.   I do have a direct --
16  Q.   You had no conversations yourself --
17  A.   Correct.
18  Q.   -- with anyone at Southeast and/or Shuster about the
19  exclusive use of the bulkhead; correct?
20  A.   Correct.
21  Q.   Okay. Let me just take a quick look at this. When
22  the RDA -- the barge that RDA was leasing was at Shuster
23  Wharf, was the crane on the barge itself?
24  A.   Yes.

Page 76

1   Q.   And how did the crane operate with respect to the
2   equipment that was being loaded onto the barge?
3   A.   What do you mean?
4   Q.   Let me strike that.
5        Can you describe for me what the purpose of the
6   crane was on the barge with respect to what was being
7   stored?
8   A.   The crane was -- for the particular time frame we are
9   talking about, the crane would pick the piles up from the
10  parking lot, put them on the deck of the barge, and then
11  move any other equipment around on the deck. Aluminum is
12  heavy. You can't pick it up. It's very heavy.
13  Q.   So what were the -- what was Mr. Bombard's purpose or
14  duties on the date of the accident?
15  A.   He was part of the crew of people that were loading
16  the piles from the parking lot to the barge. And then they
17  were going to secure them.
18  Q.   How would the crew go about loading the piles?
19  A.   You typically have one guy in the parking lot that
20  would rig it. The crane would come over. The guy in the
21  parking lot would rig it. He'd pick it up, load it on the
22  deck of the barge. And then you'd have a few guys on deck
23  that would block the pipe so it wouldn't roll and then
24  unhook the hook. And then the crane would swing back over

20 (Pages 77 to 80)

Page 77

1  to the guy in the parking lot. And he would load the next
2  pipe.
3  Q.  And was there any -- was there a reason for any RDA
4  employees to be getting on and off the barge throughout the
5  course of the day prior to Mr. Bombard's accident?
6  A.  As a matter of the way the plan would work, probably
7  not. It would depend on if you drove to work or you came by
8  boat.
9      You'd get -- access the barge, and then the guys
10  would stay on the barge for the day. And the guy would stay
11  in the parking lot, and they'd go up and down.
12  Q.  Do you know in particular what Mr. Bombard's duties
13  were prior to the accident, whether -- if he was in the yard
14  or if he was on the boat?
15  A.  I believe he was on the barge.
16      MS. HARDY: I have nothing further. Thank you.
17      MR. MCALEER: Do you have any --
18      MS. MORELLO: Yes, I do. Just a couple.
19      MR. MCALEER: I don't have any right now.
20
21  REDIRECT EXAMINATION BY MS. MORELLO:
22  Q.  I just want to make sure I understand part of your
23  testimony. You testified, I believe, that you didn't think
24  that Southeast Development or Shuster Corporation should

Page 78

1  have been providing a gangplank if, in fact, the barge had
2  been docked against the bulkhead; is that correct?
3  A.  Correct.
4  Q.  Then you said if you had been told that there were
5  going to be two boats in front of the barge, some other
6  arrangements would have been made. What do you mean by some
7  other arrangements?
8  A.  We probably would have went somewhere else if they
9  said three weeks ahead of time, Well, you've got to raft up
10  against the boat. I would have said, No, thanks.
11  Q.  Okay. Now, you just testified that there were -- I
12  believe your testimony was that there were gangways on the
13  barge; correct?
14  A.  As a matter of business, the course of our business,
15  there would always be a gangway left on the barge.
16  Q.  But RDA was unable to use the gangway because of --
17  because of the two boats. What did you mean by that? Was
18  it physically impossible to take that gangway from the barge
19  and put it up against one of the vessels?
20  A.  Physically impossible, probably not. But you're
21  dealing with the tide down there. And as the tide moves,
22  your angle of the gangway will change and get hung up --
23  physically, you'd ruin the gangway. You'd have to spend too
24  much time watching the gangway. You'd have to -- you

Page 79

1  couldn't have left the gangway.
2      The gangway is meant to go right up and down with
3  the tide. It would slide. It has reels on it. A lot of
4  times it would fly along the back of -- depending on the
5  height of the tide and where the barge is.
6      But with the boats there, you can't put it there
7  because there's rigging and all kinds of nets and stuff in
8  the back of those boats that you couldn't physically get the
9  gangway in. I imagine you could have stuffed the gangway --
10  it would have broke. It would have ruined the boat. It
11  would have bent some gear. Physically probably impossible
12  to put a gangway there.
13  Q.  Is that why a plank was used?
14      MR. MCALEER: Objection.
15      MS. HARDY: Objection.
16  A.  I don't know.
17  Q.  Well, let's suppose -- in its course of business, I
18  take it that sometimes RDA employees need access to a vessel
19  that's -- that's tied to a bulkhead; correct?
20  A.  Yes.
21  Q.  Okay. What type of mechanism is used for access? A
22  gangplank?
23  A.  Gangways, ladders.
24  Q.  Well, but you just said -- and maybe I'm missing

Page 80

1  something here -- but you just said that you couldn't use a
2  gangway in the situation that was present on the day of the
3  accident. How is that any different than using a gangway to
4  any other vessel that's tied up to a bulkhead?
5  A.  I might have to draw a picture. I tried to explain --
6      MR. MCALEER: Could we just go off the record for
7  a second?
8      MS. MORELLO: Yes.
9      (Discussion off the record.)
10  Q.  Okay. Has RDA employees ever needed ingress and
11  egress to a fishing vessel?
12  A.  No.
13  Q.  So the types of vessels that RDA employees have
14  required ingress and egress during the course of RDA's
15  work has been the kind of vessel that a gangway would be
16  appropriate to use?
17  A.  Or a ladder.
18  Q.  Or a ladder. So the specific problem posed in this
19  situation was because it was a fishing vessel?
20  A.  No. I think this specific problem came that we were
21  not prepared to be tied up, rafted off these boats. And
22  they came down with the gangway based on the understanding
23  of the deal that Jimmy had made with Shuster or whoever that
24  we're tied to the bulkhead.

Page 81

1    If you're tied up to the bulkhead, which is the
2  deal that we made -- we wouldn't have made any other deal.
3  So we prepared for that deal with the gangway.
4    When we showed up, we had to tie it up. The piles
5  were in the parking lot. I can look at the chronology of
6  the invoices and I'll -- a little bit more is getting
7  refreshed to me.
8    The piles were in the parking lot. We couldn't go
9  somewhere else. We had to go here now. We couldn't move
10  the piles. So the gangway wouldn't work. Physically -- you
11  had to span the boats. And in spanning the boats, you need
12  a direct line. The boats just weren't clear.
13  Q.  So would a plank work better than a gangway?
14    MR. MCALEER: Objection.
15  A.  I believe that the boats had some means of egress. I
16  don't know. The plank is shorter. I'm looking at a
17  drawing. So somebody -- I don't want to assume anything so
18  I really don't know.
19  Q.  Well, would you consider a plank safe, given the
20  condition of the tide and the harbor and --
21    MR. MCALEER: Objection.
22    MS. HARDY: Objection.
23  A.  I don't know the time of the tide. If it was flat,
24  yes, I'd consider it safe -- if it was flat.

Page 82

1  Q.  Well, it wouldn't be flat by virtue of the tide;
2  correct?
3  A.  It depends on what time you'd walk on the plank, high
4  tide or low tide.
5    MS. MORELLO: I have no further questions.
6
7  CROSS-EXAMINATION BY MR. MCALEER:
8  Q.  Was anyone hurt using this alleged plank?
9  A.  No.
10  Q.  Was anybody hurt using the steps or built-in scuppers
11  or scupper-type steps that were on the side of these fishing
12  vessels?
13  A.  No.
14    MR. MCALEER: I don't have any further questions.
15    MS. HARDY: I have one question.
16
17  RECROSS-EXAMINATION BY MS. HARDY:
18  Q.  With respect to the configuration that Mr. Bombard has
19  drawn on his exhibit -- and that was dated -- that's Exhibit
20  2 -- was RDA able to load the piles with a crane?
21  A.  Were they able to?
22  Q.  Yes.
23  A.  Yes.
24    MS. HARDY: I have nothing further.

Page 83

1    THE WITNESS: That's not Exhibit 2.
2    MS. HARDY: That was from his deposition. I'm
3  sorry.
4    MR. MCALEER: All set.
5    MS. MORELLO: Thank you.
6    (Whereupon the deposition concluded at 4:00 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 84

1    CERTIFICATE
2    I, EUGENE KELLEY, do hereby certify that I
3  have read the foregoing transcript of my testimony, and I
4  further certify that said transcript is a true and accurate
5  record of said testimony (with the exception of the
6  corrections listed below).
7
8  PAGE LINE    CORRECTION
9  ___ ___    _____
10  ___ ___    _____
11  ___ ___    _____
12  ___ ___    _____
13  ___ ___    _____
14  ___ ___    _____
15  ___ ___    _____
16  ___ ___    _____
17
18  Signed under the pains and penalties this _____ day of
19  _____, 2007.
20
21    _____
22    EUGENE KELLEY
23
24

## Page 1

Volume I
Pages 1–118

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11389REK

MARK BOMBARD,
      Plaintiff,    :

vs.    :

SHUSTER CORPORATION and   :
RDA CONSTRUCTION CO., INC.,   :
and SOUTHEAST DEVELOPMENT CO.  :
LLC,   :
      Defendants.   :

DEPOSITION of STEVEN LEWIS SHUSTER, taken
on behalf of the Plaintiff, pursuant to the
applicable provisions of the Massachusetts Rules
of Federal Procedure, before Barbara M. Montijo,
a Registered Professional Reporter and Notary
Public within and for the Commonwealth of
Massachusetts, at the Law Offices of
Joseph G. Abromovitz, 858 Washington Street,
Dedham, Massachusetts, on January 15, 2007,
commencing 10:00 a.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA 02109
(617) 742-6900

## Page 2

1   APPEARANCES:
2   MARSHA A. MORELLO, ESQUIRE
    JOSEPH G. ABROMOVITZ, P.C.
3   858 WASHINGTON STREET
    DEDHAM, MA 02026
4   TELEPHONE NO. (781) 329-1080
    FOR: MARK BOMBARD
5
    PATRICK O. McALEER, ESQUIRE
6   LOONEY & GROSSMAN, LLP
    101 ARCH STREET
7   BOSTON, MA 02110
    TELEPHONE NO. (617) 951-2800
8   FOR: RDA CONSTRUCTION CO., INC.
9   JENNIFER B. HARDY, ESQUIRE
    MELICK, PORTER & SHEA
10   28 STATE STREET
    BOSTON, MA 02109
11   TELEPHONE NO. (617) 523-6200
    FOR: SHUSTER CORPORATION
12     and SOUTHEAST DEVELOPMENT CO. LLC
13
14
15
16
17
18
19
20
21
22
23

## Page 3

INDEX

1
2   WITNESS          PAGE
3   STEVEN LEWIS SHUSTER
4     Examination by Ms. Morello . . . . . . 4
    Examination by Mr. McAleer . . . . . . 72
5
6         EXHIBITS
7   NO.   DESCRIPTION        PAGE
    (Plaintiff, Mark Bombard)
8
    1   Notice of Deposition (3PP) . . . . . . 9
9
    2   Answers to Interrogatories (10PP) . . 15
10
    3   Drawing (1P) . . . . . . . . . . . . . 24
11
    4   Drawing (1P) . . . . . . . . . . . . . 39
12
    5   Invoice Number 13844 (1P) . . . . . . 45
13
    6   Photocopy of Cancelled Check (1P) . . 49
14
    7   Invoice Number 13831 (1P) . . . . . . 50
15
    8   Photocopy of Cancelled Check (1P) . . 53
16
    9   Invoice Number 13833 (1P) . . . . . . 54
17
    10   Invoice Number 13837 (1P) . . . . . . 64
18
    11   Color Photograph (1P) . . . . . . . . 94
19
    12   Fax dated 3/30/2000 (1P) . . . . . . . 105
20
    13   Memo dated 3/30/2000,
21       Re: Shuster (1P) . . . . . . . . . . . 105
22   14   Plot Plan (1P) . . . . . . . . . . . . 105
23
24

## Page 4

1         (DEPOSITION COMMENCED AT 10:00 A.M.)
2       MS. MORELLO: It's agreed by and
3   between counsel that the witness will read and
4   sign the deposition. 30 days?
5       MS. HARDY: That's fine.
6       MS. MORELLO: All objections, except
7   as to the form, and motions to strike are
8   reserved until the time of trial. And he's
9   going to waive signing before a notary.
10      ***********************
11       STEVEN LEWIS SHUSTER
12     The deponent, having been satisfactorily
13   identified and duly sworn by the Notary Public,
14   deposes and testifies as follows:
15      EXAMINATION BY MS. MORELLO
16   Q. Mr. Shuster, my name is Marsha Morello and I
17   represent the plaintiff, Mark Bombard, in his
18   case against the defendants, including Southeast
19   Development, relevant to injuries that he
20   sustained on August 1st, 2002 on premises that
21   we allege Southeast Development was in control
22   of.
23     I'm going to be asking you a series of
24   questions today. If you don't understand my

| | |
|---|---|
| **Page 17** | **Page 19** |

**Page 17**

1  Shuster Corporation?
2  A.  Would you repeat that question?
3  Q.  Right.  What is the space that Southeast rents
4      to Shuster Corporation?
5  A.  The warehouse facility and the access to the
6      warehouse facility so it can operate as a
7      warehouse.
8  Q.  Well, when you say "the access," what do you
9      mean precisely?
10 A.  Precisely that.  You can drive a truck in and
11     either offload or load the products that Shuster
12     Corporation deals with to either receive them or
13     ship them.
14 Q.  And the two entities that share principals, I
15     take it that's you and your brother?  The rest
16     of the answer that I read was, "The two
17     entities," that is, Southeast and Shuster
18     Corporation, "also share principals."  That
19     would be you and your brother, correct?
20 A.  Yes.
21 Q.  It's fair to say that the premises on 4 Wright
22     Street include what is commonly known as a
23     wharf?
24         MS. HARDY:  Objection.  You can

**Page 18**

1  answer.
2  A.  No.
3  Q.  Is it fair to say the premises comprise what is
4      commonly known as a pier?
5  A.  No.
6  Q.  Have you ever heard of the premises referred to
7      as Shuster's Wharf?
8  A.  No.
9  Q.  Do you know what a wharfinger is?
10 A.  Yes.
11 Q.  And you would not consider Southeast Development
12     Corporation as a wharfinger?
13 A.  No.
14 Q.  What is your understanding of what a wharfinger
15     means?
16 A.  Somebody that would be in charge of a wharf.
17 Q.  So, is it your testimony that in no way is
18     Southeast Development Company in charge of a
19     wharf?
20         MS. HARDY:  Objection.  You can
21     answer.
22 A.  Yes.
23 Q.  And it's your testimony that in no way is
24     Southeast Development in charge of a pier?

**Page 19**

1         MS. HARDY:  Objection.  You can
2      answer.
3  A.  Yes.
4  Q.  Is Shuster Corporation in charge of a wharf?
5  A.  No.
6  Q.  Is Shuster Corporation in charge of a pier?
7  A.  No.
8  Q.  So that both business entities have absolutely
9      no -- strike that.  So, you would certainly not
10     -- you might have answered this and I might have
11     asked it, I apologize if I've done so.  So, you
12     would not describe Southeast Development as a
13     wharfinger?
14         MS. HARDY:  Objection.  You can
15     answer.
16 A.  I would not.
17 Q.  And you wouldn't describe Shuster Corporation as
18     a wharfinger?
19         MS. HARDY:  Objection.  You can
20     answer.
21 A.  No.
22 Q.  Now, has Southeast Development owned the
23     premises on 4 Wright Street for 30 years?
24 A.  Approximately.

**Page 20**

1  Q.  And from whom did Southeast buy the property?
2  A.  The New Bedford Redevelopment Authority.
3  Q.  Now, the answer in Number 1 as I stated states,
4      "Southeast owns the premises of 4 Wright Street
5      and rents space to Shuster Corporation."  Does
6      that describe the extent, other than that you
7      both share principals, of the relationship
8      between Shuster Corporation and Southeast
9      Development?
10 A.  Yes.
11 Q.  Do you own stock in Shuster Corporation?
12 A.  Yes.
13 Q.  How much?
14 A.  50 percent of it.
15 Q.  Does your brother own the other 50 percent?
16 A.  Yes.
17 Q.  If we could just draw -- if I could just draw
18     your attention to Interrogatory Number 2 and the
19     answer going over to the second page.  It is
20     stated, "The bulkhead in front of 4 Wright
21     Street is owned by the City of New Bedford,
22     133 Williams Street, New Bedford, Mass."  Did I
23     read that correctly?
24 A.  Yes.

30

6 (Pages 21 to 24)

Page 21

1   Q.  For the record, can you define bulkhead?
2   A.  A bulkhead is the wall that was installed to
3       keep the earth from falling into the harbor.
4   Q.  Does the property on 4 Wright Street abut a
5       harbor?
6   A.  No.
7   Q.  Does it abut a bulkhead?
8   A.  No.
9   Q.  What does it abut?
10  A.  It abuts a 5 foot strip of land --
11  Q.  And who owns this 5 --
12  A.  -- that partitions --
13  Q.  I'm sorry, go ahead.
14  A.  -- the property from the bulkhead.
15  Q.  I'm sorry, could you repeat that?  It abuts a
16      5 foot strip of land?
17  A.  Along the bulkhead that partitions the property
18      from the bulkhead.
19  Q.  Partitions, did you say?
20  A.  Yes.
21  Q.  Who owns that strip of land?
22  A.  The City of New Bedford.
23  Q.  Now, when you say "a 5 foot strip of land," are
24      you saying 5 feet wide?

Page 22

1   A.  Yes.
2           MS. MORELLO:  Why don't we do this.
3       Why don't you draw a diagram.  Off the record
4       for a minute.
5           (OFF THE RECORD)
6   Q.  This will not obviously be to scale and will be
7       kind of rough.  Can you just draw a diagram of
8       the property that you described as comprising
9       4 Wright Street, including the strip of land and
10      the bulkhead?
11  A.  Sure.  This is not to scale, mind you.
12  Q.  Right.
13  A.  The property is basically a rectangle; and
14      that's what this piece of paper is, a rectangle.
15      It's a rectangle that basically -- that's
16      approximately 3 acres, okay.
17  Q.  Okay.
18  A.  And along one side of this property there is
19      water.
20  Q.  Can you just put an arrow?
21  A.  I already have.
22  Q.  I'm sorry.
23  A.  Where this piece of paper leaves off and the
24      table begins is the water.  This line, this edge

Page 23

1       of the paper is the bulkhead.  Okay?
2   Q.  Yes.
3   A.  Do you want that labeled?
4   Q.  Yes.  Could you like do another arrow to
5       indicate the bulkhead, which obviously precedes
6       the water?
7   A.  Okay.  The edge of the paper equals the bulkhead
8       line, okay?  Water in this direction.  5 foot
9       strip of land owned by City of New Bedford.
10  Q.  So, it's 5 feet -- what is this property here?
11      When the 5 feet leaves off, it's owned by the --
12  A.  I'm sorry?
13  Q.  Let's start this way.  What is this square that
14      you've written?
15  A.  This is the warehouse, warehouse building.
16  Q.  Where is the parking lot?
17  A.  The parking lot -- there's parking along here
18      and this is where the shipping and receiving is,
19      down here.
20  Q.  Is the rest of -- you've indicated the parking
21      lot in the far left-hand corner.  What is the
22      rest of the property?
23  A.  The rest of the property is a big open expanse
24      of area, just the way it's depicted in this

Page 24

1       drawing.
2   Q.  Do you own the big open expanse?  Does Southeast
3       Development own the big open expanse?
4   A.  Southeast Development owns all of what is
5       considered 4 Wright Street.  This building and
6       all of this land.
7   Q.  Other than the bulkhead and other than this
8       strip of property, which is 5 feet wide and how
9       long?
10  A.  Whatever the width of the property is at that
11      point.  I think it's about 205 feet
12      approximately.
13  Q.  205 feet long?
14  A.  The width is what you just said and that's what
15      it is.
16  Q.  Thank you.  Could you just sign and could you
17      just initial that and put the date on it and
18      that will be Exhibit Number 3 to this
19      deposition?
20  A.  (Witness complied).
21          (EXHIBIT 3 MARKED FOR IDENTIFICATION)
22  Q.  Now, was there a written rental agreement
23      between Shuster Corporation and Southeast
24      Development?

DUNN & GOUDREAU

Page 41

1  Q.  Now, in order for a vessel to be moored or
2       docked, attached to that bulkhead, do they need
3       permission from Southeast Development?
4  A.  Yes.
5  Q.  Why?
6  A.  Because in order for them to access their boat,
7       they need to go across the property that
8       Southeast Development owns.
9  Q.  Well, in order to have access to the boat, they
10      have to go over, according to your diagram,
11      property that's owned by the City of New Bedford
12      as well, correct?
13 A.  That's true.
14 Q.  Did or do vessel owners charge -- strike that.
15      Does Southeast Development charge vessel owners
16      to dock their vessel?
17 A.  Yes.
18 Q.  Does the charge include access to the vessel?
19      MS. HARDY: Objection. You can
20      answer.
21 A.  That's what we charge for, is access to the
22      vessel.
23 Q.  I want to draw your attention to Exhibit Number
24      4, the diagram that Mr. Bombard drew at his

Page 42

1       deposition. And I'd like to draw your attention
2       to what he drew as a rectangle between one of
3       the vessels and what he's labeled the
4       waterfront, a plank, do you see that on that
5       diagram?
6  A.  Yes.
7  Q.  I'm going to represent to you that per his
8       testimony, he testified that the plank was a
9       means of access to and from the vessel that he's
10      placed in this diagram and then to the barge.
11      Now, relative to that Southeast agreement with
12      RDA, which entity, RDA or Southeast, was
13      responsible for providing a means of access to
14      and from the barge?
15      MS. HARDY: Objection. You can
16      answer.
17 A.  Would you repeat the question?
18 Q.  Yes. Relative to Southeast's agreement with RDA
19      Construction, which we've discussed, which
20      entity, RDA or Southeast, was responsible for
21      providing a means of access for RDA's employees
22      to and from the barge?
23      MS. HARDY: Objection. You can
24      answer.

Page 43

1  A.  RDA would have been. However, with regards to
2       this whole notion of accessing the barge, I
3       don't know anything about it except what you've
4       explained to me.
5  Q.  Well, when vessels are moored, docked at the
6       waterfront abutting the bulkhead, and we'll go
7       back to your drawing and this space owned by the
8       city, who provides access typically, forgetting
9       this specific case, does Southeast provide
10      access to vessels as a custom and practice?
11      MS. HARDY: Objection. You can
12      answer.
13 A.  No.
14 Q.  Who does provide that access, the vessel owners?
15 A.  Whoever it is that rents the space from us.
16 Q.  So, a vessel owner pays Southeast to dock their
17      vessels, correct?
18 A.  I'm sorry?
19 Q.  The vessel owners pay Southeast to dock their
20      vessels, correct?
21 A.  Yes.
22 Q.  And I think you described that as they're paying
23      for access to the vessel?
24 A.  Yes.

Page 44

1  Q.  The actual, physical means of access from the
2       vessel, not this case now, but from any vessel
3       to the land, who provides that typically? Does Southeast
4       provide that typically?
5  A.  No.
6       MS. HARDY: Objection.
7  Q.  Has Southeast ever provided that for any vessel?
8  A.  No.
9  Q.  So, this plank, going back to Mark Bombard's
10      diagram, this plank that he identified being
11      used for access for RDA employees to get onto
12      this vessel and onto the barge was not supplied
13      by Southeast Development?
14 A.  No.
15 Q.  Was it supplied by Shuster?
16 A.  No.
17 Q.  Do you know if RDA Construction supplied that
18      plank?
19 A.  No.
20 Q.  You don't know one way or the other?
21 A.  Yes.
22 Q.  You don't know whether they did or they didn't,
23      correct?
24 A.  Yes.

12 (Pages 45 to 48)

Page 45

1  Q.  Do you know where this plank is now, by any
2     chance?
3  A.  No.
4        MS. MORELLO:  Can we mark this as the
5     next exhibit, Exhibit 5?
6        (EXHIBIT 5 MARKED FOR IDENTIFICATION)
7  Q.  I'm going to represent to you, Mr. Shuster, that
8     counsel on behalf of Southeast Development
9     produced several documents in response to
10    plaintiff's request and some of these I'm going
11    to mark as exhibits.  Now, the first one is
12    Exhibit 5.  Take a look at that, please.  Have
13    you ever seen this document before?
14 A.  (Witness perusing document) Yes.
15 Q.  I think you'll agree that the exhibit is an
16    invoice by Southeast Development issued to RDA
17    Construction, correct?
18 A.  Yes.
19 Q.  And it's Invoice Number 13844, correct?
20 A.  Yes.
21 Q.  Would you agree that the invoice indicates that
22    Southeast Development is billing RDA
23    Construction for dockage and yard use?
24 A.  Yes.

Page 46

1  Q.  For the periods 7/27/02 through 8/5/02 and the
2     periods 8/16/02 through 8/19/02, correct?
3  A.  Yes.
4  Q.  Now, dockage, I believe -- strike that.  So, in
5     addition to providing RDA with parking space and
6     yard space, you were also providing them with
7     dockage?
8  A.  Yes.
9  Q.  Could you please describe -- and you may have
10    done it somewhat.  Could you please describe the
11    dockage service that was being provided?
12       MS. HARDY:  Objection.  You can
13    answer.
14 A.  I can't based on this specific document.
15 Q.  Well, can you describe the service without --
16    forgetting the document?
17       MS. HARDY:  Objection.  You can
18    answer.
19 Q.  I mean, Southeast was clearly providing RDA with
20    dockage?
21 A.  Yes.
22 Q.  Can you describe what that involved?
23 A.  I can't based on this document.
24 Q.  Do you have a memory independent of this

Page 47

1     document of the dockage service that you
2     provided to RDA?
3  A.  No.
4        MS. HARDY:  Objection.
5  Q.  Has Southeast Development provided dockage
6     services to other entities besides RDA?
7  A.  Yes.
8  Q.  What does it usually and typically involve?
9  A.  There is no usual and typical, but what it
10    always means is that somebody needs to access
11    the waterfront through our property.  Save that,
12    it's difficult for me to specifically tell you
13    unless I know what the specific circumstances
14    are governing that particular transaction.
15 Q.  Well, in your experience at Southeast, has
16    dockage ever involved providing physical access
17    to a vessel?
18       MS. HARDY:  Objection.  Go ahead.
19 A.  Only access through our property.  The actual
20    access of the boat, getting on and off it?
21 Q.  Yes.
22 A.  We have nothing to do with that.
23 Q.  Okay.  Thank you.
24 A.  You're welcome.

Page 48

1  Q.  Do you recognize the handwriting on this?
2  A.  Yes.
3  Q.  And whose handwriting is it?
4  A.  It's mine.
5  Q.  So, as part of your duties you authored these
6     invoices?
7  A.  Yes.
8  Q.  Are there any other employees at Southeast
9     Development?
10 A.  I'm not an employee.
11 Q.  Strike that.  You're a partner.  Does Southeast
12    Development have employees?
13 A.  No.
14 Q.  So, it's just you and your brother as partners?
15 A.  Yes.
16 Q.  Let's go on to the next exhibit, please.  It's
17    -- just go back to that exhibit, I'm sorry.  The
18    date on this invoice, does this indicate that
19    RDA Construction was going to use the premises
20    of Southeast Development for a period of 7/27 to
21    8/19/02?
22       MS. HARDY:  Objection.  That's not
23    what that invoice states.
24 Q.  That's why I'm asking.  I'm not sure what it

14 (Pages 53 to 56)

3(

## Page 53

1  A. And therefore explains my inability to answer
2     your previous series of questions pursuant to
3     the matter of what this was all about.
4        MS. MORELLO: Thank you. Now, if we
5     could just go on to mark this as Exhibit
6     Number 8.
7        (EXHIBIT 8 MARKED FOR IDENTIFICATION)
8  Q. Exhibit Number 8, you'll agree, is a check from
9     RDA Construction Corporation, Number 22746, paid
10    to Shuster Corporation, is it not?
11 A. (Witness perusing document) Yes.
12 Q. And it appears, when you compare it to Exhibit
13    Number 7, Invoice Number 13831, that this is the
14    check in payment of that invoice, correct?
15 A. Yes.
16 Q. Now, this check is made out to Shuster
17    Corporation. Why is it made out to Southeast
18    Corporation instead of Southeast Development?
19 A. I have no idea. It's apparently a mistake.
20 Q. Well, if we go back to Exhibit Number 7, Invoice
21    Number 13831, is there any reason, if you look
22    at the top left-hand corner where we have --
23    this is Invoice Number 13831, Exhibit Number 7
24    to this deposition?

## Page 54

1  A. Yes.
2  Q. We have Southeast Development and its address
3     printed and then underneath someone has written
4     in the phone and fax number of Shuster
5     Corporation?
6  A. Yes.
7  Q. Why is that?
8  A. I have no idea.
9  Q. Well, the invoice to which this check refers is
10    the parking lot and that's in control of
11    Southeast Development, is it not?
12 A. Yes.
13       MS. MORELLO: Let's mark the next
14    exhibit. It is Invoice Number 13833.
15       (EXHIBIT 9 MARKED FOR IDENTIFICATION)
16 Q. In front of you do you have Invoice Number
17    13833, Mr. Shuster?
18 A. Yes.
19 Q. And this is another invoice from Southeast
20    Development issued to RDA Construction Corp., is
21    it not?
22 A. Yes.
23 Q. And it's for 7/27/02 through 8/5/02, correct?
24 A. Yes.

## Page 55

1  Q. And again, we have parking lot use indicated?
2  A. Yes.
3  Q. Five days?
4  A. Yes.
5  Q. And underneath that we have five days bulkhead?
6  A. Yes.
7  Q. And next to that 8/1/02 to 8/5/02. What does
8     five days bulkhead refer to?
9  A. What that means is the vessel that was tied up
10    at this location was right up against the
11    bulkhead.
12 Q. What vessel are you referring to?
13 A. In this case, my recollection is it was a barge.
14 Q. So, you're saying that the barge is RDA's -- do
15    you understand that to be a barge that RDA
16    either owned or rented?
17       MS. HARDY: Objection. You can
18    answer.
19 A. I know nothing about whether they owned it or
20    rented it.
21 Q. Well, all right. Is this a barge you understand
22    they were utilizing?
23 A. Yes.
24 Q. That RDA was utilizing?

## Page 56

1  A. Yes.
2  Q. So, when you say bulkhead, it's your
3     understanding that the barge -- it's a charge
4     that Southeast Development charged RDA
5     Construction Corporation to tie up the barge to
6     the bulkhead?
7  A. That's -- not tied up specifically to the
8     bulkhead. This is dockage, okay. And it's
9     making reference to a specific kind of dockage,
10    okay. And that dockage is dockage when the
11    vessel is tied up alongside of the bulkhead,
12    that is, that there's no space, if you will, as
13    shown in one of your earlier documents, Exhibit
14    Number 4, where you have vessels, which are
15    described in this document as being boats that
16    are sandwiched between.
17       In this particular instance on Exhibit
18    Number 4, the barge is outboard the vessels.
19    This would be the exact opposite, where the
20    barge would be inboard and, that is, right along
21    the side of the bulkhead.
22 Q. Well, would you have still charged -- would
23    Southeast Development have still charged RDA
24    Construction Corporation a bulkhead fee, so to

Page 57

1   speak, if in fact the barge had been tied up in
2   this fashion as represented by the plaintiff in
3   this diagram?
4   A.  No.
5   Q.  Well, would these vessels have been charged the
6   dockage fee?
7   A.  Yes.
8   Q.  Is it possible that Southeast Development,
9   assuming that this diagram is correct, this is,
10  a representation from the plaintiff on the day
11  of the accident, would Southeast Development --
12  if this situation were as the plaintiff depicted
13  it on the day of the accident, would Southeast
14  Development then be charging a fee to the two
15  vessels as well as the barge if this was the
16  setup?
17  A.  Yes.
18  Q.  So, even though the barge in this diagram is not
19  directly up against the bulkhead, they still
20  have to pay Southeast Development?
21  A.  Yes.
22  Q.  And again, is that your handwriting?
23      THE WITNESS:  Is what handwriting my
24  handwriting?

Page 58

1       MS. MORELLO:  On that exhibit, the
2   exhibit in front of you.
3       THE WITNESS:  Is that Exhibit 9?
4       MS. MORELLO:  Yes, it is.  I'm sorry,
5   Invoice Number 13833.
6   A.  Yes.  No, excuse me.  No, it's not.  I'm sorry,
7   I'm getting mesmerized here.  No, it's not my
8   handwriting.
9   Q.  Whose handwriting is that?
10  A.  Whoever the clerk was that I dictated what I
11  wanted the invoice to show.
12  Q.  Well, you had clerks working for Southeast
13  Development?
14  A.  No, not working for them, but I had people write
15  up invoices.
16  Q.  Well, were these people paid by Southeast
17  Development?
18  A.  No.
19  Q.  They did it for free?
20  A.  No.
21  Q.  I'm a little confused.  You said you dictated
22  this to a clerk and this is not your
23  handwriting.  Can you identify the clerk?
24  A.  No, I can't.

Page 59

1   Q.  And at the time that the clerk -- at the time
2   that you dictated this, the clerk was not an
3   employee of Southeast Development Company?
4   A.  That's correct.
5   Q.  He or she received no money to take this
6   dictation and develop this invoice; is that your
7   testimony?
8   A.  Would you ask the question again?
9   Q.  Yes.  You said that this is not your
10  handwriting.  I believe on a previous invoice
11  you identified your handwriting?
12  A.  Yes.
13  Q.  You said that you probably dictated -- and
14  correct me if I'm wrong, I believe your
15  testimony was that you probably dictated this or
16  you did dictate this invoice to a clerk who took
17  down the information that's on Invoice Number
18  13833?
19  A.  Yes, I probably dictated it.
20  Q.  And then what I'm asking you is, did this clerk
21  provide this service, which you would agree is a
22  service to Southeast Development Company, for
23  free?
24  A.  Yes.

Page 60

1   Q.  Is this clerk a female or a male, if you recall?
2   A.  I would guess that it's a male.  I mean, a
3   female.
4   Q.  Do you know her name?
5   A.  No.
6   Q.  Does she still perform this service for
7   Southeast Development Company?
8   A.  I don't know the person that specifically
9   performed this.  So, it's difficult for me to
10  say whether or not they still perform the same
11  activity.
12  Q.  Would your brother know who she was?
13  A.  No.
14  Q.  Is there anybody performing these clerkship
15  duties at the present time?
16  A.  No.  Excuse me, let me expand on it.  Yes, there
17  is.
18  Q.  And is this person paid by Southeast
19  Development?
20  A.  No.
21  Q.  By Shuster?
22  A.  Yes.
23  Q.  Let's go back to Invoice Number 13833.  Did
24  Shuster pay this particular female clerk, whose

Page 73

1  probably know.
2  Q.  I guess what I'm asking you is, does Shuster
3      specifically offer services from its warehouse
4      facility to vessels that tie up alongside the
5      pier?
6  A.  No.
7  Q.  Can you explain to me what else Shuster
8      Corporation does besides bearings?
9  A.  Shuster Corporation sells other industrial
10     component parts, mechanical, pneumatic, and
11     hydraulic component parts.
12 Q.  Does Shuster Corporation or any of its divisions
13     specifically make equipment for the marine
14     industry?
15 A.  No.
16 Q.  Does Shuster Corporation have anything to do
17     with fuel separation systems or Racor systems?
18 A.  Yes.
19 Q.  Are those used in a marine capacity?
20 A.  Yes.
21 Q.  So, would that change your previous answer;
22     that, no, Shuster doesn't do anything with the
23     marine industry?
24 A.  No.  What you said is specifically for and those

Page 74

1  are specifically for.
2  Q.  Do you have or does Shuster Corporation have
3      anything to do with any type of equipment used
4      in the marine industry?
5  A.  Yes.
6  Q.  Can you explain what those are, those particular
7      applications, whether they're just for the
8      marine industry or for other applications?
9  A.  Would you repeat that question?
10         MS. HARDY:  Objection.  Go ahead.
11 Q.  Sure.  Can you explain to me any type of
12     equipment, or device, or apparatus that Shuster
13     Corporation either manufactures or provides that
14     can be used in a marine capacity?
15 A.  Virtually all of the components that Shuster
16     Corporation deals in by virtue of the fact that
17     they're universal might be found in a maritime
18     setting.
19 Q.  Does Shuster offer any type of refit service or
20     any type of repair service using any of these
21     types of equipment or parts or whatever they may
22     be at its facility on Wright Street?
23 A.  No.
24 Q.  Other than the specific references in some of

Page 75

1      these invoices concerning parking lot use,
2      dockage, are there any other services that
3      Shuster or Southeast provides to vessels tied up
4      alongside the pier?
5  A.  Shuster provides no services whatsoever to
6      vessels tied up alongside the pier.
7  Q.  Does Southeast provide shore power to vessels
8      that tie up alongside the pier?
9  A.  I'm sorry?
10 Q.  Does Southeast and/or Shuster provide shore
11     power electricity to vessels that shore up
12     alongside the pier?
13         MS. HARDY:  Objection.  You can
14     answer.
15 A.  Yes.
16 Q.  Does Southeast and/or Shuster provide water to
17     vessels that tie up alongside the pier?
18 A.  Yes.
19         MS. HARDY:  Same objection.
20 Q.  Other than electricity and water, does Shuster
21     and/or Southeast provide any other services to
22     vessels that tie up along its pier?
23 A.  No.
24 Q.  Is there any security provided for vessels that

Page 76

1      tie up alongside the pier?
2  A.  No.
3  Q.  Is the yard at 4 Wright Street locked at night?
4  A.  No.
5  Q.  Is the yard at -- is Shuster and/or the
6      Southeast yard on Wright Street patrolled at all
7      by a security company or a night watchman?
8  A.  No.
9  Q.  Can you explain to me why the charge for
10     bulkhead is higher than the charge for dockage?
11 A.  Yes.
12 Q.  Why is that?
13 A.  Because when we reference bulkhead, that means
14     we are providing the exclusive use of the entire
15     width of the property to accommodate a vessel
16     that's going to be tied up by virtue of the fact
17     that it encompasses the entire width of the
18     property; therefore, closes any other
19     opportunity for us to use that space that's
20     immediately adjacent to our property.  As a
21     result, it commands a premium; so, instead of
22     charging $35 for ordinary dockage, you charge a
23     $100 for that, if you will, exclusivity.
24 Q.  These charges of $35 and $100, are they based

20 (Pages 77 to 80)

| Page 77 |
|---|

1    upon the length of the vessel, or are they just
2    set rates based upon the size of the bulkhead
3    and the pier you're providing?
4            MS. HARDY: Objection. You can
5        answer.
6    A.  Could you ask that question again, please?
7    Q.  Sure. The fee of $35 you referenced and the
8        $100 fee, are those set fees; or if the vessel
9        is a certain length, are you charging the vessel
10       by foot?
11   A.  We're never charging the vessel by the foot.
12   Q.  I'd like to refer back to Exhibits Number 9 and
13       Number 10, I refer first to Exhibit Number 9.
14       The second entry on it refers to five days
15       bulkhead, 8/1/02 to 8/5/02, am I reading that
16       correctly?
17   A.  Yes.
18   Q.  Directing your attention now to Exhibit Number
19       5, which is another invoice we looked at earlier
20       today.
21   A.  Yes.
22   Q.  Under dockage and yard use it has the date
23       7/27/02 through 8/5/02; is that correct?
24   A.  Yes.

| Page 78 |
|---|

1    Q.  And I'm going to ask you, sir, does it appear
2        that there's an overlap from 7/27/02 through
3        8/5/02 on Exhibit 5 and the five days bulkhead
4        from 8/1/05 and 8/5/02 on Exhibit 9?
5    A.  Yes. There's an overlappage in the time frame,
6        yes.
7    Q.  And I'd ask you this as well, Exhibit Number 9
8        is Invoice Number 13833; is that correct?
9    A.  Yes.
10   Q.  Exhibit 5 looks like it was drafted later
11       because it's Invoice Number 13844. Is it safe
12       to say that it was a later invoice as opposed to
13       Exhibit Number 9?
14   A   Yes.
15   Q.  Is it possible that Invoice Number 9 was never
16       actually paid by RDA and that Invoice Number 5
17       was later served on them and that one was paid?
18   A.  No.
19   Q.  Why is that?
20   A.  Because these invoices are for different kinds
21       of activity.
22   Q.  Let me ask you this: As far as your testimony
23       here today and the testimony of Mr. Bombard has
24       shown, there was only one barge that was being

| Page 79 |
|---|

1    used by RDA Construction, correct?
2            MS. HARDY: Objection.
3    A.  I don't know.
4    Q.  On the day of the incident, which was August 1,
5        '02, the plaintiff in his diagram, which was
6        Exhibit 4, shows that there's two fishing
7        vessels along the bulkhead; is that correct?
8    A.  Yes.
9    Q.  And Invoice Number 13833, which is Exhibit 9, is
10       charging RDA for the bulkhead on 8/1/02; is that
11       correct?
12   A.  That's correct.
13   Q.  So, is it possible that this invoice is
14       incorrect, in that RDA's barge was not alongside
15       the bulkhead on 8/1/02?
16   A.  It's unlikely that this invoice is incorrect.
17   Q.  Let me ask you this: We've been provided by
18       your counsel with these various invoices as well
19       as some checks.
20   A.  Yes.
21   Q.  And we've determined through your testimony that
22       Invoice Number 5 was in the amount of $1,025; is
23       that correct? Exhibit Number 5, rather, Invoice
24       Number 13844?

| Page 80 |
|---|

1    A.  13844 is $1,025.
2    Q.  And Exhibit Number 6 in your deposition, which
3        is a check from RDA Construction, was in the
4        amount of $1,025, correct?
5    A.  Yes.
6    Q.  I'll represent to you this, Mr. Shuster, I have
7        not been provided a check that coincides with
8        Number 13833, which is Exhibit Number 9. Do you
9        see one in any of the exhibits that have been
10       provided today?
11   A.  No.
12   Q.  Is it possible that this invoice was never paid
13       by RDA?
14   A.  No.
15   Q.  Why is that?
16   A.  The reason why I know that is we had difficulty
17       collecting money from them and we finally
18       prevailed in collecting the money. So, I always
19       etch those in my memory.
20   Q.  Can you explain to me why your counsel was able
21       to provide a check for -- that appears to
22       coincide with Invoice Number 13844, but I don't
23       have a check that coincides with Invoice Number
24       13833?

Page 81

1  A.  I cannot.
2  Q.  Would your accountant or the accountant for
3      Southeast Development be in possession of a
4      check that would coincide with Invoice Number
5      13833?
6  A.  It's possible.
7  Q.  Let me ask you this:  If the plaintiff's
8      testimony is correct, and he diagrammed it,
9      which is Exhibit 4 in this deposition.
10  A.  Yes.
11  Q.  And it shows two fishing vessels alongside the
12      bulkhead on August 1, '02.
13  A.  Yes.
14  Q.  If this diagram is correct and that in fact is
15      the case on August 1, '02, was RDA improperly
16      charged for bulkhead use on August 1, '02?
17  A.  If Document 4 is correct -- I'm sorry, if
18      Exhibit 4 is correct, then Exhibit 9 would be
19      incorrect.
20  Q.  You might have already answered this question.
21      Who specifically dealt with representatives of
22      RDA concerning the dockage at the Wright Street
23      facility?
24  A.  Steven Shuster.

Page 82

1  Q.  That would be you?
2  A.  I am Steven Shuster.
3  Q.  As you sit here today, do you have any specific
4      recollection concerning a conversation with RDA
5      employees about dockage at the Wright Street
6      facility?
7  A.  No.
8  Q.  Would it refresh your memory or give you any
9      recollection that an employee or employees of
10      RDA specifically requested that they be able to
11      tie the barge alongside the bulkhead and not
12      have it nested alongside another vessel?
13      THE WITNESS:  Do I have a specific
14      recollection of that?
15      MR. McALEER:  Yes.
16  A.  No.  I do not have a specific recollection of
17      that.
18  Q.  Referring back to Exhibit Number 9.  If somebody
19      or a vessel owner was charged for five days of
20      bulkhead use, would that be because they
21      specifically requested to tie up alongside the
22      bulkhead?
23  A.  Yes.
24  Q.  So, it's safe to say that RDA was charged for

Page 83

1      five days of bulkhead usage because they
2      requested that the vessel be tied up alongside
3      the bulkhead?
4  A.  Yes.
5  Q.  Would any situation occur where one vessel would
6      trump another vessel as far as preference for
7      the bulkhead as opposed to being rafted up
8      alongside or nested alongside another vessel?
9      MS. HARDY:  Objection.  You can
10      answer.
11  A.  I don't understand what your question is asking.
12  Q.  Let's just say Fishing Vessel A is tied up
13      alongside the bulkhead and Fishing Vessel B
14      comes in and wants dockage.  Is there any type
15      of hierarchy as to who would get the bulkhead or
16      who would have to raft up alongside the boat
17      that's already at the bulkhead?
18      MS. HARDY:  Objection.
19  A.  There is no hierarchy.
20  Q.  Are there situations or have there been
21      situations where a vessel that's alongside the
22      bulkhead has been asked to move and make room
23      for another vessel to tie up alongside the
24      bulkhead?

Page 84

1  A.  Yes.
2  Q.  When circumstances like that arise, what is the
3      reason why that may occur?  Why one may have to
4      move for another?
5  A.  One may have to -- by virtue of the fact that
6      they need to be in the proximity of the bulkhead
7      line, because maybe they're moving something on
8      or off the vessel.  That's one example.  There
9      are probably others, but that would be what
10      common sense would tell me.
11  Q.  Understandably.  As you sit here today, do you
12      have any other examples?  You said that's one.
13      Do you have any others that come to mind?
14  A.  Yes.  If somebody needed to fuel their vessel,
15      they would probably need to be alongside.
16  Q.  Does Shuster and/or Southeast provide fueling
17      facilities, or would this be when a mobile
18      fueling truck would come alongside?
19  A.  We don't nor do we allow fueling at our
20      facility.
21  Q.  We talked a little bit about shore power,
22      electrical power that's provided to the vessels
23      at the Wright Street facility.  Is there a
24      separate charge for that or is that included in